PEARSON, MJ.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE TITLE INSURANCE ANTITRUST LITIGATION | ) ) ) ) ) ) ) ) ) ) ) | CASE NO. 1:08CV677 <br><br> JUDGE  DAVID D. DOWD, JR. <br><br> MAGISTRATE JUDGE BENITA Y. PEARSON <br><br> **REPORT AND RECOMMENDATION** |

(1:08CV677)

## TABLE OF CONTENTS

**Page**

I.  Introduction....................................................................................................................1

II.  Summary of Findings and Recommendations.......................................................2

III.  Factual and Procedural Background......................................................................5

    A.  The Parties..............................................................................................................5

    B. Plaintiffs' Allegations............................................................................................6

    C.  Defendants' Motions to Dismiss............................................................................7

IV. Standard of Review................................................................................................8

    A.  Rule 12(b)(6)..........................................................................................................8

    B.  Rule 12(b)(1)........................................................................................................10

    C.  Use o f Extrinsic Evidence..................................................................................11

V.  Law and Analysis.................................................................................................13

    A.  The Filed Rate Doctrine.......................................................................................13

        1.  The Doctrine and its Purpose.......................................................................13

        2.  Application of the Doctrine..........................................................................15

            a.  The Filed Rate Doctrine Does Not Provide Full Immunity.............17

            b.  The Filed Rate Doctrine as Applied to the Insurance Industry.....18

        3.  Sherman Act – Federal Antitrust Challenge................................................19

        4.  Valentine Act –  State Antitrust Challenge..................................................21

        5.  Plaintiffs' Arguments against Application of the Filed Rate Doctrine......25

(1:08CV677)

        **a.  Meaningful or Comprehensive Review**..............................................27

        **b.  Lack of an Active Rate Approval Process**........................................30

        **c.  Fraud Exception**........................................................................31

        **d.  Lack of Compliance with Ohio's Laws**............................................33

        **1.  Improper Filing of Rates**........................................................34

        **e.  Application to Injunctive Relief**.........................................................37

**B.  The McCarran-Ferguson Act Exempts Plaintiffs' Sherman Act Claim from Scrutiny**...............................................................................................39

    **1.  The "Business of Insurance"**......................................................42

    **2.  Regulated by State Law**............................................................47

    **3.  Act of Boycott, Coercion, or Intimidation**..................................48

    **4.  Applying the McCarran-Ferguson Anti-trust Exemption**.........................49

**C.  Complaint Fails to State a Claim that Corporate Parent Defendants Engaged in Conspiratorial Behavior**.....................................................................49

**VI.  Conclusion and Recommendation.**.......................................................56

(1:08CV677)

# I.  <u>Introduction</u>

This matter is before the undersigned Magistrate Judge pursuant to a referral from District Court Judge David D. Dowd, Jr. under 28 U.S.C. § 636(b)(1) and Local Rule 72.1.  ECF No. 84. Before the Court are Plaintiffs' Consolidated Amended Complaint, ECF No. 36 (the "Complaint"), Defendants' Motions to Dismiss the Amended Complaint for failure to state a claim and lack of personal jurisdiction and venue (ECF No. 40, ECF No. 41, and  ECF No. 43); Plaintiffs' Oppositions to Defendants' Motions to Dismiss (ECF No. 64 and  ECF No. 77); and Defendants' Reply Memoranda (ECF No. 65, ECF No. 66 and ECF No. 79).  Both sides have also submitted supplemental law and/or responses thereto.  *See* ECF Nos. 96 through 101.

The Complaint presents a putative class action lawsuit that challenges the propriety of state-regulated title insurance rates *(i.e.* price) under both federal and state antitrust laws. Summarily, Plaintiffs allege that Defendants illegally conspired to suppress price competition, artificially raise and maintain title insurance prices and deprive purchasers of title insurance of the benefit of free and open competition.  ECF No. 36 at ¶ 67.  Count One alleges violation of the Sherman Antitrust Act, a federal antitrust statute.  Count Two alleges violation of the Valentine Act, Ohio's antitrust statute.  Both Counts One and Two rely upon the same facts.  Similarly, the Prayer for Relief is the same for both counts; it seeks: (1) declaratory judgments that the alleged conspiratorial behavior of the defendants and their coconspirators be adjudged "an unreasonable restraint of trade" in violation of both the Sherman and Valentine Acts; (2) treble damages; (3) injunctive relief; and (4) any "further relief as may be necessary and appropriate."  ECF No. 36 at

-1-

(1:08CV677)

21.

## II. **Summary of Findings and Recommendations**

All Defendants jointly seek dismissal of the Complaint in its entirety based upon Plaintiffs' failure to state a claim due to the Filed Rate Doctrine, pursuant to Federal Rule of Civil Procedure ("Fed.R.Civ.P." or Rule)12(b)(6), and, alternatively, lack of subject matter jurisdiction due to the McCarran-Ferguson Act, 15 U.S.C. § 1011, *et seq.*, (the "Act"), pursuant to Federal Rule of Civil Procedure 12(b)(1).  ECF No. 43.  Additionally, one corporate parent defendant seeks dismissal, pursuant to Fed.R.Civ.P.12(b)(6), due to Plaintiffs' failure to allege that the parent agreed or conspired  to commit anti-competitive behavior.  ECF No. 40.  That same corporate parent defendant and one other also seek dismissal due to lack of personal jurisdiction and improper venue, pursuant to Fed.R.Civ.P 12(b)(2) and (3).  ECF Nos. 40 & 41. Plaintiffs argue that neither the  filed rate doctrine nor McCarran-Ferguson Act bar their claims that Defendants violated the Sherman Act, 15 U.S.C. § 1, and Ohio's Valentine Act, O.R.C. § 1331.01 *et seq.*, Counts One and Two, respectively, that venue is proper and that the Court has personal jurisdiction.

Defendants may possibly have placed more weight on the Filed Rate Doctrine and the McCarran-Ferguson Act than each can each bear.  Neither independently hefts enough weight to resolve the entire matter.  The Filed Rate Doctrine bars monetary damages for rate-related claims but it does not bar non-rate-related relief such as injunctive or, possibly, declaratory relief. Similarly limited, the McCarran-Ferguson Act bars federal but not state antitrust claims.  Thus, the McCarran-Ferguson Act would not eliminate the state antitrust claim, Count Two.  Because

(1:08CV677)

the state law claim is a class-action, albeit putative at this stage, the Court has diversity

jurisdiction, pursuant to 28 U.S.C. § 1332(d)(2).[1]  Therefore, the state antitrust claim would

survive on the federal docket even with the dismissal of the Sherman Act claim in Count One.

A motion pursuant to Federal Rule of Civil Procedure 12(b)(1) raises the fundamental

question whether the federal district court has subject matter jurisdiction over the action before it.

"It is universally recognized by the federal courts, the objection presented by a motion under

Rule 12(b)(1) challenging the court's subject matter jurisdiction is that the district judge had no

authority or competence to hear and decide the case before it."  Wright & Miller, 5B Federal

Practice and Procedure § 1350 at 64 (2004).  Typically, the Court is bound to consider the Rule

12(b)(1) motion first, since the Rule 12(b)(6) challenge becomes moot if the Court lacks subject

matter jurisdiction.  *See* *Bell v. Hood*, 327 U.S. 678, 682 (1946) (motion to dismiss for failure to

state a cause of action may be decided only after establishing subject matter jurisdiction, since

determination of the validity of the claim is, in itself, an exercise of jurisdiction); Wright &

Miller, 5 Federal Practice and Procedure § 1350 at 548 (1969).

Although *entitled* a 12(b)(1) challenge to jurisdiction, because the McCarran-Ferguson

Act, like the filed rate doctrine, raises a defensive rather than a jurisdictional bar to Plaintiffs'

---

[1] The Complaint alleges the Court has jurisdiction over the state law claim pursuant to the recently enacted Class Action Fairness Act of 2005 ("CAFA") codified at 28 U.S.C. § 1332(d). ECF No. 36 at ¶ 8. CAFA expanded federal jurisdiction over putative class actions lawsuits in which the amount in controversy exceeds $5 million.  More specifically, in the context of such lawsuits, CAFA relaxed the complete diversity requirement in favor of "minimal diversity," requiring only that one plaintiff class member be diverse from one defendant.  28 U.S.C. § 1332(d)(2).  Mindful of its obligation to determine whether the Court would retain jurisdiction of the state law claim after dismissal of the federal claim, the undersigned found no CAFA exceptions to be a bar to jurisdiction.  *See also* note 23, *infra*.

-3-

(1:08CV677)

recovery, the undersigned believes the 12(b)(1) motion was mischaracterized and should have

been labeled a 12(b)(6) motion.[2]  Additionally, because Defendants intended a facial rather than

factual 12(b)(1) attack, the ultimate effect of this distinction is minimal.[3]  It does, however,

eliminate concerns regarding a lack of subject matter jurisdiction.

     With these matters in mind, the Filed Rate Doctrine analysis is presented first because the

Filed Rate Doctrine, unlike the McCarran-Ferguson Act, potentially resolves the entire matter.[4]

Additionally, the order of presentation was informed by the conclusion that Defendants should

prevail in dismissing each count, to the extent legally permissible.

     Thus, for reasons provided in greater detail below, the undersigned recommends

dismissal without prejudice of both counts in the Complaint.  A "without prejudice" dismissal

would permit Plaintiffs an opportunity to (once again) modify the Complaint in order to present a

---

    [2] *See In re Industrial Life Insurance Litigation*, 148 F. Supp.2d 719, 722 (E.D. La.  2001) (finding that neither the filed rate doctrine nor the McCarran-Ferguson Act erect jurisdictional bars and distinguishing, on other grounds, *Dana Corp. v. Blue Cross & Blue Shield Mutual of Northern Ohio*, 900 F.2d 882, 888 (6th Cir. 1990) (affirming denial of 12(b)(1) motion for lack of jurisdiction) as not having a McCarran-Ferguson issue and merely turning on questions related to Ohio administrative process while vaguely mentioning the Act); *Phelps v. Nationwide Ins. Co.*, 37 Fed. Appx. 752 **2 (finding the McCarran-Ferguson Act does not provide an independent basis for federal jurisdiction); *Equal Employment Opportunity Commission v. Wooster Brush Co.*,1980 WL 279, *1-2 (N.D. Ohio Nov. 25, 1980) (finding motion to dismiss for lack of subject matter jurisdiction pursuant to 12(b)(1) was mischaracterized given that dismissal pursuant to the McCarran-Ferguson act is merit-based, not jurisdictional so recharacterized as a 12(b)(6)).

    [3] Defendants only mentioned "12(b)(1)"once in their otherwise thorough pleadings.  *See* ECF No. 43 at 8.  Even then no standard of review was suggested, creating the impression that Defendants are not firmly wedded to a 12(b)(1) dismissal.

    [4] If the dismissal is granted without prejudice, as recommended, opportunities for injunctive relief may survive as discussed in greater detail below.

(1:08CV677)

prayer for non-rate-related injunctive or declaratory relief that might survive the Filed Rate

Doctrine relative to all Defendants other than the corporate parent defendants.[5]  Regarding, the

corporate parent defendants, a without prejudice dismissal would permit the Plaintiffs to amend

the Complaint to meet the *Twombly*/*Iqbal* standard, if possible.

### III.  Factual and Procedural Background

#### A.  The Parties

Plaintiffs Jordan Katz, Craig Mintz, Sean Nightengale, Carol A. Rhamy, Micah Watts,

Katherine A. Wirkus, Gaby and Gina Hasrouni, and Adam C. Falkner filed this action on behalf

of themselves and others similarly situated.[6]  Defendants are comprised of three types: title

insurance companies, their five corporate parents and the sole entity with which the title

insurance companies submit their title insurance rates, the Ohio Title Insurance Rating Bureau,

Inc ("OTIRB").[7]

---

[5] Case law is silent as to the file rate doctrine's effect on prayers for declaratory relief. Logic, however, dictates that the filed rate doctrine applies to filed rates not those which have not yet been filed, i.e. those to be filed in the future.  *See also* note 33,, infra.

[6] Judge Dowd consolidated the following cases: 1:08-CV-00678,1:08-CV-00741, 4:08-CV-00750, 1:08-CV-00803, 1:08-CV-01021, 5:08-CV-01289, and 1:08-CV-01836.  *See* ECF No. 37.  Civil action 1:08-CV-677 is the Lead Case.  *See* ECF No. 37.

[7] Specifically, Plaintiffs have named the following title insurance companies as defendants: Fidelity National Title Insurance Company, Chicago Title Insurance Company, Ticor Title Insurance Company, Security Union Title Insurance Company, Ticor Title Insurance Company of Florida, First American Title Insurance Company, United General Title Insurance Company, Ohio Bar Title Insurance Company, Port Lawrence Title and Trust Company, T.A. Title Insurance Company, Censtar Title Insurance Company, Commonwealth Land Title Insurance Company, Lawyers Title Insurance Corporation, Transnation Title Insurance Company, Stewart Title Guaranty Company, National Land Title Insurance Company, and Old Republic National Title Insurance Company.  The parent corporation Defendants are Fidelity

(1:08CV677)

### B. **Plaintiffs' Allegations**

Plaintiffs allege that Defendants collectively formed and are members of the OTIRB.[8]

ECF No. 36 at 2 ¶ 5.  Through the OTIRB, Defendants submit title insurance rates to the Ohio

Department of Insurance ("ODI") for approval.  ECF No. 36 at 2 ¶ 5.  Plaintiffs claim these rates

"become effective if not disapproved by the Department of Insurance withing thirty days." ECF

No. 36 at 2 ¶ 5.  Plaintiffs also claim that ODI cannot regulate the reasonableness of these

submitted rates because the "rates are based principally on undisclosed costs" that consist of

"kickbacks, referral fees and other expenses" for the purpose of generating business referrals

from individuals and entities that are part of the "home purchase scenario."  ECF No. 36 at 3 ¶ 6.

The Complaint alleges that "Plaintiffs and Class members purchased title insurance at

artificially maintained, non-competitive prices established by the actions of defendants in

connection with restraints of trade" and "paid inflated prices for title insurance."  ECF No. 36 at

10-11 ¶ 29.  Plaintiffs allege that "defendants, and their co-conspirators engaged in contract,

combination and conspiracy in unreasonable restraint of interstate trade and commerce in

violation of Section 1 of the Sherman Act."  ECF No. 36 at 18 ¶ 57.

Essentially, Plaintiffs allege the title insurance rate filed with the Ohio Department of

---

National Financial, Inc. (¶ 12), First American Corporation (¶ 14), Land America Financial
Group, Inc.(¶16), Stewart Information Services Corporation (¶ 18), and Old Republic
International Corporation (¶ 20).

[8]  In Ohio, title insurers are permitted to become members of a rating bureau in order to
submit rates to ODI for approval.  O.R.C. § 3935.04(B).  Ratings Bureaus are licensed by ODI
and membership is not required.  O.R.C. §§ 3935.04 & 3953.28.  A rating bureau submits rates
on behalf of its members for approval by ODI and must charge only those rates approved by ODI,
which become the filed rate.  O.R.C. §§ 3935.04 & .07.

(1:08CV677)

Insurance is the result of a horizontal price-fixing agreement and is therefore violative of the

Sherman Act and Ohio's antitrust law known as the Valentine Act.  Plaintiffs allege injury

because they "paid more for [title insurance] than [they] would have . . . paid in the absence of

said antitrust violations."  ECF No. 36 at 20 ¶ 68.  Plaintiffs seek a presently undetermined

amount of treble damages and declaratory and injunctive relief against all Defendants.  ECF No.

36 at 20 ¶ 68 & 21.

### C.  **Defendants' Motions to Dismiss**

Stewart Information Services Corporation seeks dismissal for lack of personal

jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(2).  *See* ECF No. 40.  Old

Republic International Corporation seeks dismissal, pursuant to Federal Rules of Civil Procedure

12(b)(2), (3), and (6).  *See* ECF No. 41.  All Defendants jointly seek dismissal with prejudice,

pursuant to Federal Rules of Civil Procedure 12(b)(1) & (6).[9]  ECF No. 43.

Defendants' reply in support, ECF No. 79, filed on March 16, 2009, asserts that

Plaintiffs' attempts to create exceptions to the filed rate doctrine fail as they do not exist pursuant

to case law.  Defendants also assert that their rate making activities are regulated by state law and

that the fixing of rates is the business of insurance.

---

[9] In light of the undersigned's recommendation of dismissal of the entire matter on other grounds, it unnecessary to rule upon the challenges to personal jurisdiction and venue, *i.e.,* the 12(b)(2) and (3) motions.  *See Weber v. National Football League,* 112 F. Supp.2d 667, 671 (N.D.Ohio 2000)(dismissing Sherman Act claims under Fed. R. Civ.P. 12(b)(6) and noting that "it would be premature to examine the . . . defendants' objections to jurisdiction and venue of those claims without first making a determination of whether plaintiff has stated a claim under antitrust statutes in the first instance").

(1:08CV677)

The parties appeared before the undersigned  for oral argument.  *See* ECF  No. 95

(Transcript).  Subsequently, the parties also provided the Court with supplemental authority.  *See*

ECF Nos. 96 through 101.  Consequently, the Court renders this Report and Recommendation

having had the benefit of the parties' additional viewpoints.

### IV.  **Standard of Review**

Defendants' joint motion seeks the dismissal of Plaintiffs' claims pursuant to Rule

12(b)(6), due to the filed rate doctrine, and 12(b)(1), due to the McCarran-Ferguson Act.  *See*

ECF No. 43.  Old Republic International Corporation ("ORO") also seeks dismissal, pursuant to

Federal Rules of Civil Procedure 12(b)(6) but on different grounds, as discussed in Section C

below.[10]  *See* ECF No. 41.

Although the joint motion invokes both Rules 12(b)(6) and 12(b)(1), neither party

distinguishes or describes the nature and purpose of either rule, the procedure for dismissal under

either rule, or the applicable standards of review.  Given that the standard of review is an

essential component of a judicial opinion, the Court must give due attention to the applicable

standard of review.

### A.  **Rule 12(b)(6)**

According to *Bell Atl. Corp. v. Twombly*, in order to survive a Rule 12 motion to dismiss

for failure to state a claim, "'grounds' of [plaintiff's] 'entitle[ment] to relief,' requires more than

---

[10] As noted above, all other motions to dismiss, *e.g.* Stewart Information Services Corporation's motion to dismiss for lack of personal jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(2) and ORI's motions pursuant to 12(b)(2) and (3) should be denied as moot, given the undersigned recommendations of dismissals on other grounds.  *See* ECF No. 40.

-8-

(1:08CV677)

labels and conclusions, and a formulaic recitation of the elements of a cause of action."[11]  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Ashcroft v. Iqbal, et al.*, 129 S.Ct. 1937, 1950 (2009); Fed.R.Civ.P. 12(b)(6).  That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Twombly*, 550 U.S. at 555 (internal citation omitted); *see Assoc. of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007) (recognizing that the Supreme Court "disavowed the oft-quoted Rule 12(b)(6) standard of *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)").

*Iqbal* made clear that *Twombly* was based upon "[t]wo working principles."  *Iqbal*, 129 U.S. at 1949.  First, "[a]lthough for the purposes of a motion to dismiss[, courts] must take all of the factual allegations in the complaint as true, courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"  *Iqbal*, 129 U.S. at 1949-50 (*citing Twombly*, 550 U.S. at 555).  "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss.  Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal,* 129 U.S. at 1950 (internal citations omitted).  Per *Twombly*, claims set forth in a complaint must be plausible, rather than conceivable.  *Twombly*, 550 U.S. at 570. "[W]here well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged  - but it has not 'show[n]'—'that the pleader is entitled to

---

[11]In *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1953 (2009), the Supreme Court made it clear that "[o]ur decision in *Twombly* expounded the pleading standard for 'all civil actions,' and it applies to antitrust and discrimination suits alike."

-9-

(1:08CV677)

relief.'" *Iqbal,* 129 U.S. at 1950 (*citing* Fed.R.Civ.P. 8(a)(2)).  However, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Id.*

In the realm of antitrust litigation,  "[a]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly,* 550 U.S. at 556.  In the context of a § 1 Sherman Antitrust claim, "such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made."  *Id.*

**B.  Rule 12(b)(1)[12]**

A Rule 12(b)(1) motion to dismiss an action for lack of subject matter jurisdiction may be premised on a facial attack or a factual attack.  *See Abdelkhaleq v. Precision Door of Akron*, No. 5:07cv3585, 2008 WL 3980339, at *2 (N.D.Ohio Aug.21, 2008) (O'Malley, J.).  A facial attack tests the adequacy of the complaint, *Scheuer v. Rhodes*, 416 U.S. 232, 235-37 (1974), overruled on other grounds by *Davis v. Scherer*, 468 U.S. 183 (1984), while a factual attack evaluates the actual existence of subject matter jurisdiction, *Ohio Hosp. Ass'n v. Shalala*, 978 F.Supp. 735, 739 (N.D. Ohio 1997).  The importance of this distinction has to do with the nature of the Court's consideration of the facts and allegations presented in connection with the Rule 12(b)(1) motion.

---

[12] As explained above, the undersigned believes the 12(b)(1) to be a mischaracterization. Nevertheless, out of an abundance of caution, the standard of review pursuant to 12(b)(1) is provided.  The standard of review for a facial challenge such as that mounted in the instant case, essentially mirrors that of a 12(b)(6) motion.

(1:08CV677)

If the motion presents a facial attack,  the Court must take all of the material allegations in the complaint as true and construe them in the light most favorable to the non-moving party.  *United States v. Richie*, 15 F.3d 592, 598 (6th Cir.1994) cert. denied. 513 U.S. 868, 115 S.Ct. 188, 130 L.Ed.2d 121 (1994) (*citing Scheuer*, 416 U.S. at 235-37).  In contrast, if the motion presents a factual attack, then the Court is free to consider extrinsic evidence and may weigh the evidence of its own jurisdiction without affording the plaintiff the presumption of truthfulness. *Abdelkhaleq*, 2008 WL 3980339 at *2 (*citing Ritchie*, 15 F.3d at 598); *Rogers v. Stratton Indus., Inc.*, 798 F.2d 913, 915 (6th Cir.1986); *see also Ernst v. Rising*, 427 F.3d 351, 372 (6th Cir.2005).  "[W]here subject matter jurisdiction is challenged under Rule 12(b)(1) . . . the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Rogers v. Stratton Indus., Inc.*, 798 F.2d at 915.

Based upon review of Defendants' joint motion to dismiss, the undersigned finds and defense counsel has agreed that the motion, ECF No. 43, presents a facial attack *via* Rule 12(b)(1).[13]  When reviewing a facial attack, a district court takes the allegations in the complaint as true, which is a similar safeguard employed under 12(b)(6) motions to dismiss.  *See Gentek Building Products, Inc. V. Sherwin-Williams*, 491 F.3d 320, 330 (6th Cir. 2007).

### C.  Use of Extrinsic Evidence

Plaintiffs were permitted limited discovery before responding to Defendants' joint motion.  ECF No. 52.  As part of that discovery, Plaintiffs' conducted a Rule 30(b)(6) deposition

---

[13]  At oral argument, defense counsel agreed that its joint Rule 12(b)(1) motion presents a facial rather than factual attack on the Complaint.  ECF No. 95 at 79 lines 6-7 ("In either case, we're looking just at the face of the pleadings.) (Attorney Coleman).

(1:08CV677)

of an employee of the Ohio Department of Insurance.  Plaintiffs cite the testimony of that

deponent, Maureen Motter, in opposition to both prongs of Defendants' joint motion.  *See e.g.*,

ECF No. 77 at 11-13 (filed rate doctrine) & 33-34 (McCarran-Ferguson Act).  Defendants

correctly respond that the deposition is extrinsic evidence of which the Court cannot take judicial

notice and, therefore, cannot be considered in ruling upon the Rule 12(b)(6) motion without first

converting that motion to a Rule 56 motion for summary judgment.[14]  *See* ECF No. 79 at 12 n.1

(acknowledging that the Court can consider Exhibits 1, 3, and 4 as they are public records, unlike

the Motter deposition).  As Defendants acknowledge the 12(b)(1) motion mounts a facial attack,

the overall analysis is limited to the face of the Complaint and the few public records integral to

the Complaint of which the Court can take judicial notice.

In sum, the undersigned will consider all allegations in the Complaint as true and limit its

use of materials outside of the pleadings to those matters which are of public record.[15]

## V.  Law and Analysis

---

[14] Regarding a 12(b)(1 ) motion, a conversion to a factual attack would eliminate the
presumptive truthfulness which otherwise attaches to Plaintiffs' allegations and permit evidence
to be weighed in order to resolve factual disputes.  *See Wenz v. Rossford Ohio Transp.*
*Improvement Dist.*, 392 F. Supp.2d 931, 934 (N.D. Ohio 2005).  Although the Rule 12(b)(1)
standard of review permits (under certain circumstances) the Court to resolve factual disputes,
that opportunity is something the undersigned finds unnecessary in the instant case and notes that
the task was not requested by either party, given that   Plaintiffs' posed no objection either orally
or in writing to Defendants' prescribed limited use of its attached Exhibits.

[15] Regarding the motion for dismissal due to the McCarran-Ferguson Act, the undersigned
notes that Plaintiffs' references to the Motter Deposition (although not exclusively) are focused
on her testimony about Bulletin 91-1, a document publicly available.  And, as Plaintiffs' indicate,
Bulletin 91-1 speaks for itself.  *See* ECF 77 at 34 n.26.

(1:08CV677)

### A.   The Filed Rate Doctrine

Defendants assert that the filed rate doctrine "bars antitrust claims that are based on an allegation that rates filed with a regulatory agency are too high."  ECF No. 43-2 at 6.  Defendants assert that the filed rate doctrine bars both Plaintiffs' federal and state antitrust claims.

### 1.   The Doctrine and its Purpose

The filed rate doctrine, also known as the filed tariff doctrine, is a principle originating in federal law that recognizes the unsuitability of a court in determining "reasonable" rates, giving deference to regulatory agencies that have been designed by legislatures for the specific purpose of setting uniform rates.  According to this doctrine, judicial intervention cannot be used to second-guess and challenge rates that have been approved by a regulatory agency with the requisite authority to approve such rates.  *See* Holmes, Antitrust Law Handbook § 8:6 Dec. 2008).  "The filed rate doctrine reflects judicial thinking that application of antitrust standards could undermine and clash with the applicable agency's regulatory scheme and decisions."  *Id.* The Supreme Court of the United States first applied the doctrine to an antitrust matter in *Keogh v. Chicago & Northwestern Railway, Co.,* 260 U.S. 156 (1922).[16]  In *Keogh,* the Court affirmed

---

[16]  Although *first* applied to an antitrust case in *Keogh*, the origin of the filed rate doctrine can be traced back to the Supreme Court's ruling in *Texas & Pacific Railway v. Abilene Cotton Oil Co.*, 204 U.S. 426 (1907) in which the Court addressed the issue of whether a shipper could maintain a common law action for damages against a common carrier for "the exaction of an alleged unreasonable rate, although the rate collected and complained of was the rate stated in the schedule filed with the Interstate Commerce Commission." *Id.* at 436.  The Court reasoned that the existence of the shipper's right to recover damages due to the unreasonableness of the established rate was "wholly inconsistent with the administrative power conferred upon the [ICC], and with the duty, which the [Interstate Commerce Act] casts upon that body, of seeing to it that the statutory requirement as to uniformity and equality of rates is observed." *Id.* at 440-41.

-13-

(1:08CV677)

the dismissal of a shipper's antitrust claim against interstate freight carriers, even though the carriers were allegedly conspiring to set artificially high tariff rates, because the Interstate Commerce Commission had previously approved the rates as being "reasonable and nondiscriminatory."  *Id.* at 162 (*finding* that plaintiff may not recover under federal antitrust laws for asserted injury related to paying the rate approved by the ICC).  Since the 1920s, federal courts have applied the filed rate doctrine in a variety of contexts to bar monetary recovery by those who claim injury by virtue of having paid a filed rate.

Under the doctrine, rates filed with and approved by a regulatory agency are "*per se* reasonable and unassailable in judicial proceedings brought by ratepayers."  *Wegoland Ltd. v. NYNEX Corp.,* 27 F.3d 17, 18 (2d Cir. 1994).  The trigger for application of the doctrine requires only that the rates be filed with the appropriate regulatory agency.[17]  *See also  Square D Co. v. Niagara Frontier Tariff Bureau, Inc.,* 476 U.S. 409, 417 (1986) (stating that a plaintiff may not recover under federal antitrust laws for an asserted injury related to paying the rate approved by the ICC).  When a regulated entity has filed rates with a federal or state agency, the doctrine bars claims that challenges the rates as unreasonable or unlawful.  *Square D Co.,* 476 U.S. at 417, n. 19 (finding the filed rate doctrine bars "treble-damage action" against motor carriers under antitrust laws despite allegations of "covert legal violations" resulting in artificially high filed rates).

In *Keogh*, the Supreme Court explained its policy principles underlying the filed rate

---

[17] In the instant matter, the rates Plaintiffs complain of are the only rates Defendants are permitted to charge, given they are the only filed rates.  *See* O.R.C. § 3935.04(H).

-14-

(1:08CV677)

doctrine.  Chief among them was the Courts' limited ability to determine the reasonableness of rates.  The doctrine serves to ensure that courts do not "substitute [their] judgment as to reasonable rates for that of an agency with specialized knowledge of the area."  *County of Suffolk,* 154 F. Supp. 2d at 385.  This principle pertains to the "justiciabilty" of determining reasonable rates.  The Second Circuit has explained that, "Courts are simply ill-suited to systematically second guess the regulators' decisions . . . ."  *Wegoland,* 27 F.3d at 21.  An assessment of damages would inevitably require an independent rate determination proceeding requiring a court to guess what (presumably) lower rate the agency should have chosen.  *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 402 (7th Cir. 2000) (finding that filed rate doctrine barred consumer's claim for overcharges by incumbent local exchange carrier).

Additionally, the filed rate doctrine prevents regulated companies from engaging in price discrimination between ratepayers.  *Keogh,* 260 U.S. at 163*; Town of Norwood, Mass. v. New England Power Co.* , 202 F.3d 408, 419 (1st Cir. 2000); *Marcus v. AT&T Corp.,* 138 F.3d 46, 58 (2d Cir. 1998).  Awarding damages to certain plaintiffs while leaving less litigious customers paying the filed rates would be discriminatory.  *Keogh,* 260 U.S. at 163-64; *Goldwasser*, 222 F.3d at 402.  Problematically, if courts were able to award damages according to their assessment of reasonable rates, plaintiffs would end up paying different rates than non-suing ratepayers.  *See Wegoland,* 27 F.3d at 21.  It is exactly this type of price discrimination that the filed rate doctrine seeks to prevent.

### 2.  Application of the Filed Rate Doctrine

Since *Keogh*, the United States Supreme Court has applied the filed rate doctrine to a

-15-

(1:08CV677)

variety of cases, including antitrust, to impede claims that directly or indirectly attack rates that have been filed with the appropriate regulating authority.  *See e.g. Maislin Indus., U.S., Inc. v. Primary Steel, Inc. 497 U.S. 116, 128 (1990)* (noting "[d]espite the harsh effects of the filed rate doctrine, we have consistently adhered to it"); *Arkansas La. Gas Co. v. Hall et al., 453 U.S. 571, 577 (1981)* (filed rate doctrine prohibits seller of natural gas from collecting rate different than one it filed with Federal Power Commission, noting doctrine has been extended across spectrum of regulated utilities);  *Square D Co., 476 U.S. at 417* (affirming continued validity of decision in *Keogh* in antitrust cases; "This stringent rule prevails because otherwise the paramount purpose of Congress-- prevention of unjust discrimination – might be defeated.").

Similarly, federal circuit courts have also applied the filed rate doctrine as a bar to antitrust litigation seeking monetary damages dependent upon a filed rate.  *See e.g., Pinney Dock & Transport Co. v. Penn. Cent. Corp., 838 F.2d 1445, 1482 (6th Cir. 1988)* (holding that "under Keogh . . . all rate-related claims made by plaintiffs, whether state or federal, must be dismissed."); *AT & T Corp. v. JMC Telecom, LLC, 470 F.3d 525, 535 (3d Cir. 2006)* (state law claims for fraud and negligent misrepresentation barred by filed rate doctrine where court would be forced to determine what reasonable rate would be to assess damages); *In re Mirant Corp., 378 F.3d 511, 518 (5th Cir. 2004)* (under filed rate doctrine, reasonableness of rates and agreements regulated by FERC may not be collaterally attacked in state or federal courts); *Arsberry v. Illinois, 244 F.3d 558, 562 (7th Cir. 2001)* (filed rate doctrine bars plaintiff in federal district court from seeking to invalidate or modify filed rate or seeking damages based on difference between actual and hypothetical lawful tariff); *Town of Norwood v. FERC, 202 F.3d*

-16-

(1:08CV677)

408, 416 (1st Cir. 2000) (filed rate doctrine limits attacks outside regulatory process on rates filed

with federal regulatory agencies); *Wegoland, Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994)

(filed rate doctrine holds any rate approved by governing regulatory agency is per se reasonable

and unassailable in judicial proceedings brought by ratepayers); *H.J. Inc. v. Nw. Bell Tel. Co.*,

954 F.2d 485, 484 (8th Cir. 1992) (finding the filed rate doctrine applies to rates promulgated by

state as well as federal agencies).

### a.  The Filed Rate Doctrine Does Not Provide Full Immunity

The filed rate doctrine does not provide full immunity from antitrust attacks on filed

rates.  In fact, the doctrine only acts a legal barrier to rate-related (monetary) damages.[18]  *Accord*

*Georgia v. Pennsylvania R. Co.*, 324 U.S. 439 (1945) (*restating* the *Keogh* holding and holding

that, although plaintiff could not maintain a suit under the antitrust laws to obtain damages, it

could obtain injunctive relief against the collective rate-making procedures).  "[C]ollective rate-

making activities are not immunized from antitrust scrutiny simply because they occur in a

regulated industry."  *Square D Co.*, 476 U.S. at 421.  Rather, *Keogh* holds that "an award of

treble damages is not an available remedy," but regulated companies remain "subject to scrutiny

under the antitrust laws by the Government and to possible criminal sanctions or equitable

relief."  *McCray v. Fidelity Nat'l Title Ins. Co.*, --- F.Supp.2d ---, 2009 WL 2170694 at 9 (D. Del.

---

[18]  Recognizing the "powerful role" of an award of treble damages, the Supreme Court
has acknowledged that "[t]he treble damages provision wielded by the private litigant is a chief
tool in the antitrust enforcement scheme, posing a crucial deterrent to potential violators. []
Granting this role its due respect, however, a critical distinction remains between an absolute
immunity from all antitrust scrutiny and a far more limited nonavailability of the private treble-
damages remedy."  *Square D Co.*, 476 U.S. at 422 n.28 (internal citations and quotations
omitted).

-17-

(1:08CV677)

Jul. 15, 2009) (*citing Square D Co.*, 476 U.S. at 422).  However, "certain non-rate related claims

must survive," at least initially.  *See Pinney Dock & Transp. Corp., 838 F.2d at 1482.*

### b.  <u>The Filed Rate Doctrine as Applied to the Insurance Industry</u>

Notably, numerous federal district courts have applied the filed rate doctrine to actions

involving insurers.  *Id.* at 9 (*citing Rios v. State Farm Fire & Cas. Co.*, 469 F.Supp.2d 727,737

(S.D. Iowa 2007) (applying filed rate doctrine to common law claim seeking return of insurance

premiums); *Mullinax v. Radian Guar. Inc.*, 311 F. Supp.2d 474, 484 n.6 (M.D.N.C. 2004) (filing

of rate by defendant with state Department of Insurance bars plaintiffs from challenging

reasonableness of those rates); *Kirksey v. Am. Bankers Ins. Co.,* 114 F.Supp.2d 526, 529 (S.D.

Miss. 2000) (applying filed rate doctrine to common law claim seeking return of insurance

premiums); *Stevens v. Union Planters Corp.*, 2000 WL33128256, at*3 (E.D. Pa. Aug. 22, 2000)

(allegation of kickbacks in forced hazard insurance scheme barred by filed rate doctrine); *Allen v.

State Farm Fire & Cas. Co.*, 5 F. Supp.2d 1217, 1229 (S.D. Ala.1999) (filed rate doctrine barred

claim challenging unlawfulness of rate filing by insurance company); *Korte v. Allstate Ins. Co.,*

48 F. Supp.2d 647, 651 (E.D. Tex. 1999) (applying filed rate doctrine to claim asserting

insurance rates improper due to submission by defendant of illegal subsidy factor accounts to

state insurance regulator because state agency determined reasonable rates pursuant to statutory

scheme); *Morales v. Attorney's Title Ins. Fund, Inc.*, 983 F. Supp. 1418, 1429 (S.D. Fla. 1997)

(dismissing plaintiffs' kickback claim against title insurer pursuant to filed rate doctrine because

claim was nothing more than challenge to title insurance rates set by state regulators); *Calico

Trailer Mfg. Co., Inc.v. Ins. Co. Of N. Am.*, 1994 WL 823554 at *6 (E.D. Ark. Oct. 12, 1994)

(1:08CV677)

(filed rate doctrine barred plaintiffs' challenge to insurance rates as inflated as result of conspiracy among defendant insurance companies). Therefore, the application of the filed rate doctrine to the title insurance industry is not an unsupported intellectual stretch. *See Winn, et al. v. Alamo Title Ins. Co., et al.*, Case No. A-09-CA-214-SS (W.D.Tex. May 14, 2009) (*applying filed rate doctrine to Texas' title insurance regime for the first time and granting dismissal)*(ECF No. 87-2); *see also McCray v. Fidelity Nat'l Title Ins. Co.*, --- F.Supp.2d ---, 2009 WL 2170694 at 9 (D. Del. Jul. 15, 2009) (ECF NO. 98) (*dismissing* claims against title insurance defendants pursuant to filed rate doctrine) ; *Dolan v. Fidelity National Title Insurance Co.*, No. 08-CV-0046 (E.D.N.Y. June 17, 2009)(ECF No. 96) (same); *In re Pennsylvania Title Ins. Antitrust Litigation*, --- F.Supp.2d ---, 2009 WL 2190669 (E.D.Pa. July 21, 2009) (ECF No. 101) (same).

### 3. **Sherman Act – Federal Antitrust Challenge**

Plaintiffs' allege violations of both federal and state antitrust laws. A plethora of courts have held that the filed rate doctrine applies to a federal antitrust challenge to a rate filed with federal as well as state regulatory agencies. In such cases, federal antitrust policy governs and the federal filed rate doctrine applies. *See e.g.*, *Uniforce Temp. Pers., Inc. v. Nat'l Council on Comp. Ins., Inc.*, 892 F.Supp. 1503 (S.D. Fla. 1995) (applying federal filed rate doctrine to rate filed with state regulatory agency); *Guglielmo v. Worldcom, Inc.* 808 A.2d 65 (N.H. 2002) (prison inmates' state antitrust law complaint about excessive rates charged by prison pay phones preempted by federal law's filed rate doctrine); *accord Taffet v. S. Co.*, 967 F.2d 1483, 1494 (11th Cir. 1992) (amid allegations violating RICO, court held "the filed rate doctrine applies whether the rate in question is approved by a federal or state or agency") (*quoting H. J. Inc. v.*

(1:08CV677)

*Nw. Bell Tele. Co.*, 954 F.2d 485, 494 (8th Cir. 1992) (RICO claims barred by filed rate

doctrine).

The undersigned has not found nor has any party presented authority prohibiting the

application of the filed rate doctrine because a state agency, rather than a federal one, authorized

or regulated the rates at issue.  *See e.g.*, ECF No. 98-2 (*McCray*, --- F.Supp.2d ---, 2009 WL

2170694 at 7).  The far majority of courts that have ruled on the applicability of the filed rate

doctrine to state-regulated rates has applied some version of a filed rate doctrine to bar a state

antitrust challenge to a state-regulated rate.[19]  Plaintiffs have "presented no reason to distinguish

between rates promulgated by state and federal agencies. [The Court is] persuaded that the

rationale underlying the filed rate doctrine applies whether the rate in question is approved by a

federal or state agency."  *H.J. Inc.*, 954 F.2d  at 494. The undersigned is aware of only two cases

wherein the court refused to apply the filed rate doctrine to state antitrust challenge of a state

---

[19]  Such cases include the following. *See e.g.*, *Texas Commercial Energy v. TXU Energy, Inc.*, 413 F.3d 503 (5th Cir. 2005) (doctrine barred both state and federal antitrust claims based on rates filed with a state regulatory agency); *Coll v. First Am. Title Ins. Co.*, No. CIV 06-348, Dkt. No.141 (D.N.M. Apr. 21, 2008) (doctrine barred state law claims based on title insurance rates filed with a state insurance department) (ECF 43-2) ; *Fersco v. Empire Blue Cross/Blue Shield of New York*, 1994 WL 445730 (S.D.N.Y. Aug. 17, 1994) (doctrine barred both state and federal claims based on rates filed with a state insurance department); *Amundson & Assocs. Art Studio, Ltd. v. National Council on Compensation Ins.*, 988 P.2d 1208 (Kan.App. 1999) ("filed rate" doctrine barred claim based on insurance rates filed with state agency); *N.C. Steel, Inc. v. Nat'l Council on Comp. Ins.*, 347 N.C. 627 (N.C. 1998) (adopting "filed rate" doctrine under North Carolina law; complaint was that insurers withheld information from regulator, forcing plaintiffs to pay more for insurance); *Minihane v. Weissman*, 640 N.Y.S. 2d 102 (N.Y. App. Div. 1996); *Prentice v. Title Insurance Co.*, 176 Wis.2d 714 (Wis. 1993), cert. Denied, 510 U.S. 1113 (1994) (doctrine barred state law antitrust claim based on rates filed with a state insurance department); *Teleconnect Co. v. U.S. West Commc'ns, Inc.*, 508 N.W.2d 644, 648-649 (Iowa 1993) (similar).

-20-

(1:08CV677)

agency-regulated rate. Both those Ninth Circuit cases involved California's Antitrust law, the Cartwright Act.[20] Neither are persuasive in this case. More on point, the Sixth Circuit has ruled that filed rate doctrine bars both Sherman Act and Valentine Act claims. *See Pinney Dock & Transp. Corp., 838 F.2d at 1482* (holding that "all rate-related claims made by the plaintiffs, whether state or federal, must be dismissed"); *see also* ECF 79 at 18 n.18.

### 4. **Valentine Act – State Antitrust Challenge**

Consistent with longstanding Ohio jurisprudence, federal courts interpret the Valentine Act "in accordance with federal judicial construction of federal antitrust laws." *Johnson v. Microsoft Corp.* 106 Ohio St. 3d 278, 834 N.E. 2d 791, 797 (2005).

Plaintiffs warn that Ohio does not recognize the filed rate doctrine. ECF No. 77 at 22. This is not necessarily the case. Although not explicitly, the Ohio Supreme Court recognized the force of the filed rate doctrine in *In re Investigation of Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,* 66 Ohio St.3d 81, 609 N.E.2d 156 (Ohio 1993). In that case, the Ohio Supreme Court affirmed the finding that National Union's charging the City a premium other than that specified in the filed rate violated the law. *In re Investigation of Nat'l Union Fire, 66 Ohio St.3d at 88.* The Court observed that the Ohio Revised Code requires that any rate charged must be set forth in a manual of classifications, rules, and rates, or in a rating plan filed by or on behalf of the

---

[20] *See Knevelbaard Dairies v. Kraft Foods, Inc., 232 F.3d 979 (9th Cir. 2000)* (finding, with respect to state antitrust law and rate filed before state agency, question of filed rate immunity is purely one of state law; in this case, California recognized a narrower immunity than federal law does; following *Cellular Plus, Inc., v. Superior Court, 18 Cal.Rptr.2d 308 (Cal. App. 4th Dist. 1993)* (refusing to follow *Keogh* and *Square D* and finding that denying standing would "implicitly . . . encourage[] regulated companies to engage in anticompetitive price fixing activities.")

(1:08CV677)

insured, and it rejected National Union's claim that the nature of its filing gave the insurer the

discretion to use its own judgment in setting rates.  *In re Investigation of Nat'l Union* Fire, 66

Ohio St.3d at 84.  The Ohio Supreme Court's recognition of this principle in *National Union*

augurs that the Ohio Supreme Court would apply the filed rate doctrine to Plaintiffs' Valentine

Act claims, if given the opportunity to do so.

Defendants argue that the title insurance rates filed by Defendant's fall within the scope

of the filed rate doctrine.  The rates at issue were submitted to, reviewed and approved by the

Ohio Department of Insurance before becoming effective.  *See* O.R.C. §3935.04(C) *Cf.* ECF No.

36 ¶ 5.  Once filed, the rates are *per se* reasonable, and cannot be challenged in court.  *Wegoland,*

27 F.3d at 18 ("is *per se* reasonable and unassailable in judicial proceedings brought by

ratepayers.").  Plaintiffs do not contest that the filed rates were the only rates that Defendants

were allowed to charge in Ohio.  ECF No. 36 at ¶¶ 4,5.  And, that those rates were filed with the

Ohio Department of Insurance, the relevant regulatory agency.  ECF No. 36 at ¶¶ 5, 40, 46 & 47.

Despite Plaintiffs' objections, nothing more is required for the filed rate doctrine to apply.

*Square D Co.*, 760 F.2d at 1351.  Plaintiffs' allegations of fraud (discussed further below) do not

alter the landscape groomed by the filed rate doctrine.  *Wegoland,* 27 F.3d at 20.  The application

of the filed rate doctrine is not "determined by the culpability of the defendants['] conduct or the

possibility of inequitable results." *Marcus,* 138 F.3d at 58; *H.J. Inc. v. Nw. Bell Tel. Co.*, 954

F.2d 485, 488 (8th Cir. 1992) (filed rate doctrine prohibits party from recovering damages

measured by comparing filed rate and rate that might have been approved absent alleged

misconduct at issue).

-22-

(1:08CV677)

The filed rate doctrine states that where regulated companies are required by federal or state law to file proposed rates or charges with a governing regulatory agency, any rate approved by that agency "is *per se* reasonable and unassailable in judicial proceedings brought by ratepayers." *Wegoland*, 27 F.3d at 18. The State of Ohio requires that all rates for title insurance be filed with ODI. *See* O.R.C. § 3935.04(A) ("Every insurer shall file with the superintendent of insurance, . . . every form of a policy, endorsement, rider, manual, minimum class rate, rating schedule, or rating plan, and every other rating rule, and every modification of any of them, which it proposes to use.").

Finally, as Defendants aptly recount, Ohio's rules of statutory construction also support the application of the filed rate doctrine because the Ohio Revised Code *specifically* permits defendants to collaborate through a rating bureau jointly (*i.e.*, the OTIRB) to submit proposed rates to the ODI. *See* O.R.C. §3935.04(B). Under well-established doctrines of statutory construction, conduct that is *specifically* allowed by Ohio Revised Code's Chapter 3925 cannot be a violation of the *general* antitrust prohibitions of the Valentine Act. The Ohio Revised Code has codified this principle of statutory construction:

> If a general provision conflicts with a special or local provision, they shall be construed, if possible, so that effect is given to both. If the conflict between the provisions is irreconcilable, the special or local provision prevails as an exception to the general provision, unless the general provision is the later adoption and the manifest intent is that the general provision prevail.

O.R.C. §1.51. *See Roth Steel Prods. v. Sharon Steel Corp.,* 705 F.2d 134 (6th Cir. 1983) (special statute of frauds in O.R.C. §1302.03 (U.C.C. Sec. 2-201) prevails over the general statute of frauds in O.R.C. §1335.05); *State ex rel. Brown v. Rockside Reclamation, Inc.,* 47 Ohio

-23-

(1:08CV677)

St. 2d 76 (Ohio 1976) (applying principle to conclude that solid waste facility licensed by Ohio

EPA was not subject to Ohio's general nuisance statute).  Further, O.R.C. §1.52 provides that

"[i]f statutes … are irreconcilable, the statute latest in date of enactment prevails."  The

Valentine Act is a general provision, adopted in 1898, that prohibits price-fixing in Ohio.  O.R.C.

§3935.04(B) is a specific provision, adopted in 1947, that permits insurers to make collective rate

proposals to ODI. Consistent with Ohio's principles of statutory construction, these two laws

must be reconciled by treating Section 3935.04(B), which is the later and more specific provision

concerning collective rate making by insurers, as an exception to the Valentine Act. Any other

conclusion would render the rating bureau provision meaningless.  See *Tucson Unified Sch. Dist.*

*v. Chicago Title Ins. Co.* 804 P.2d 843 (Ct. App. Ariz. 1991) (cooperative rating making

authorized by state insurance law is beyond the reach of state antitrust law).  ECF No. 79 at 29-

30.

       Although Plaintiffs object to such an extension in the instant case, it appears

that there is no blanket prohibition against applying the filed rate doctrine to Ohio's title

insurance regime.[21]  Rather, it just has not yet been done.[22]  In *Pinney Dock*, the Sixth Circuit

---

[21]The undersigned has not found, nor have Defendants or Plaintiffs cited, any Ohio court applying the filed rate doctrine to Ohio's title insurance regime.

[22] *Cf. Barnes v. First Am. Title Ins. Co.*, 2006 WL 2265553 (N.D. Ohio 2006), *and Chesner v. Stewart Title Guaranty Co.*, 2006 WL 2252542 (N.D.Ohio 2006) are both cases in which defendant title insurance companies unsuccessfully tried to defeat allegations of constructive fraud by retorting that the filed rate doctrine "creates a presumption of knowledge of the rate filed and discount rate by the consumer" satisfying the defendant's need to "disclose the availability of the discount rate in the filing of its rate manual." *Barnes*, 2006 WL 2265553 at *7; *Chesner*, 2006 WL 2252542 at *7.  The court declined to apply the filed rate doctrine. Neither *Barnes* or *Chesner* are persuasive or binding authority over this Court.  To the extent

-24-

(1:08CV677)

perhaps presciently, noted "we do not believe that either *Keogh* or *Square D* was intended to be

limited solely to antitrust damage claims brought by shippers."  838 F.2d at 1456.

### 5.  Plaintiffs' Arguments against Application of the Filed Rate Doctrine

Plaintiffs urge several reasons why  the filed rate doctrine has not and should not be

applied to Ohio's Title Insurance regime.[23]  Initially, Plaintiffs argue that Ohio's failure to

_____

either decision regards the filed rate doctrine, both *Barnes* and *Chesner* relies on a decision that
(even at the time those decisions were rendered) had no precedential value given that it had been
vacated after the district court realized it did not have jurisdiction.  *See* Zangara v. Travelers
Indemnity Co. of Am., 423 F.Supp.2d 762, 776, vac'd by 2006 WL 825231 (N.D.Ohio).
Moreover, to the extent either *Barnes* or *Chesner* is mistaken as serving as an important datum of
this District's law, the undersigned notes that both cases narrowly restricted the application of the
filed rate doctrine, in direct contradiction to the Sixth Circuit's ruling in *Pinney Dock* wherein the
Sixth Circuit explicitly states that it does "not believe that either *Keogh* or *Square D* was
intended to be limited solely to antitrust damage claims brought by shippers."  Pinney Dock, 838
F.2d at 1456 (foretelling the possible application of the filed rate doctrine to non-shipper related
antitrust matters).

[23] Because Count Two presents a state antitrust statute challenge to a state-regulated title
insurance rate, a matter of first impression for this Circuit.  The undersigned presents without
recommending, that the Court stay the ruling on the entire matter pending certification to the
Ohio Supreme Court the questions of (1) Whether the Filed Rate Doctrine applies to Ohio's Title
Insurance [] regime and/or (2) Whether the Filed Rate Doctrine applies to a state antitrust
challenge to a rate regulated by state law.  The prospect of certifying the broad question of the
applicability of the Filed Rate Doctrine to the Ohio Supreme Court was raised by Judge Dowd on
June 24, 2008 during a case management conference wherein all parties were represented.  At
that time, Bruce Cohen, counsel for Plaintiff Mintz, and Deborah Coleman, designated Defense
Counsel Liason agreed that the Valentine Act is interpreted consistently with the Sherman Act.
ECF No. 33 Tr. at 23-24 (Lapatine, counsel for First American Corp.).  And, attorney Cohen
added that he did not think certification to the Ohio Supreme Court necessary in this case.  ECF
No. 33 Tr. at 24 ("I don't think it's necessary here, Your Honor.  I think this [C]ourt is certainly
competent to rule on a matter like that in the context of a Sherman Act case.").  Because (as
discussed above) CAFA confers diversity jurisdiction, the Court has no basis to "decline
supplemental jurisdiction" of the Count Two, the state antitrust claim, upon dismissal of Count
One, unless the class status of the Plaintiffs were at issue, making it unlikely that Plaintiffs could
maintain a diversity action.

-25-

(1:08CV677)

provide "meaningful agency oversight" to title insurance rate-making necessitates the application

of the Sherman Act because "the court would not be interfering with any expertise utilized by the

regulator."[24]  *See* ECF No. 77 at 23 n.23; ECF No. 99 (Letter dated July 20, 2009 objecting to

*McCray*).  In addition to failure to provide oversight, Plaintiffs warn of: allegations of fraud in

the rate setting procedure; the lack of pervasive regulatory scheme for title insurance rate filings;

and lack of alternative remedy, *e.g.* reparations, for injured Ohio consumers under Ohio law.

Additionally, Plaintiffs also argue that Defendant title insurance companies' rate filings do not

comply with ODI's filing  requirements, in the first instance.  These reasons, from Plaintiffs'

viewpoint, individually or collectively justify an exception to the application of the filed rate

doctrine.

  Despite its numerous component parts, Plaintiffs' argument overall against the

application of the filed rate doctrine – that the rates are infirm because they were not properly

reviewed, are the offspring of corruption, and noncompliant with established procedures – is

firmly contradicted by Supreme Court and other (albeit) non-binding but persuasive case law.

  In *Square D,* the Supreme Court's affirmation of *Keogh* is especially instructive because,

in *Square D*, unlike *Keogh*, the rates at issue had <u>not</u> been "challenged" or vetted  in a formal

regulatory (ICC) hearing before going into effect.  Nevertheless, the *Square D* Court found

(despite Judge Friendly's obvious temptations) that the rates "were. . . duly submitted, lawful

_____

[24] *See* ECF No. 99 (Letter dated June 22, 2009 from Plaintiff's counsel, Daniel B. Allanoff) (urging that the application of the Filed Rate Doctrine hinges on meaningful review of rate filings; *see also* ECF No. 97 (Letter from Allanoff dated July 20, 2009 *(citing McCray, --- F.Supp.2d ---, 2009 WL 2170694* (same).

-26-

(1:08CV677)

rates." *Square D Co., 476 U.S. at 417*.  And, under *Keogh*, precluded "a treble damages antitrust

action." *Id.*  "Since the Supreme Court did in fact uphold the ruling in *Keogh* [the Sixth Circuit]

construe[d] its cited language to be that the Keogh rationale, whatever else might be said of it,

still commands, in the Supreme Court's view, the support of Congress." *Pinney Dock*, 838 F.2d

at 1456.  Plaintiffs have presented no legal authority or argument more persuasive than *stare*

*decisis*.  Even the Sixth Circuit has conceded, "[i]f there is to be an overruling of the *Keogh* rule,

it must come from Congress not from *Pinney Dock*, 838 F.2d at 1456 (*citing Square D Co., 476*

*U.S. at 424*.

### a.  Meaningful or Comprehensive Review

In *Square D*, the Supreme Court unambiguously refused to require meaningful review as

a predicate for applying the filed rate doctrine.  *See Square D Co., 476 U.S. at 417 n.19*

(affirming the appellate court's ruling that "shippers could not recover treble damages for

overcharges whenever tariffs have been filed.").  Despite being legally bound to follow the

relevant rulings of  the United State Supreme Court, the *Square D* ruling is particularly insightful

because, unlike *Keogh*, the facts of *Square D* presented allegations of both antitrust and covert

legal violations.[25]  The allegations of illegal activity in the rate-setting process did not detract the

Supreme Court from its goals of leaving rate-setting to the experts.  *Square D Co., 476 U.S. at*

---

[25] Recognizing the strength of the *Keogh* decision, the *Square D* Court noted "[s]tare decisis is usually the wise policy because in most matters, it is more important that the applicable rule of law be settled than that it be settled right."  *Square D Co., 476 U.S. at 424* (quoting Justice Brandieis a decade after his *Keogh* decision).  Similarly, that Court recounted that [m]ore than any other doctrine in the field of precedent, [stare decisis] has served to limit the freedom of the court."  *Id at n.34* (*quoting Levi, An Introduction to Legal Reasoning*, 15 U.Chi.L.Rev. 501, 540 (1948)).

(1:08CV677)

424.  "It is the filing of the tariffs, and not any affirmative approval or scrutiny by the agency, that triggers the filed rate doctrine." *Town of Norwood v. New England Power Co.*, 202 F.3d 408 (1st Cir. 2000) *(crediting Square D Co., 476 U.S. at 417).* S*ee also Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 402 (7th Cir. 2000) *(relying* on the filed rate doctrine to bar antitrust claim "although the state public utility commissions nominally oversee its rate-setting, they rarely exercise their muscle and thus give no meaningful review to the rate structure."). Meaningful and comprehensive review appear to be used interchangeably – both indicating, minimally, a statutory scheme providing a review of rates filed and public input in rate determination.

Assuming that comprehensive oversight is required, Ohio's regulatory scheme provides it.  The following is undisputed.[26] Ohio law requires that title insurance rates be filed.  *See* O.R.C. § 3935.04(H); ECF No. 36 at ¶ 40.  "Ohio is one of the very small number of states in which insurers may satisfy that obligation by becoming a member of a licensed rating bureau which makes such filings on the insurer's behalf."[27] ECF No. 36 at ¶ 40.  The Superintendent of Insurance must review the filed rates.  *See* O.R.C. § 3935.04(C).  These filed rates may become effective 30 days after filing if the Superintendent has not disapproved.  *See* O.R.C. § 3935.04(D).  Ohio law does not "require" nor "prohibit" uniformity of rates among insurers. ECF No. 36 at ¶ 41.  *Square D* required no more process than that required by Ohio's law

---

[26] In *Randleman*, albeit in dicta, another branch of this Court characterized Ohio's title insurance scheme as "Comprehensive" in deciding that the Court had jurisdiction over Plaintiffs' claims.  *Randleman v. Fidelity Nat'l Title Ins.*, 465 F. Supp.2d 812, 817 (N.D. Ohio 2006).

[27] Each defendant except the corporate parent defendants "submits its title insurance rates collectively through OTIRB." ECF No. 36 ¶ 40.

-28-

(1:08CV677)

provides.  *See also* *Rios,* 469 F.Supp.2d 727 (*dismissing* plaintiffs' claims pursuant to filed rate

doctrine and finding that Iowa's homeowners insurance regulatory scheme (which is nearly

identical to Ohio's) was comprehensive).  Plaintiffs rely on *Blaylock v. First Am. Title Ins. Co.,*

504 F.Supp.2d 1091 (W.D. Wash 2007), wherein the court declined to apply the filed rate.[28]

*Blaylock,* a putative class action suit brought under the Real Estate Settlement Procedures Act

and state consumer protection act, was filed just two days after an investigative report revealing

that the defendant title insurance companies had paid illegal inducements to middlemen in order

to attract business, behavior specifically prohibited by state regulations.  *Id.* at 1096.  The State of

Washington had a "comprehensive scheme for setting insurance premiums," the title insurance

industry, however, was "specifically exempted from this rate-setting regulatory scheme." *Id.* at

1095-96.  *Blaylock* detailed that its refusal to apply the filed rate doctrine to bar Plaintiffs'

claims hinged on considerations such as: (1) Washington insurance code's failure to mandate any

review of the  filed rates; (2) no requirement that title insurers consider past and prospective loss

experience, hazards, profitability and expenses when setting rates; (3) the shortened – 15 versus

30 days for general insurance rates – waiting period before the rated became effective,

"indicating that review of the rates is not actually anticipated"; and (4) the lack of any alternative

means for constituents to participate in the rate-setting process.  *Id.* at 1096.   These factors taken

together left the Court with the impression that Washington state "title insurance rates are

subjected only to superficial regulation."  *Id.* at 1102-03 & n.2.   The *Blaylock* Court's decision

_____

[28]  Plaintiffs' also rely on *Hanson v. Acceleration Life Ins. Co.*, 1999 WL 33283345 (D.N.D. Mar. 16, 1999) (finding that statutory language was inconsistent with the establishment of a filed rate obviating the application of the filed rate doctrine).

(1:08CV677)

was also informed by Plaintiffs' failure to directly challenge the reasonableness of the rates or the quality of the service along with "the uneasy fit between the animating purposes of the [filed rate] doctrine and the facts of [that] case." *Id.* at 1103.

Blaylock is distinguishable from the instant case wherein Plaintiffs acknowledge that Ohio law requires title insurers, or a rating bureau on their behalf, to submit proposed rates to the Department of Insurance for review.  In Ohio, rates must take into account, *inter alia*, past and prospective loss experience, and past and prospective expenses and filings must be accompanied by sufficient supporting information for the superintendent to make his review.  *See* Complaint, ECF No. 36 at ¶ 4 (citing O.R.C. §§ 3935.03 & .04).   In contrast to the 15-day waiting period in *Blaylock,* in Ohio, title insurance rates do not become effective until 30 days after filing.  *See* Complaint, ECF No. 36 at ¶ 5.  The infirmities complained of in *Blaylock* are not present in the instant case.

### b.  Lack of an Active Rate Approval Process

In addition to relying on *Blaylock*, Plaintiffs rely heavily on two Ninth Circuit cases wherein that Court declined to apply the filed rate doctrine because the regulatory scheme did not require active approval of the filed rate.  *See* ECF No. 77 at 22-23 *(citing Brown v. Ticor Title Ins. Co.*, 982 F.2d 386, 394 (9th Cir. 1992) and *Wileman Bros. & Elliott, Inc. v. Giannini*, 909 F.2d 332, 338 (9th Cir. 1990)).  Neither Ninth Circuit case is persuasive.  *Accord McCray,* --- F.Supp.2d ---, 2009 WL 2170694 at 11.  The plaintiffs in *Brown* filed a class action complaint alleging that the defendant had violated the antitrust law by participating in state-licensed rating bureaus that filed rates with state administrative agencies.  *Brown, 982 F.2d at 388.*   The Ninth

-30-

(1:08CV677)

Circuit focused on the regulatory regime's only requiring non-disapproval of rates, rather than robust antecedent review and express approval. *Brown*, 982 F.2d at 394. Ignoring Supreme Court precedent, *Brown* held that the filed rate doctrine did not apply because the rates filed " were not subject to meaningful review by the state, [and thus] the fact that they were filed does not render them immune from challenge." *Id.* Brown's result directly contradicts *Square D's* directive that the filed rate applies "whenever tariffs have been filed" and is not limited to circumstances in which an agency "investigated and approved" filed rates. *Square D Co.*, 476 U.S. at 417 n.19. *Wileman Bros* is less persuasive. In that case, the Court did not discuss the filed rate doctrine. Rather it focused on whether immunity existed under 7 U.S.C. § 608b for following agricultural marketing orders. *Wileman,* 909 F.2d at 333-34.

Plaintiffs are well within their rights to insist on a more robust approval process. Such a decision is, however, one more appropriately made by lawmakers than courts.

### c. **Fraud Exception**

The application or effect of the filed rate doctrine is not precluded by the fraud or other unlawful conduct by Defendants or any State agency officials. *See generally Wegoland,* 27 F.3d at 20. Although given the opportunity to do so, the Supreme Court has not decided that there is a fraud exception to the filed rate doctrine. *See Arkansas La. Gas Co.*, 453 U.S. at 583 n.13 (the Court reserved "for another day the question whether the filed rate doctrine applies in the face of fraudulent conduct."). Other courts have also refused to recognize a fraud exception to the filed rate doctrine. As the Court of Appeals for the Eight Circuit stated, "the underlying conduct does not control whether the filed rate doctrine applies. Rather, the focus for determining whether the

-31-

(1:08CV677)

filed rate doctrine applies is the impact the court's decision will have on agency procedures and rate determinations" not on underlying conduct such as fraud.  *H.J.Inc. II,* 954 F.2d at 489 & n.4 (8th Cir. 1992); *accord, Taffet II,* 967 F.2d at 1494-95 (11th Cir. 1992) (rejecting proposition that fraud is exception to the filed rate doctrine); *Wegoland,* 806 F.Supp. at 1118 (same).

A court does not consider "the culpability of the defendant's conduct or the possibility of inequitable results" when applying the doctrine.[29]  *Marcus v. AT&T Corp.,* 138 F.3d 46, 58 (2d Cir. 1998) (*citing Wegoland,* 27 F.3d at 19 and *H.J. Inc.*, 954 F.2d at 488).  Justice Brandeis, author of the *Keogh* decision, wrote that even if the Court were to assume that the rate-fixing conspiracy allegations against the defendants were true, the filed rate doctrine would still bar the plaintiff's claim since the tariff rates had been filed with the Interstate Commerce Commission.  *See Keogh,* 260 U.S. at 165.  Similarly, in *Maislin Indus. v. Primary Steel, Inc.*, Justice Brennan explained that the Supreme Court has "never held that a carrier's unreasonable practices" justifies departure from the filed rate doctrine.  *Maislin Indus.*, 497 U.S. at 129 (finding that the Interstate Commerce Commission could not preclude collection of a filed rate on the grounds that carrier had engaged in an unreasonable practice).

In *Wegoland*, the Second Circuit reaffirmed the notion that there is no fraud exception to the filed rate doctrine that would save a suit from dismissal. *Wegoland,* 27 F.3d at 20.  First, the Court explained that allowing an exception for fraud would be incompatible with the line of Supreme Court cases from *Keogh* to *Square D.*  *Id.* at 21.  Secondly, such an exception would be

---

[29]  The Ninth Circuit has declined to apply the doctrine if the rates to be challenged resulted from unlawful activity prior to the filing.  *See e.g.*, *Brown v. Ticor Title*, 982 F.2d at 394; *Blaylock*, 504 F.Supp.2d at 1102.

-32-

(1:08CV677)

inconsistent with policy behind the filed rate doctrine; allowing a fraud exception would be the equivalent of a court deciding what rates are reasonable, which, in turn, would "unduly subvert the regulating agencies' authority and thereby undermine the stability of the system." *Id.*

In light of the Supreme Court's reaffirmation of the filed rate doctrine in *Square D*, and the persuasive authority of the notable decisions of the Second, Eight and Eleventh Circuit Appellate courts, the undersigned declines Plaintiff's invitation to weave a fraud exception into the application if the filed rate doctrine, especially given the Sixth Circuit's uninterrupted commitment to enforcing the principals underlying the doctrine. *Square D Co.*, 476 U.S. at 424 (if the *Keogh* rule is to be overruled, "it must come from Congress, rather than this Court"). See also *Pinney Dock*, 838 F.2d at 1457 (stating that it believed the *Keogh* or *Square D* were intended to extend beyond antitrust cases involving shippers)

### d. __Lack of Compliance with Ohio's Laws__

Plaintiffs allege that Defendants have failed to comply with Ohio's Insurance laws relative to rate submission. In support of their arguments, Plaintiffs rely upon cases wherein the courts determined that "rates were impossible to calculate from the information [the carrier] filed with the ICC" or the filing was an "incomplete tariff" because the transportation company did not file the distances associated with the rates. *Atlantis Express, Inc. v. Associated Wholesale Grocers, Inc.*, 989 F.2d 281, 284 (8th Cir. 1993); and *Security Servs. v. Kmart Corp.*, 511 U.S. 431, 442 (1994). In both these cases, the ICC regulations themselves specifically voided the tariffs. *See Atlantis,* 989 F.2d at 284 and *Security Servs.,* 511 U.S. at 434. In the instant case, Plaintiffs do not allege that the title insurance rates that they challenge are impossible to calculate

-33-

(1:08CV677)

based on the rate filings.

In two other cases relied upon by Plaintiffs, the courts decided that the filed rate doctrine did not prevent the agency charged with overseeing the filed rates from compelling a regulated entity to make a refund or to charge a different rate, consistent with its own regulations or orders. *Aberdeen & R.R. Co. v. United States*, 682 F.2d 1092, 1102-03 (5th Cir. 1982) (ICC could determine rates sought to be enforced were not permitted, and require a refund), *vacated on other grounds*, 467 U.S. 1237 (1984); *TON Servs. v. Qwest Corp.*, 493 F. 3d 1225, 1237-38 (10th Cir. 2007) (FCC's Waiver/Refund Order under 1996 Telecommunications Act put industry on notice that a refund might be necessary once new rates were filed.).  These decisions concerning the authority of a regulatory agency to compel a rate refund or rate change are irrelevant to whether the filed rate doctrine prevents this Court from taking such action.

### 1.  **Improper Filing of Rates**

Plaintiffs' "improper filing" argument also relies on the assertion that "Ohio law does not permit rating bureaus in Ohio to submit minimum premiums." ECF No. 77 at 19.   In so arguing, Plaintiffs seemingly rely upon a publication issued by ODI without giving due deference to its inconsistency with existing Ohio law.  The Revised Code specifically permits a title insurance company to "satisfy its obligation" to make the filings required by O.R.C. § 3935.04(A), including "minimum class rate[s], rating schedule[s], or rating plan[s], and every other rating rule", "by becoming a member of, or a subscriber to, a licensed rating bureau." O.R.C.  § 3935.04(B). As Plaintiffs recognize in their Complaint, the title insurer defendants maintain membership in the Ohio Title Insurance Rating Bureau ("OTIRB"), which is "licensed by the

(1:08CV677)

ODI pursuant to Sections 3935.04 and 3953.28 of the Ohio Revised Code."  ECF No. 36 at ¶¶

22, 40.  "OTIRB files the title insurance rates for its members in Ohio."  ECF No. 36 at ¶ 46.

Plaintiffs admit that such rates have been approved, ECF No. 77 at 4, and it is undisputed that

their complaint attacks the filed and approved rates.  Insurers who join in an OTIRB filing are

bound to adhere to the filings made by the Bureau and approved by the Department of Insurance,

unless permission for deviation has been granted. O.R.C. § 3935.07.  Despite Plaintiffs complaint

against the uniformity of the OTIRB filed rates, the ORC explicitly provides that uniformity is

not prohibited nor encouraged.  ECF No. 36 at ¶ 4; O.R.C. § 3935.01.

Plaintiffs direct the Court's attention to ODI  Bulletin 91-1 without noting whether it is

legally binding on the OTIRB.[30][31]  On its face, Bulletin 91-1 does not prohibit the individual

insurers from satisfying their obligation to file rates by subscribing to a licensed rating bureau, as

permitted by O.R.C. §§ 3935.04(B) (applicable to all insurers, including title insurers) and

O.R.C. § 3937.03 (applicable to casualty and motor vehicle insurance).  Rather, the Bulletin

---

[30] Bulletin 91-1, which Plaintiff's concede in legally non-binding, is publicly available
online.  ECF 77 No. at 10 ("In any case regardless of whether Bulletin 91-1 is legally binding on
OTIRB . . ."). *See* http://www.insurance.ohio.gov/Legal/Bulletins/Pages/BulletinIndex.aspx;
ECF No. 77-2.

[31] *See New England Health Care Employees Pension Fund*, 336 F.3d 495, 501(6th Cir.
2003) (in ruling on a Rule 12(b)(6) motion courts may consider materials beyond the complaint
"if such materials are public records or are otherwise appropriate for the taking of judicial
notice.")*; see also* F.R.E. 201(c) ("A court shall take judicial notice, whether requested or not.").
Because this title insurance related document is integral to Plaintiffs' allegations, the Court takes
judicial notice. Defendants have not objected to Plaintiffs' introduction of Bulleting 91-1 nor
challenged its authenticity.  The lack of objection from Defendants satisfies any concern the
undersigned might have had regarding its reliance on the proffered document which is obviously
integral to Plaintiffs' allegations of Defendant's non-compliance with Ohio's title insurance laws.
The proffered document may also be admissible as a public record.

(1:08CV677)

outlines the procedures to be followed when a rating bureau files only advisory prospective loss costs, rather than filed rates, and supporting data.  Under Ohio law, a filed rate may take into account not only prospective loss costs (costs associated with the risk of loss and the cost of loss adjustment), but also other expenses and a reasonable margin for profit.  *See* Complaint, ECF No. 36 at ¶4.  Ohio law permits rating bureaus to file either final rates or advisory prospective loss costs, as well as other types of information.  O.R.C. §§ 3935.04(A),(B); 3935.07.  If ODI interpreted its Bulletin 91-1 to preclude rate filings by OTIRB, in accordance with its procedure it would not have disapproved them.

A bulletin such as 91-1 is only advisory in nature.  *In re Investigation of Nat'l Union Fire Ins. Co.,* 66 Ohio St. 3d 81, 86, 609 N.E. 2d 156 (1993) ("*National Union*).  Although such a bulletin may be used to provide guidance, it cannot be used to establish policies inconsistent with an act of the legislature.  *State ex rel. Montrie Nursing Home v. Aggrey,* 54 Ohio St. 2d 394, 396 (Ohio 1978).  Interpreting Bulletin 91-1 to forbid a rating bureau from filing rates on behalf of its members, as Plaintiffs urge, would be inconsistent with the legislative intent to permit such filings, as expressed in O.R.C. §§ 3935.04(A), (B); 3937.03.

In sum, the rates that Plaintiffs challenge were filed by the OTIRB, in accordance with existing Ohio laws.   Rate filings by the OTIRB are expressly permitted by O.R.C. § 3935.04(A) and (B).  Bulletin 91-1 offers an alternative approach to rate filing for insurers and rating bureaus, but did not repeal O.R.C. § 3935.04(A) and (B), which authorizes defendants' conduct.  Assuming *arguendo* that the challenged rate filings violated Bulletin 91-1 in some way, the filed rate doctrine would still require dismissal.  Plaintiffs admit that defendants filed rates and the

(1:08CV677)

Department of Insurance approved them.  ECF No. 36 at ¶¶ 40, 46; ECF No. 77 at 5.

Bulleting 91-1 does not obviate the application of the filed rate doctrine.  *See e.g.*,

*Norwood*, 202 F.3d at 419 ("It is the filing of the tariffs and not any affirmative approval or

scrutiny by the agency that triggers the filed rate doctrine.)"; *Wegoland II*, 27 F.3d at 18; *Stevens*,

2000 WL 33128256, at *2; *Daleure*, 119 F. Supp. 2d at 689.

### e.  Application to Injunctive Relief

Lastly, Plaintiffs argue that the filed rate doctrine does not apply to demands for

injunctive relief.  The undersigned agrees.

The Complaint's Preliminary Statement announces that "Plaintiffs bring this class action

to recover from the defendants the damages they and others who have purchases title insurance in

the State of Ohio sustained as a result of defendants' anti-competitive and unlawful conduct."

ECF No. 36 at ¶ 7.  This preamble bookends the confirmation that the Complaint seeks

"threefold the damages" (ECF No. 36, Prayer for Relief, p. 21) because plaintiffs have "paid

more for [title insurance] than would have been paid in the absence of said antitrust violation,"

this damages concept falls squarely within the realm of that the filed rate doctrine seeks to

prevent.  ECF No. 36 at ¶ 68.[32]

There is little question that the filed rate doctrine bars plaintiffs' Sherman Antitrust Act

claim for monetary damages, given that "[i]t is quite true that one rationale of the filed rate

doctrine is to prevent discriminatory damage awards to different customers."  *Square D Co.*, 476

---

[32] Paragraph 29 augurs the discriminatory damages award the filed rate doctrine was
created to prevent.  ECF No. 36 ¶ 29 ("Except as to the amount of damages each member of the
Class has by itself sustained . . .").

(1:08CV677)

U.S. at 417) (affirming Supreme Court's "holding in [Keogh] . . . petitioners may not bring a treble-damages antitrust action"); *Town of Norwood, Mass.*, 202 F.3d at 419 (affirming dismissal despite prayer for declaratory and injunctive relief).  There remains, however, the question of whether the filed rate doctrine bars Plaintiffs' prayer for injunctive relief as articulated in the Complaint.

> The Complaint's prayer for relief includes the following  request for injunctive relief:
>
> Perpetually enjoin[] or restrain[] [defendants] from. . . [1] continuing, maintaining or renewing the aforesaid combination, conspiracy, agreement, understanding or concert of action, [2] adopting or following any practice, plan, program or design having a similar purpose or effect in restraining competition.

ECF No. 36 at p. 21.  In *State of Geogia v. Pennsylvania R. Co.*, 324 U.S. 439, 454-462, the Supreme Court indicated that, relative to equity claims, *Keogh* operated as a limitation rather than an immunity.  "*Keogh* very likely does preclude [prevent] an injunction that would require a firm to charge in the future a rate different from a previously filed tariff mandated.  But there is no reason to think *Keogh* would prohibit an injunction against an antitrust violation attending some tariff that would or might be filed in the future.  Such a tariff has not been 'filed' at all.[33] Areeda and Hovenkamp, ANTITRUST LAW, § 247d at 423 (Vol. IA Third Edition).  An effective remedy would require the Court to restrain the application of Ohio's current title insurance rates and the application of Ohio's current scheme of setting those rates in the future.  The undersigned can divine no way of providing the injunctive relief sought that does not involve the Court's intervention in changing the rates filed, reviewed and approved by the ODI, the very intervention

---

[33] A similar argument can be made in support of declaratory relief.  *See* also *Pinney Dock*, 838 F.2d at 1482 .

-38-

(1:08CV677)

that controlling legal authority uniformly urges against.  *See Hill v. BellSouth Telecomms., Inc.* 364 F.3d 1308, 1316 (11th Cir. 2004) (finding that even if a claim does not directly attack a filed rate an award of damages that would effectively result in judicial determination of reasonableness of rate is prohibited under filed rate doctrine).  *Keogh* objects to a monetary remedy based upon the filed rate.  Thus, Plaintiffs' state and federal claims seeking such a remedy must fail.

### B.  The McCarran-Ferguson Act exempts Plaintiffs' Sherman Act Claim from Scrutiny

The McCarran-Ferguson Act has its origins in the Commerce Clause disputes of the 1940s.  Historically, it had been assumed that "[i]ssuing a policy of insurance is not a transaction of commerce . . . ." *Paul v. Virginia*, 75 U.S. 168, 183, (1869).  Consequently, the prevailing view was that insurance was a state matter beyond Congress' power to regulate as interstate commerce.  The Supreme Court changed this view in 1944 when it held that an insurance company conducting a substantial part of its business across state lines was engaged in interstate commerce and thereby subject to federal antitrust laws.  *U.S. v. South-Eastern Underwriters Ass'n*, 322 U.S. 533, 553 (1944).  The *South-Eastern Underwriters* holding caused panic among insurers and was widely perceived as a threat to state power over the insurance industry.  *See United States Dept. of Treasury v. Fabe*, 508 U.S. 491, 499-500 (1993).  In order to quell the insurance industries concerns, Congress quickly enacted the McCarran-Ferguson Act in 1945 to reaffirm state supremacy in the realm of insurance regulation.  *Id.* at 500; *see also Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 40 (1996); *AmSouth Bank v. Dale*, 386 F.3d 763, 780-83 (6th Cir. 2004).

-39-

(1:08CV677)

Defendants argue that the McCarran-Ferguson Act provides an exemption from

federal antitrust laws.  The Act states in relevant part:

> (b) Federal regulation
> No Act of Congress shall be construed to invalidate, impair, or supersede any law
> enacted by any State for the purpose of regulating the business of insurance, or which
> imposes a fee or tax upon such business, unless such Act specifically relates to the
> business of insurance: *Provided*, That after June 30, 1948, the Act of July 2, 1890,
> as amended, known as the Sherman Act, and the Act of October 15, 1914, as
> amended, known as the Clayton Act, and the Act of September 26, 1914, known as
> the Federal Trade Commission Act, as amended [15 U.S.C.A. 41 et seq.], shall be
> applicable to the business of insurance to the extent that such business is not
> regulated by State law.

15 U.S.C. § 1012(b) (emphasis in original).  The Act further provides:

> (b) Nothing contained in this chapter shall render the said Sherman Act inapplicable
> to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or
> intimidation.

15 U.S.C. § 1013(b).  Thus, the Act exempts from federal antitrust liability conduct that is part of

the "business of insurance," regulated by state law, and does not constitute a boycott, coercion, or

intimidation.  *See* 15 U.S.C. §§ 1012(b) & 1013(b).

The first criteria the Court must consider is whether the challenged activity is the

"business of insurance."  The Act does not define the term, but the case law concerning the Act

has produced a structured analysis to determine what constitutes the business of insurance.  The

evolution of Supreme Court case law regarding the business of insurance determination has been

refined in *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205 (1979) and *Union

Labor Life Ins. Co. v. Pireno*, 458 U.S. 119 (1982).

In *Royal Drug*, the Court emphasized that the Act exempts the business of insurance, not

the business of insurers from the scrutiny of certain federal laws.  *Royal Drug*, 440 U.S. at 210-

-40-

(1:08CV677)

11; *see also Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 783 (1993) (*citing Royal Drug*, 440 U.S. at 232-33) ("the McCarran-Ferguson Act immunizes activities rather than entities . . . ."). The *Royal Drug* Court found that the agreements at issue were "not 'between insurer and insured,'" but instead, "separate contractual agreements" between the insurance company and outside service providers. *Royal Drug*, 440 U.S. at 216. Because the Act does not create an unconditional exemption from antitrust laws, the Court explained that collateral agreements were not intended to qualify as the "business of insurance" and that Congress' intent was to exempt the underwriting of risk and permit intra-industry cooperation for statistical and rate-making purposes. *Id.* at 221-22.

Building upon its holding in *Royal Drug*, the Court in *Pireno* further distilled the business of insurance analysis down to three specific criteria for determining whether an insurer's particular activity constitutes the "business of insurance." The *Pireno* criteria are:

>1) whether the practice has the effect of transferring or spreading a policy-holder's risk;
>
>2) whether the practice is an integral part of the policy relationship between the insurer and the insured; and
>
>3) whether the practice is limited to entities within the insurance industry.

*See Pireno*, 458 U.S. at 129; *U.S. Dept. of Treasury v. Fabe*, 508 U.S. 491, 497 (1993) (applying *Pireno*'s "tripartite standard for divining what constitutes the 'business of insurance.'"). Affirmative responses to these criteria indicate that the practice is the business of insurance, but "[n]one of these criteria is necessarily determinative in itself." *Pireno*, 458 U.S. at 129.

Based upon the guidance set forth in *Royal Drug* and *Pireno*, the undersigned's focus is

-41-

(1:08CV677)

not on the legality of Defendants' practices, but instead on the "quality of the practice."

*Hartford*, 509 U.S. at 782.  Taking the allegations in the Complaint as true, Plaintiffs allege that

Defendants' practice is submitting a rate to the Ohio Department of Insurance for title insurance

that is the result of a horizontal price-fixing agreement and is therefore violative of the Sherman

Act.  The horizontal price-fixing agreement is between members of the Ohio Title Insurance

Rating Bureau ("OTIRB") who are all title insurance companies.  ECF No. 36 at ¶¶ 5, 24, 36, 49.

The submitted rate, once approved by ODI, becomes the filed rate for title insurance for the

members of OTIRB who then must charge this rate pursuant to Ohio law.  ECF No. 36 at ¶ 40.

Plaintiffs complain that the filed rate for title insurance for which they paid was more than it

should be because of the alleged price-fixing conspiracy.  ECF No. 36 at ¶ 7.  The mere fact that

the alleged price-fixing conspiracy may be anti-competitive or illegal does not remove it from the

"business of insurance."  *See Royal Drug*, 440 U.S. at 210 ("Whether the Agreements are *illegal*

under the antitrust laws is an entirely separate question, not now before us.") (emphasis in

original); *Hartford*, 509 U.S. at 782 n.10 ("The activities in question here, of course, are alleged

to violate federal law, and it might be tempting to think that unlawful acts are implicitly excluded

from the 'business of insurance.' Yet [the McCarran-Ferguson Act]'s grant of immunity assumes

that acts which, but for that grant, would violate the Sherman Act ... are part of the 'business of

insurance.'").

### 1.  The "Business of Insurance"

As an initial matter, Plaintiffs urged the Court during oral argument to find that title

insurance is not "insurance."  Plaintiffs have cited no authority to support this contention.

-42-

(1:08CV677)

Rather, they described title insurance as a warranty that is a commodity product. ECF No. 36 ¶¶
2, 39. Plaintiffs argue that because the "risk" that title insurance company's policies cover is
reduced through the title search and examination process completed before issuing coverage, that
Defendants are not undertaking any risk, which is one of the three basic elements of the concept
of insurance. ECF No. 36 at ¶ 38; *see* *Royal Drug*, 440 U.S. at 212 n.7 (noting the three elements
as: 1) the undertaking of a "risk" by the insurer; 2) in exchange for the payment of a "premium;"
3) through a contract called the "policy"). The undersigned finds this argument untenable.

This Court has not found, nor has Plaintiff directed the Court to, any federal district,
circuit, or Supreme Court case holding that title insurance is not "insurance."[34] Moreover,
several other types of insurance companies conduct essentially the same analysis prior to issuing
insurance policies. For example, for an individual to obtain life insurance, more often than not,
one is subject to a battery of medical tests and questions prior to the issuance of any policy. *See*
*e.g.*, *United of Omaha Life Ins. Co. v. Rex Roto Corp.*, 126 F.3d 785, 786 (6th Cir. 1997)
(describing life insurance underwriting process). And the premium for such a policy, if one is
not denied coverage, is based on the results of those tests and ones *past* and current health. *See*
*id.* The same rationale applies to health insurance and auto insurance. Health insurance
companies ask similar questions as life insurance companies prior to issuing a policy and one
may be excluded from coverage for a pre-existing condition or simply denied coverage because

_____

[34] Defendants directed the Court's attention to *Coll v. First Am. Title Ins. Co.*, No. CIV
06-348, Dkt. No.141 (D.N.M. Apr. 21, 2008) (stating the purpose of New Mexico's Title
Insurance Law "is to provide a comprehensive body of law for the effective regulation and active
supervision of the business of title insurance transacted [] in response to the McCarran-Ferguson
Act.") (ECF 43-2 at 17)

-43-

(1:08CV677)

of *past* health issues.  *See e.g.*, *Colley v. Conseco Medico Ins. Co.*, 11 Fed.Appx. 487, 488-90, 2001 WL 599712 (6th Cir. 2001) (describing plaintiff's health insurance application process). Similarly, auto insurance rates are usually based on age, gender, and driving record.  *See e.g.*, *McLiechy v. Bristol West Ins. Co.*, 474 F.3d 897, 899 (6th Cir. 2007) (*describing* Michigan's statutory factors insurance companies may consider in setting rates).  Lastly, ratings bureaus and title insurance are regulated by Ohio law and the Ohio Department of Insurance.  *See* O.R.C. §§ 3935 *et al.* & 3953 *et al.*  For these reasons, the undersigned is not persuaded that title insurance is not insurance for purposes of the McCarran-Ferguson Act.

With respect to the business of insurance criteria under the Act, the Court notes that the Supreme Court stated in *Royal Drug* that "the fixing of insurance rates is the 'business of insurance.'"  *Royal Drug*, 440 U.S. at 224; *see also* *Gilchrist v. State Farm Mut. Auto. Ins. Co.*, 390 F.3d 1327, 1331 (11th Cir. 2004) ("Rate-making, of course, is the paradigmatic example of the conduct that Congress intended to protect by the McCarran-Ferguson Act.") (*citing* *Royal Drug*, 440 U.S. at 221 ("Because of the widespread view that it is very difficult to underwrite risks in an informed and responsible way without intra-industry cooperation, the primary concern of both representatives of the insurance industry and the Congress was the cooperative ratemaking efforts be exempt from the antitrust laws.").  Thus, the scenario Plaintiffs must establish to distinguish their claim as one outside the rate-making process is that their claim challenges a conspiracy involving a party outside of the rate-making process.  *See Royal Drug*, 440 U.S. at 216-22 (holding the Act does not exempt agreements between an insurance company and an outside provider).

-44-

(1:08CV677)

In order to determine the appropriate characterization of Plaintiffs' claim, the Court looks

to the Complaint which alleges the following, in pertinent part:

¶ 7.   The ultimate purpose and effect of the defendants' unlawful conduct has been to increase the prices Ohio title insurance purchasers have paid compared to what they would have paid absent defendants' joint illegal conduct. Plaintiffs bring this class action to recover from the defendants the damages they and others who purchased title insurance in the State of Ohio sustained as a result of defendants' anticompetitive and unlawful conduct.

¶ 57.  Beginning at least as early as March 2004, and continuing thereafter to the present, the exact dates being unknown to plaintiffs, defendants and their co-conspirators[35] engaged in a contract, combination and conspiracy in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act.

¶ 58.  The aforesaid contract, combination and conspiracy has consisted of a continuing agreement, understanding and concert of action among the defendants and their co-conspirators, the substantial terms of which have been:
   (a)   to fix, raise, maintain and stabilize the price of title insurance throughout the State of Ohio; and,
   (b)   to fix, raise, maintain and stabilize the terms and conditions of sale of title insurance in the State of Ohio.

¶ 59.  Those defendants who are Ohio licensed title insurance companies are competitors in the sale of title insurance to consumers in Ohio. Through OTIRB, Defendants and their co-conspirators have agreed upon and engaged in concerted efforts to (I) collectively set and charge uniform and supra-competitive rates for title insurance in Ohio, (ii) embed within these costs, payoff, kickbacks, and other charges that are unrelated to the issuance of title insurance or the business o[f] insurance, and (iii) hide these supposed "costs" from regulatory scrutiny by funneling them to and through title agents.

¶ 60.  In the absence of proper regulatory authority and oversight, defendants' conduct constitutes a horizontal agreement to fix the form, structure, and

---

[35]  Plaintiffs characterize Defendants' co-conspirators as "various title insurers, not named as defendants herein, which were members of OTIRB during all or part of the class period." ECF No. 36 at 10 ¶ 25.

-45-

(1:08CV677)

> prices of title insurance in Ohio and is a *per se* violation of Section 1 of the Sherman Act.
>
> ¶ 61.   Defendants' price-fixing activity has been continuous throughout the relevant damages period and has been renewed and reinforced through OTIRB's submissions to the Ohio Department of Insurance of supposed cost and revenue information and its periodic submissions of rate changes.
>
> ¶ 62.   Through their collective price-fixing and manipulation of the regulatory process, defendants have harmed competition by charging consumers supra-competitive prices for title insurance in Ohio.

ECF No. 36 at 3, 18-19.

These allegations clearly do not involve a party outside the rate-making process.  The claims allege that only title insurance companies and their corporate parents or affiliates conspired to set title insurance rates.  Also, the allegations clearly challenge rate-setting and price-fixing activities as those terms are used explicitly in the Complaint.  Therefore, Plaintiffs' allegations are a direct challenge to the integrity of title insurers rate-making as well as Ohio's regulatory process that oversees the rate submission and approval process.

Additionally, Plaintiffs do not alleging a conspiracy or agreement between title insurers and their title agents or brokers.  The conspiracy alleged by Plaintiffs is comprised of an agreement by title insurers and their corporate parents and affiliates[36] to submit a rate to ODI, which becomes the legal filed rate in Ohio after review and non-disapproval.  *See* O.R.C. § 3935.04(c).  Defendants' practice of setting rates as described by Plaintiffs is not a collateral agreement that would be outside the intended purpose of the Act as described in *Royal Drug*.  *See Royal Drug*, 440 U.S. at 216-22.  Defendants' rate setting process involves only title insurers

---

[36]  The role of the corporate parent defendant is discussed in Section C, *infra*.

-46-

(1:08CV677)

and ODI, who approves the rate for which Ohio consumers must pay.  Because the *Royal Drug* Court found that the fixing of insurance rates is the "business of insurance," the undersigned follows the Supreme Court's guidance and finds that Defendants' rate setting activity is the same fixing of insurance rates as described by the Court in *Royal Drug* and is therefore the "business of insurance."  Thus, all three *Pireno* criteria are satisfied.

### 2.  Regulated by State Law

Plaintiffs argue that title insurance is not regulated by state law[37] because it is not insurance, or because the State of Ohio insufficiently regulates title insurance.  Having established above that title insurance is within the "business of insurance," the undersigned addresses the State of Ohio's regulation of the title insurance industry.[38]

The State of Ohio has established a regulatory scheme that explicitly includes title insurance.  *See* O.R.C. Ch. 3953 Title Insurance, Ch. 3935 Rating Bureaus.  The Ohio Department of Insurance is mandated by statute to "review filings," not simply allowing for the non-disapproval of a submitted rate to equate to the approval of the rate.  *See* O.R.C. § 3935.04(C) ("The superintendent *shall review filings* as soon as reasonably possible after they have been made in order to determine whether they meet the requirements of sections 3935.01 to 3935.17 of the Revised Code.") (emphasis added).

The Sixth Circuit has explained that if a state regulates insurance, that is enough for the

---

[37]  Curiously, Plaintiffs state in their Complaint that Ohio law regulates title insurance. *See* ECF No. 36 at 15 ¶ 47 ("Ohio Revised Code § 3935.03(B), which regulates title insurance . . . .").

[38] Please also see text above regarding ODI's "Meaningful or Comprehensive Review."

-47-

(1:08CV677)

Act to apply and that "no satisfactory definition is to be derived from its legislative history."

*Ohio AFL-CIO v. Insurance Rating Bd.*, 451 F.2d 1178, 1181-82 (6th Cir. 1971).  The Sixth

Circuit concluded that the test for whether the activity is regulated by state law is as follows:

> It is well-established that the McCarran-Ferguson Act's "state regulation" requirement is satisfied by the general undertaking by a state to regulate the insurance industry.  *See Federal Trade Comm'n v. Nat'l Cas. Co.*, 357 U.S. 560, 78 S.Ct. 1260, 2 L.Ed.2d 1540 (1958); *Ohio AFL-CIO v. Ins. Rating Bd.*, 451 F.2d 1178 (6th Cir.1971), cert. denied, 409 U.S. 917, 93 S.Ct. 215, 34 L.Ed.2d 180 (1972).

*Owensboro Nat'l Bank v. Stephens*, 44 F.3d 388, 397 (6th Cir. 1994).

Based upon Ohio's statutory insurance scheme, which explicitly mandates the regulation

of title insurance (as extensively explained above), the undersigned finds that Defendants' title

insurance related activities as alleged by Plaintiffs are indeed regulated by Ohio state law.

### 3.  Act of Boycott, Coercion, or Intimidation

During oral argument, Defendants advised the Court that the parties agree that

Defendants' activities do not involve a boycott.  ECF No. 95 at 85.  Plaintiffs did not object to

this statement nor does the Complaint or Opposition Memorandum make a claim of boycott.

ECF No. 95 at 85.   Similarly, there are no allegations regarding coercion or intimidation.

Therefore, the undersigned finds the final test for determining the applicability of the

McCarran-Ferguson Act exemption is satisfied.

### 4.  Applying the McCarran-Ferguson Anti-trust Exemption

Accordingly, the undersigned finds that Defendants' conduct is exempt from federal

antitrust scrutiny pursuant to the McCarran-Ferguson Act because (1) Plaintiffs' claim attacks

rate-making is within the quintessential business of insurance; (2) Defendants' conduct is

-48-

(1:08CV677)

regulated by state law; and (3) no boycott, coercion or intimidation is alleged.  Furthermore,

Plaintiffs acknowledge that they "challenge the defendants' collective price-setting of rates in the

State of Ohio for title insurance as *per se* illegal price-fixing under federal and state antitrust

laws."  ECF No. 36 at ¶ 1.

Therefore, the McCarran-Ferguson Act does, in this case, what Congress intended: allows

the States of Ohio to exempt insurance companies from federal competition laws by enacting

state regulations which may very well eliminate competition.  *See* 15 U.S.C. § 1011-1015**.**

Accordingly, the undersigned finds the Complaint to fail to state a cause of action under § 1 of

the Sherman Antitrust Act because, taken as true, the allegations contained in the Complaint are

exempt from federal antitrust scrutiny for the reasons provided above.

### C.   **Complaint Fails to State a Claim that the Corporate Parent Defendants Engaged in Conspiratorial Behavior**[39]

At the threshold, it is important to recall that Section 1 of the Sherman Act "does not

prohibit [all] unreasonable restraints of trade . . . but only restraints effected by a contract,

combination or conspiracy."  *Twombly*, 550 U.S. at 553 (citations omitted).  Regardless of which

manner of collusion is alleged, "'[t]he crucial question' is whether the challenged

---

[39] Old Republic International Corporation ("ORI") is the ultimate parent company of Old Republic National Title Insurance Company ("ORNTIC").  *See* ECF No. 41-2 at 17 n.6.  Both ORI and ORNTIC are named defendants.  ORI, a self-described "insurance holding company," separately moved for the dismissal of the entire Complaint due to Plaintiffs' failure to state a claim "under either the Sherman Act or the Valentine Act, because [the Complaint] does not allege facts which could support a finding that ORI itself, as opposed to ORI's corporate 'affiliates,' was involved in the alleged conspiracy to fix Ohio title insurance rates."  ECF No. 41-2 at 7; *see also* ECF No. 36 at ¶¶ 19,20.  ORI along with the other corporate parent defendants joined all other defendants to dismiss pursuant to the Filed Rate Doctrine and McCarran-Ferguson Act (ECF No. 43), as discussed earlier.  *See* ECF Nos. 40 & 66 at 6 n.1.

(1:08CV677)

anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express.'" *Id.* (citations omitted).  Plaintiffs' Complaint fails to establish this element relative to the corporate parent defendants because it does not sufficiently allege any concerted action on their part.  Rather, the alleged conspiratorial behavior, as pled, is directly attributed to the subsidiaries or affiliates of the corporate parent defendants.  Specifically, Plaintiffs allege that each of the parent corporations "approved" or "assented to" their affiliates' or subsidiaries' actions by virtue of their ownership relationship.  *See* ECF No. 36 ¶¶ 12, 14. 16, 18, 20.  Plaintiffs pled no additional facts regarding how or when each of the corporate parent's agreed to or participated in the alleged conspiracy.[40]  This is problematic.

First, "[i]t is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries.  *U.S. v. Bestfoods*, 524 U.S. 51, 61 (1998) (citations omitted); *see also Cupp v. Alberto-Culver USA, Inc.*, 310 F.Supp.2d 963, 974 (W.D. Tenn. 2004) (applying *Bestfoods* to Sherman § 1 and stating "mere existence of a corporate relationship [does not] implicate a parent in its subsidiary's actions.").  Therefore, Plaintiffs cannot successfully rely only on the parent corporations ownership interest in their title company subsidiaries to sustain a § 1 claim against the corporate parent defendants.

Second, a parent and its subsidiaries or affiliates are not legally capable of conspiring

_____

[40] Plaintiffs offer "that this conduct by the title insurance companies is not limited to Ohio.  Plaintiffs believe that, in every state in which there is a rating bureau for title insurance, there is an identical horizontal price fix.  It is unlikely that this conduct would have uniformly occurred absent coordination and control by the ultimate parents of the operating company defendants."  ECF No.88 at 3 n.1.

-50-

(1:08CV677)

with each other for purposes of § 1 of the Sherman Antitrust Act.[41]  The coordinated behavior of

a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for

purposes of § 1 of the Sherman Act.[42]  *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S.

752, 771 (1984).  The *Copperweld* Court explained that "there can be little doubt that the

operations of a corporate enterprise organized into divisions must be judged as the conduct of a

single actor."  *Id* at 770.  By contrast, an agreement under the Sherman Act must be between

separate, independent entities capable of combining their efforts to restrain trade.  *Id.* at 769-771.

Under *Copperweld*, Plaintiffs cannot base their § 1 conspiracy claim solely on an agreement

between a corporate parent defendant and any of its affiliates or subsidiaries.[43]  "Thus, to state a

claim against parent corporations, Plaintiffs must allege facts establishing the corporate parent

corporations' direct and independent participation in the alleged conspiracy."  *In re Pennsylvania*

*Title Ins. Antitrust Litig.*, --- F.Supp.2d ---, 2009 WL 2190669 at 41; *see also McCray*, ---

F.Supp.2d ---, 2009 WL 2170694 at 25 (requiring for "claim against a parent corporation . . .

[allegations of] facts sufficient to infer . . . direct involvement"); *In re Pressure Sensitive*, 566

F.Supp.2d 363, 375-77 (M.D. PA. 2008) (finding insufficient allegations that parent corporation

---

[41] Of course this does not immunize corporate actors from Sherman Act scrutiny; it does however dictate that any post-acquisition scrutiny falls outside of the reach of § 1 (conspiracy).

[42] The Complaint alleges the title insurance defendants are "wholly owned" and/or "controlled" by their various parent corporation.  *See* ECF No. 36 at ¶¶ 12, 14, 16, 18, and 20.

[43] Plaintiffs allege that some corporate parent defendants wholly own and control their subsidiaries (*e.g.*, ¶ 18), while others wholly own and/or control their subsidiaries, (*e.g.*, ¶ 20). For the purposes of this motion, the court will read the Complaint in the light most favorable to Plaintiffs and presume that all corporate defendant parents wholly own and control their title insurance subsidiaries.

(1:08CV677)

participated in antitrust conspiracy on it own, even though Court found sufficient allegations that subsidiary did participate); *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp.2d 1048, 1068-69 (D.Colo. 2004) ("Absent allegations or evidence of 'independent conduct' on the part of the parent, there is no basis upon which to hold a parent directly liable for the acts of a subsidiary.")

In determining whether a complaint stated a claim under § 1 of the Sherman Act, in *Twombly*, the Supreme Court held that "stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. The *Twombly* Court further explained that "a naked assertion of conspiracy in a § 1 complaint: [] gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility an plausibility of 'entitle[ment] to relief.'" *Id*. at 557 (holding, among other things, that "a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality"). Despite Plaintiffs' statement to the contrary, the Complaint does not "specifically allege[] that ORI [or any other corporate parent defendant] *agreed* to its subsidiary's participation with non-related entities in the conspiracy." ECF No. 64 at 39 (emphasis added).

Plaintiffs appear to acknowledge the Complaint's lack of detailed allegations regarding the alleged conspiracy and rely on the "slight evidence rule" to make up the difference. *See* ECF No. 64 at pp. 25-26. According to Plaintiffs, the slight evidence rule is applicable after a conspiracy has been established. *Id*. Then, only slight evidence is needed to connect a particular participant to the overall conspiracy. *Id*. Even if the slight evidence rule were applicable, it

-52-

(1:08CV677)

insufficient in the instant case wherein the conspiracy itself is precariously premised on

Defendants' participation in a lawfully created trade association such as OTIRB and actions

sanctioned by Ohio's insurance law.  Additionally, the problem is not merely the Complaint's

lack of detail but, more importantly, Plaintiffs' patent failure to allege facts constituting a

conspiracy or agreement involving the parent corporation defendants based upon facts other than

the business relationship with their title insurance subsidiary or affiliate.

That Plaintiffs were provided discovery on this very issue prior to responding to the

motion to dismiss, punctuates their failure to meet this benchmark.  *See* ECF No. 52; *See e.g.,*

ECF No. 65 at 3 n.1 (explaining discovery ORI provided to Plaintiffs).  "Asking for plausible

grounds to infer an agreement . . . simply calls for enough fact to raise a reasonable expectation

that discovery will reveal evidence of illegal agreement."  *Twombly*, 550 U.S. at 556.  Bare

allegations such as those against the parent corporations are models of those *Twombly* sought to

weed out.

The Complaint fails to independently link the parent corporations to the alleged

conspiracy and therefore fails to establish the threshold element required by § 1 of the Sherman

Act that the corporate parent defendants engaged in anti-competitive conduct by virtue of

contract, combination or conspiracy.  Even viewing Plaintiffs' allegations of "'approval and

assent' and 'ownership and control' in a light most favorable to Plaintiffs, as the [C]ourt must for

the purposes of th[e pending] motion, these allegations amount to nothing more than conduct

'typical of any parent and subsidiary.'" *In re Pennsylvania Title Ins. Antitrust Litigation*, ---

F.Supp.2d ---, 2009 WL 2190669 at 43.  Mere acquiescence in a subsidiary's conduct does not

-53-

(1:08CV677)

amount to coordinated or conspiratorial activity. *Id.* (citations omitted). Plaintiffs allege that the anti-competitive behavior was committed by the subsidiary and attributed to the parent "through its subsidiar[y]" without alleging any connection or contract between the corporate parent defendant or any other alleged co-conspirator, including the Rating Bureau (OTIRB). *See* ECF No. 36 at ¶¶ 12, 14, 16, & 18.[44] Plaintiffs acknowledge that the title insurance defendants, not their corporate defendant parents, "are members of the OTIRB and have charged title insurance rates in Ohio that OTIRB and the defendant title insurers collectively set." ECF No. 36 at ¶¶ 11, 13, 15 & 17. Plaintiffs do not allege facts to show that the corporate parent defendants knew what their subsidiaries were doing. Such thin allegations fail to "raise a right to relief above the speculative level." *Twombly* 550 U.S. at 555.

Because the Complaint fails the *Twombly* standard relative to the corporate parent defendants, Plaintiffs have failed to set forth a claim for relief. Consequently, the Sherman Act claim (Count One) against the parent corporation defendants should be dismissed. The Valentine Act claim is based upon the same allegations as the Sherman Act claim. As earlier stated, the Valentine Act was patterned after the Sherman Act and federal law treats Ohio's Valentine Act parallel to the Sherman Act, "and as a consequence this court has interpreted the statutory language in light of federal construction of the Sherman Act." *C.K. & J.K., Inc. v. Fairview*

---

[44] In reply to ORI's Motion to Dismiss, Plaintiffs argues that they "specifically alleged that ORI [for example] agreed to its subsidiary's participation with non-related entities in the conspiracy set forth in the [Complaint]." ECF No. 64 at 39. The undersigned has found no language in the Complaint alleging a specific agreement. And, assuming *arguendo*, were such language present, the *Copperweld* issue of whether a parent can agree or conspire with its subsidiary would still loom.

(1:08CV677)

*Shopping Center Corp.,* 63 Ohio St.2d 201, 204 (1980).  Accordingly, where a plaintiff's claim

under the Sherman Act fails, courts have also held that a plaintiff's Valentine Act claim (Count

Two) fails as well.[45]  *Invacare Corp. v. Repironics, Inc.*, 2006 WL 3022968 at *13 (N.D. Ohio

2006) (*citing Richter Concrete Corp. v. Hilltop Basic Res.,* 547 F.Supp. 893, 920 (S.D.Ohio

1981), *aff'd,* 691 F.2d 818 (6th Cir.1982)).  For the reasons set forth herein, the Valentine Act

claim (Count Two) should also be dismissed as to the corporate parent defendants.

    As stated above, only ORI, filed motion to dismiss on the ground of failure to allege a

conspiracy on behalf of the corporate parent defendants.  For the reasons provided above, the

undersigned finds that ORI's motion has merit and recommends that it (ECF No. 41) be granted.

Because  Plaintiffs' claims against the remaining corporate parent defendants cannot succeed for

the same reasons they fail as to ORI, the undersigned recommends the *sua sponte* dismissal of

the Complaint against the remaining corporate parent defendants, to wit: Fidelity National

Financial, First American Corporation, Stewart Information Services Corporation and

LandAmerica Financial Group, Inc.[46]

_____

    [45]  Plaintiffs essentially concede that a failure to state a Sherman Act claim would also
constitute a failure to state a claim under Ohio's Valentine Act.  ECF No. 64 at 40.  The Court
concurs.

    [46] LandAmerica Financial Group, Inc., one of the corporate defendants, has filed
bankruptcy.  Because the recommendation is for a dismissal of all allegations against
LandAmerica Financial Group, Inc., the undersigned recognizes the awkward position the
automatic stay (ECF No. 60) due poses for all who are bound by it.  The undersigned, therefore,
recommends that, in the interest of due process to all parties, unless or until the Court receives
evidence that the stay has been lifted or modified, the dismissal should be stayed as to defendant
LandAmerica Financial Group, Inc.

(1:08CV677)

## VI.  Conclusion and Recommendation

Thus, for reasons provided in greater detail above, the undersigned recommends:

(1) GRANTING Defendants' Joint Motion to Dismiss relative to Counts One and Two of the

Complaint, ECF No. 43, without prejudice.  (2) GRANTING Old Republic International

Corporation's motion to dismiss for failure to state a claim (ECF NO. 41), without prejudice,

and, applying the same legal logic, (3) GRANTING the *sua sponte* dismissal of all other

corporate parent defendants, with the exception of LandAmerica Financial Group, Inc. against

whom all matters are stayed due to bankruptcy.[47]  The remaining motion (ECF No. 40)  to

dismiss should be denied as moot.

"Without prejudice" dismissals would permit Plaintiffs an opportunity to (once again)

modify the Complaint in order to present a prayer for non-rate-related injunctive relief that might

survive the Filed Rate Doctrine relative to all Defendants other than the corporate parent

defendants.  Regarding, the corporate parent defendants, a without prejudice dismissal would

permit the Plaintiffs to amend the Complaint to meet the *Twombly*/*Iqbal* standard, if possible.


        *s/ Benita Y. Pearson*

Dated: September 7, 2009         Benita Y. Pearson
                                     United States Magistrate Judge

---

[47] As noted above, the parent corporations include, Fidelity National Financial (¶ 12),
First American Corporation (¶ 14), LandAmerica Financial Group, Inc.(¶16), Stewart
Information Services Corporation (¶ 18), and Old Republic International Corporation (¶ 20).

(1:08CV677)

## **OBJECTIONS**

       Objections to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).