# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE TITLE INSURANCE ANTI-TRUST CASES | ) ) | CASE NOS.  1:08CV677   AND RELATED CASES |
| | ) | |
| | ) | JUDGE SARA LIOI |
| | ) | |
| | ) | |
| | ) | MEMORANDUM OPINION |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

On September 7, 2009, Magistrate Judge Benita Pearson filed a Report and Recommendation (Doc. No. 102) resolving the Defendants' dispositive motions. Both Plaintiffs and Defendants filed timely objections to the Report. (Doc. Nos. 104 and 105, respectively.)

Upon *de novo* review of those portions of the Report to which the parties have made objection, this Court hereby **ADOPTS**, in part, and **REJECTS**, in part, the Report and Recommendation of the Magistrate Judge. As set forth more fully below, Defendants' Joint Motion (Doc. No. 43) and Defendant Old Republic International Corporation's motion to dismiss (Doc. No. 41) are **GRANTED**, and these consolidated cases are **DISMISSED**.

This Court's review of the Magistrate Judge's Report and Recommendation is governed by 28 U.S.C. § 636(b), which requires a *de novo* decision as to those portions of the document to which objection is made. Because the parties objected only to those portions of the Magistrate Judge's Report and Recommendation

1

relating to the application of the filed rated doctrine and the McCarran-Ferguson Act to the claims in the Consolidated Complaint, as well as the manner in which the claims were to be dismissed, the remainder of the Report -- including its account of the factual and procedural history of the case -- is hereby accepted as written. Thus, the Court will only provide a brief review of the facts and procedural posture sufficient to adequately frame the issues presented by the various objections.

**BACKGROUND**

The named Plaintiffs in these consolidated cases[1] are individuals who have purchased title insurance from certain Defendants at some time between March 2004 and the present. These Plaintiffs seek to bring a class action on behalf of all individuals who have purchased title insurance in Ohio during the relevant time period. (Case No. 1:08CV677, Doc. No. 36, Consolidated Complaint at ¶ 10(a)-(h).) Defendant insurers are alleged to have sold title insurance in Ohio during the relevant period, either directly or through subsidiaries. (*Id*. at ¶¶ 11-19.) Plaintiffs further allege that a number of the Defendant insurers are members of Defendant Ohio Title Insurance Rating Bureau (OTIRB), and that Defendant insurers charge the rates set by the OTIRB for their insurance policies. (*Id*. at ¶¶ 11-19, 21, 24; insurers and OTIRB shall be collectively referred to as "Defendants.")

---

[1] There are eight cases in all, with the lead case filed on March 18, 2008. (*See* Case No.1:08CV677, Doc. No. 1 Class Action Complaint.) The other cases are: 1:08CV678, 1:08CV741, 4:08CV750, 1:08CV803, 1:08CV1021, 5:08CV1289, 1:08CV1836. Originally assigned to the dockets of numerous judges in the Northern District of Ohio, the cases were eventually transferred to the docket of the Hon. David D. Dowd, Jr. The cases were consolidated on July 11, 2008, and Plaintiffs' Consolidated Class Action Complaint was filed on July 31, 2008. Following Judge Dowd's recusal on February 2, 2010, these consolidated cases were reassigned to the undersigned's docket. All docket references are to the lead case: 1:08CV677.

The Ohio Revised Code governs the sale of title insurance in the State of Ohio, and, particularly, those regulations set forth in Title 39. While a review of the relevant regulations appears in the Magistrate's Report, the Court finds it necessary to briefly sketch out the administrative landscape. OHIO REV. CODE § 3935.04(A) requires all title insurers to file with the superintendent of insurance "every form of a policy, endorsement, rider, manual, minimum class rate, rating schedule, or rating plan, and every other rating rule, and every modification of any of them, which it proposes to use." Insurers may satisfy their obligation to make such filings by subscribing to, or becoming a member of, a licensed rating bureau. OHIO REV. CODE § 3935.04(B). The parties agree that OTIRB is a licensed rating bureau under § 3935.04(B).

Where insurers belong to a rating bureau, they may permit the bureau to submit on their behalf proposed rates, along with supporting information, for consideration by the Department of Insurance. OHIO REV. CODE § 3935.04(A). The superintendant "shall review filings as soon as reasonably possible […]." § 3935.04(C). A proposed rate becomes final thirty (30) days after it is filed, "unless it is disapproved by the superintendent within the waiting period." § 3935.04(D).

During the waiting the period, the superintendant may require the insurer, or its bureau, to submit additional information in support of its requested rate. He may also find that the filing does not comply with the OHIO REVISED CODE. § 3935.05(B). Once a rate submitted by a bureau has been approved by the Department of Insurance (or has not been disapproved after the expiration of the 30 day waiting period), however, the rate becomes the only legal rate. As such, the insurer members are not permitted to

charge a different rate for title insurance, unless the insurer successfully petitions the superintendent for permission to deviate from the filed rate. §§ 3935.04(H); 3935.07.

At no time does the State of Ohio relinquish its right to monitor and control the rates charged for title insurance. At any time after the waiting period has expired, the superintendant may find that the filed rate no longer meets the requirements of § 3935.01 to § 3935.17, and he shall, after a hearing and upon due notice, issue a determination that the rate is no longer effective. § 3935.05(C).

Any person or organization aggrieved by a filed rate may submit a written application requesting a hearing before the superintendent. If (after the hearing) the superintendant finds the application to have merit, he shall issue a decision setting forth his reasons for finding that the rate is no longer effective. § 3935.05(D).

At the heart of these consolidated actions is the allegation that Defendants have conspired to fix prices for title insurance in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, and Ohio's Valentine Act, Ohio Rev. Code § 1331.01 *et seq*. (Cons. Compl. at ¶¶ 49, 58, 66.) According to Plaintiffs, Defendant insurers use the OTIRB to set and charge "supracompetitive" rates. (*Id*. at ¶¶ 49-50, 52.) Allegedly hidden within these inflated rates are unlawful kickbacks and other charges unrelated to title insurance or the services provided in connection with title insurance. (*Id*. at ¶¶ 49-50.) These allegations form the basis of Plaintiffs' sole causes of action under the Sherman Act ("the federal claims") and the Valentine Act ("the state claims"). Plaintiffs seek damages and injunctive relief for both the federal and state claims.

Defendant Stewart Information Services Corporation (Stewart) filed a motion to dismiss for lack of personal jurisdiction (Doc. No. 40); Defendant Old Republic International Corporation (Old Republic) moved to dismiss for failure to state a claim under the Sherman and Ohio Valentine Acts, and for improper venue and personal jurisdiction (Doc. No. 41); and all Defendants filed a joint motion to dismiss on the grounds that Plaintiffs' claims were barred by the filed rate doctrine and by the McCarran-Ferguson Act (Doc. No. 43). The Court permitted Plaintiffs to conduct limited discovery prior to responding to these dispositive motions.

Once fully briefed, the motions were referred to Magistrate Judge Benita Pearson for the preparation of a Report and Recommendation. The Magistrate Judge conducted a hearing on the motions on May 26, 2009. Thereafter, she issued a Report and Recommendation, wherein she recommended that Defendants' joint motion be granted on the grounds that the federal and state antitrust claims were barred by the filed rate doctrine and/or the McCarran-Ferguson Act, and that Old Republic's motion to dismiss be granted on the ground that Plaintiffs failed to state a claim against it. She also recommended that all corporate parent Defendants be dismissed without prejudice, that both of the claims in the Consolidated Complaint be dismissed without prejudice against the remaining Defendants, and that Stewart's motion be denied as moot. (Report at 56.)

Plaintiffs object to the Magistrate Judge's conclusion that their claims are barred by the filed rate doctrine and/or the McCarran-Ferguson Act. Defendants object to the Magistrate Judge's recommendation that the claims be dismissed without prejudice. The Court heard oral argument on the objections on December 17, 2009. After the hearing, the Court permitted the parties to file supplemental briefs. (Doc. No. 115, Exs. 1,

2.) Now, with the benefit of multiple hearings and the parties' extensive briefing, the Court is prepared to rule.

## STANDARD OF REVIEW

Defendants bring their joint motion under Fed. R. Civ. P. 12(b)(6).[2] When reviewing a motion to dismiss for failure to state a claim, the Court must construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations as true, and determine whether the moving party is entitled to judgment as a matter of law. *Commer. Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007) (citing *United States v. Moriarty*, 8 F.3d 329, 332 (6th Cir. 1993)). To survive a motion to dismiss under Rule 12(b)(6), the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Although this is a liberal pleading standard, it requires more than the bare assertion of legal conclusions. Rather, the complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *First Am. Title Co. v. DeVaugh*, 480 F.3d 438, 444 (6th Cir. 2007) (quoting *Se. Tex. Inns, Inc. v. Prime Hospitality Corp*., 462 F.3d 666, 671-72 (6th Cir. 2006)).

---

[2] Stewart brings its motion under Rule 12(b)(2), while Old Republic relies upon Rule 12(b)(2), (3), and (6). Because the Court's ruling is largely guided by its application of Rule 12(b)(6), the Court will not devote space to setting forth the standards for the other relevant provisions of Rule 12.

**ANALYSIS**

## I. THE FILED RATE DOCTRINE

The filed rate doctrine[3] precludes an award of damages under antitrust laws where recovery is premised on payments made under rates approved by a regulatory agency. In her Report and Recommendation, the Magistrate Judge held the filed rate doctrine applied to preclude both Plaintiffs' federal and state claims for damages, but did not operate to bar Plaintiffs' claim for injunctive relief.

In their objection, Defendants assert that the filed rate doctrine bars Plaintiffs' causes of actions in their entirety, including Plaintiffs' claims for injunctive relief. In their objections, Plaintiffs first claim that the filed rate doctrine is inapplicable to the Ohio title insurance industry. Alternatively, Plaintiffs claim that the filed rate doctrine is inapplicable to this case because Defendants' rate filings do not comply with Ohio's rate filing requirements. Finally, Plaintiffs assert that even if the filed rate doctrine bars their claims for damages, it does not bar their claims for injunctive relief. Each of these arguments is addressed *seriatim*.

### Application of The Filed Rate Doctrine to the Ohio Title Insurance Industry is Appropriate

#### *Keogh, Square D, and the Continued Vitality of the Filed Rate Doctrine*

The filed rate doctrine made its first substantial appearance in an antitrust context in 1922, in *Keogh v. Chicago & Northwestern R. Co*., 260 U.S. 156 (1922). In *Keogh*, the Supreme Court held that a private shipper could not maintain a cause of action against an association of freight carriers that had collectively agreed on shipping rates

---

[3] Interchangeably referred to by courts as the *Keogh* doctrine, or the filed tariff doctrine.

7

that had been filed with, and approved by, the Interstate Commerce Commission ("ICC") under authority derived by the Interstate Commerce Act ("ICA"). *Id.* at 161. The rates were approved by the ICC as reasonable and non-discriminatory, and were therefore legal under the ICA. *Id.* The Court reasoned that once the ICC approved the rate, it became legal – and a legal rate is not actionable as an antitrust injury, *even if* the rate resulted from an illegal combination of the carriers to fix rates. *Id.* at 162-3 ("A rate is not necessarily illegal because it is the result of a conspiracy in restraint of trade in violation of the [Sherman] Act. What rates are legal is determined by the [ICA].").

In *Keogh*, the Supreme Court reasoned that if it were to grant relief based on an antitrust violation, the authority of the ICC would be undermined. *Id.* at 164 ("The powers conferred upon the Commission are broad. It may investigate and decide whether a rate has been, whether it is, or whether it would be discriminatory."). Moreover, granting relief would require a court to speculate as to what the proper rate should be, a task for which courts are ill-suited. *Id.* Finally, an antitrust remedy in the form of damages would be discriminatory, providing relief to plaintiffs, but not to other consumers, which was contrary to the ICA's goal of uniform rates. *Id.* at 163.

The filed rate doctrine is not without its critics. In *Square D Co. v. Niagara Frontier Tariff Bureau*, 476 U.S. 409 (1986), the Supreme Court recognized that, as extensively noted by Judge Friendly in the Second Circuit decision under review, several developments had undermined the reasoning of *Keogh* in the six decades since its pronouncement. For example, the Court acknowledged:

> the development of class actions, which might alleviate the expressed concern about unfair rebates; the emergence of precedents permitting treble-damages remedies even when there is a regulatory remedy

8

available; the greater sophistication in evaluating damages, which might mitigate the expressed fears about the speculative nature of such damages; and the development of procedures in which judicial proceedings can be stayed pending regulatory proceedings.

*Square D*, 476 U.S. at 423 (citing *Square D Co. v. Niagara Frontier Tariff Bureau, Inc*., 760 F.2d 1347, 1356 (2d Cir. 1985) (Friendly, J.)). While the Court praised Judge Friendly's analysis as "characteristically thoughtful and incisive," it declined his invitation to overrule *Keogh* and instead reaffirmed the filed rate doctrine on stare decisis grounds for the sake of stability in the law. "If there is to be an overruling of the *Keogh* rule, it must come from Congress, rather than from this Court." *Square D*, 476 U.S. at 424. Other courts that have questioned the filed rate doctrine have also adhered to it stare decisis principles. *See, e.g., Security Servs. v. Kmart Corp.*, 511 U.S. 431, 440 (1994) (holding that the filed rate doctrine is "not subject to discretionary enforcement" even though "some may debate in other forums about [its] wisdom"); *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 402 (7th Cir. 2000) (applying filed rate doctrine in a telecommunications act case, noting that "[a]lthough the doctrine had come under some criticism, the Supreme Court reaffirmed it in *Square D* [], and we are bound to follow it."). The Sixth Circuit, in one of its few opinions that addresses the filed rate doctrine, commented on *Square D* as follows:

We do not read [*Square D's*] deferential language as an adoption of Judge Friendly's rationale, for on its face it is a polite refusal of an invitation. Since the Supreme Court did in fact uphold the ruling in *Keogh* we construe its cited language to be that the *Keogh* rationale, whatever else might be said of it, still commands, in the Supreme Court's view, the support of Congress. Justice Stevens emphasized "*Keogh's* role as an essential element of the settled legal context in which Congress has repeatedly acted in this area." *Square D*, 106 S. Ct. at 1930. Furthermore, we do not believe that either *Keogh* or *Square D* was intended to be limited solely to antitrust damage claims brought by shippers.

*Pinney Dock & Transp. Co. v. Penn Cent. Corp*., 838 F.2d 1445, 1452 (6th Cir. 1988). Although free to do so, Congress has not acted to abrogate the filed rate doctrine.[4]

### Plaintiffs Misapprehend the Nature of the Filed Rate Doctrine

In their opposition, Plaintiffs correctly assert that the filed rate doctrine has never been applied to the Ohio title insurance industry. While Plaintiffs acknowledge that the Supreme Court has applied the filed rate doctrine to areas outside the ICC, *see AT &T Co. v. Central Office Tele., Inc.,* 524 U.S. 214 (1998) (applying the filed rate doctrine to the Communications Act, noting that its provisions "share [the ICC's] goal of preventing unreasonable and discriminatory charges"); *Ark. La. Gas Co. v. Hall*, 453 U.S. 571 (1981) (applying filed rate doctrine based upon rates filed with the Federal Energy Regulatory Commission), they insist that an extension of the filed rate doctrine to the Ohio title insurance industry is improper because the Supreme Court "has repeatedly held that implied exemptions to antitrust liability are strongly disfavored." (Doc. No. 77 at 17.) Plaintiffs also correctly argue that "[r]epeals of the antitrust laws by implication from a regulatory statute are strongly disfavored, and have only been found in cases of plain repugnancy between the antitrust and regulatory provisions." *United States v. Philadelphia National Bank*, 374 U.S. 321, 350-51 (1963). While Plaintiffs are correct in

---

[4] *Cf. Georgia v. Pennsylvania R. Co*., 324 U.S. 439 (1945). The Reed-Bulwinkle Act was enacted at least in part in response to *Georgia v. Pennsylvania R. Co.,*324 U.S. 439 (1945). In *Pennsylvania R. Co.*, the Supreme Court restated *Keogh* and held that, "although Georgia could not maintain a suit under the antitrust laws to obtain damages, it could obtain injunctive relief against the collective ratemaking procedures employed by the railroads." *Square D*, 476 U.S. at 418. The Reed-Bulwinkle Act created an absolute immunity from the antitrust laws for certain specific activities, including the one at issue in *Pennsylvania R. Co.*, and thereby superseded that holding. *Square D* rejected the contention that *Keogh* "was implicitly rejected in the Reed-Bulwinkle Act" and rather held that "[p]articularly because the legislative history reveals clear congressional awareness of *Keogh*, far from supporting petitioners' position, the fact that Congress specifically addressed this area and left *Keogh* undisturbed lends powerful support to *Keogh's* continued viability." *Id.* at 419.

their general assertion, and courts indeed must be extremely reluctant to imply antitrust immunity, Plaintiffs fundamentally misapprehend the nature of the filed rate doctrine, which is not an immunity at all.

The filed rate doctrine does not create an antitrust immunity. *Square D* squarely rejected the proposition, advanced by petitioners in that case, that the filed rate doctrine is properly characterized as an immunity.[5] *Square D*, 476 U.S. at 422 (stating that *Keogh's* holding that an award of damages is not an available remedy claiming that a filed rate was the product of an antitrust violation "is far different from the creation of an antitrust immunity"). "A critical distinction remains between an absolute immunity from *all* antitrust scrutiny and a far more limited nonavailability of the private treble-damages remedy." *Id.* at 422 n.28 (emphasis in original). The filed rate doctrine is merely a judicially created restriction on remedies and standing under which private plaintiffs are barred from suing for a damage recovery. It does not preclude injunctive relief[6] or prohibit the Government from seeking civil or criminal redress. Therefore, this Court rejects Plaintiffs' contention that applying the filed rate doctrine to the Ohio title

---

[5] Thus, the filed rate doctrine is different than the State Action Doctrine, sometimes called the *Parker* State Action Doctrine, which holds that state-mandated or state-directed restraints are exempted from antitrust liability, *see Parker v. Brown*, 317 U.S. 341 (1943), and the *Noerr-Pennington* Doctrine, which immunizes from antitrust liability those who petition the federal or state government to take actions that may impose restraints on trade. *See, e.g., Eastern R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961).
[6] Although it may in certain circumstances, as discussed *infra*.

insurance industry would be an impermissible extension of antitrust immunity.[7]

*Nonjusticiability and Nondiscrimination: The Policies Underlying the Filed Rate Doctrine Support its Application to the Ohio Title Insurance Industry*

"[T]wo companion principles lie at the core of the filed rate doctrine: first, that legislative bodies design agencies for the specific purpose of setting uniform rates, and second, that courts are not institutionally well suited to engage in retroactive rate setting." *Wegoland Ltd. v. NYNEX Corp.,* 27 F.3d 17, 19 (2d Cir. 1994). Under the first, the "nonjusticiability" principle, the filed rate doctrine "preserve[s] the regulating agency's authority to determine the reasonableness of rates," *H.J., Inc. v. Northwestern Bell Tel. Co.,* 954 F.2d 485, 488 (8th Cir. 1992). Under the second, the "nondiscrimination" principle, the filed rate doctrine "insure[s] that the regulated entities charge only those rates that the agency has approved or been made aware of as the law may require." *Id.* The filed rate doctrine "is applied strictly to prevent a plaintiff from

---

[7] As noted by the Magistrate Judge in her Report and Recommendation (Doc. No. 102 at 18-19), federal courts have long applied the Filed rate doctrine to a wide spectrum of insurance actions. *See, e.g., Rios v. State Farm Fire & Cas. Co.,* 469 F.Supp.2d 727, 737 (S.D. Iowa 2007) (applying filed rate doctrine to common law claim seeking return of insurance premiums); *Mullinax v. Radian Guar. Inc.,* 311 F. Supp. 2d 474, 484 n.6 (M.D.N.C. 2004) (filing of rate by defendant with state Department of Insurance bars plaintiffs from challenging reasonableness of those rates); *Kirksey v. Am. Bankers Ins. Co.,* 114 F. Supp. 2d 526, 529 (S.D. Miss. 2000) (applying filed rate doctrine to common law claim seeking return of insurance premiums); *Stevens v. Union Planters Corp.,* 2000 WL 33128256, at *3 (E.D. Pa. Aug. 22, 2000) (allegation of kickbacks in forced hazard insurance scheme barred by filed rate doctrine); *Allen v. State Farm Fire & Cas. Co.,* 5 F. Supp. 2d 1217, 1229 (S.D. Ala.1999) (filed rate doctrine barred claim challenging unlawfulness of rate filing by insurance company); *Korte v. Allstate Ins. Co.,* 48 F. Supp. 2d 647, 651 (E.D. Tex. 1999) (applying filed rate doctrine to claim asserting insurance rates improper due to submission by defendant of illegal subsidy factor accounts to state insurance regulator because state agency determined reasonable rates pursuant to statutory scheme); *Morales v. Attorney's Title Ins. Fund, Inc.,* 983 F. Supp. 1418, 1429 (S.D. Fla. 1997) (dismissing plaintiffs' kickback claim against title insurer pursuant to filed rate doctrine because claim was nothing more than challenge to title insurance rates set by state regulators); *Calico Trailer Mfg. Co., Inc.v. Ins. Co. Of N. Am.,* 1994 WL 823554 at *6 (E.D. Ark. Oct. 12, 1994) (filed rate doctrine barred plaintiffs' challenge to insurance rates as inflated as result of conspiracy among defendant insurance companies).

bringing a cause of action even in the face of apparent inequities whenever *either* the nondiscrimination strand or the nonjusticiability strand underlying the doctrine is implicated by the cause of action the plaintiff seeks to pursue." *Marcus v. AT&T Corp*., 138 F.3d 46, 59 (2d Cir. 1998) (emphasis added). This Court therefore turns to determine whether or not *either* of the principles underlying the filed rate doctrine are implicated here.

a)      Nonjusticiability

Defendants maintain that Plaintiffs' asserted request for relief "would inescapably require this Court to make a new determination of what the multitude of different title insurance rates would have been absent Defendants' alleged 'illegal conduct.'" (Doc. No. 115-2 at p. 30.) As to Plaintiffs' request for damages, this Court agrees.

The nonjusticiability principle preserves an important purpose of the filed rate doctrine: to prohibit courts from second-guessing a regulating agency's determination as to the reasonableness of a given rate. "As compared with the expertise of regulating agencies, courts do not approach the same level of institutional competence to ascertain reasonable rates." *Wegoland*, 27 F.3d at 21. "Courts are simply ill-suited to systematically second guess the regulators' decisions and overlay their own resolution." *Id.* This doctrine therefore precludes claims for damages where a court would be required to substitute "its judgment as to reasonable rates for that of an agency with specialized knowledge of the area." *County of Suffolk v. Long Island Power Auth*., 154 F. Supp. 2d 380, 385 (E.D.N.Y. 2000).

Turning to the specifics of this case, Plaintiffs' claim for damages is

addressed in paragraph 68 of their complaint:

> During the period of the antitrust violations by defendants and their co-conspirators, plaintiffs and each member of the Class they represent, have purchased title insurance and, by reason of the antitrust violations herein alleged, paid more for such than would have been paid in the absence of said antitrust violations. As a result, plaintiffs and each member of the Class they represent, have been injured and damaged in an amount presently undetermined.

(Doc. No. 36 at ¶ 68.)[8] At the December 17, 2009 oral argument, Judge Dowd pointedly

asked counsel for Plaintiffs to explain their theory on damages:

> THE COURT: Right. I don't have this question on here, but if [t]he Court were to determine this case could go forward and that eventually plaintiffs would prevail, it would be in a class action structure, the individual plaintiffs would be entitled to some recovery? Play out for me how this case would work out in terms of remedy.
>
> MR. COHEN: Bruce Cohen, Your Honor.
>
> THE COURT: Go ahead.
>
> MR. COHEN: It would depend [on] the way the case went forward, Your Honor. If Your Honor were to find that the filed rate doctrine does not apply in Ohio title insurance and if Your Honor found McCarran-Ferguson was not applicable and we went forward on the damage case, at that point–
>
> THE COURT: You still have to show conspiracy.
>
> MR. COHEN: That would be a matter of proof because we alleged an antitrust violation in section 1. So we go forward and should we prevail, then there would be a damage analysis, damage finding.
>
> THE COURT: First off, there would have to be a finding of conspiracy.
>
> MR. COHEN: There are three elements for a Section 1 case. There's a finding of conspiracy, a finding of impact from the conspiracy, and finding of damages.

---

[8] The Court notes that the Plaintiffs' theory that lower prices would necessarily result absent the asserted 'antitrust violations' is by no means a certainty. *See, e.g,* Scott Harrington, *Competition and Health Insurance*, WALL STREET J., Nov. 6, 2009 (analyzing recent Congressional proposals to remove antitrust exemptions in the healthcare insurance industry and suggesting that, contrary to popular belief, prohibiting collaboration between insurers might actually cause premiums to increase rather than fall).

THE COURT: Right.

MR. COHEN: The class would go forward on that basis. There would be a damage finding if we were successful and –

THE COURT: How would you establish damage?

MR. COHEN: By expert testimony.

THE COURT: What the rates should have been had there been competition?

MR. COHEN: At this point I haven't gotten that far into it.

THE COURT: I'm trying to figure out.

(Doc. No. 114, Transcript from December 17, 2009 oral argument (hereinafter designated as "TR at _") at 82-83.) The Court ordered each side to simultaneously submit post-hearing memorandums, with no page restrictions and no content restrictions. (*Id.* at 101-102.) Plaintiffs offered no additional argument as to how damages might be calculated absent an inquiry into the reasonableness of the rates determined by the Ohio Department of Insurance. Plaintiffs' attempt to avoid this difficult question is telling, and the answer is inescapable. As alleged repeatedly in their complaint, and reiterated multiple times in pleadings and at oral argument, Plaintiffs' theory is that Defendants' illegal conduct caused Plaintiffs to pay higher title insurance rates, instead of what the rate would have been "in the absence of said antitrust violations." The only way to quantify this harm would require this Court, at some point in the future and assuming liability is proven, to make a determination of "what the rate would have been." This quantification is the very relief the filed rate doctrine *expressly forbids*. Therefore, because Plaintiffs' complaint implicates the nonjusticiability principle, the filed rate doctrine applies to preclude their

15

claim for damages.

b)      Nondiscrimination

As discussed above, the filed rate doctrine applies "whenever either the nondiscrimination strand or the nonjusticiability strand underlying [it] is implicated by the cause of action the plaintiff seeks to pursue." *Dolan v. Fid. Nat'l Title Ins. Co*., No. 09-2697-cv, 2010 U.S. App. LEXIS 2814 (2d Cir. Feb. 11, 2010) (citing *Marcus*, 138 F.3d at 59). Therefore, the Court's conclusion that the nonjusticiability principle is implicated by Plaintiffs' complaint is sufficient alone to apply the filed rate doctrine. The Court also finds, however, that nondiscrimination concerns are implicated and will briefly address that principle here.

The nondiscrimination principle underlying the filed rate doctrine holds that allowing a court to bind a regulated entity to a rate that was neither filed nor found to be reasonable would undermine legislative schemes premised upon uniform rate regulation. *Ark. La. Gas Co.* 453 U.S. at 579. In *Marcus*, the Second Circuit observed that "the Supreme Court has rejected the suggestion that the development of class actions, which might alleviate the [.  .  .] concern about nondiscrimination, made the nondiscrimination principle [of the filed-rate doctrine] inapplicable to a putative class action." 138 F.3d at 61 (internal quotation marks & alterations omitted) (citing *Square D*, 476 U.S. at 423). The Ninth Circuit has similarly "reject[ed] the argument that the filed-rate doctrine is inapplicable to class actions." *Enns v. NOS Communs. (In re NOS Communs.)*, 495 F.3d 1052, 1059 (9th Cir. 2007).

The filed rate doctrine serves the purpose of nondiscrimination by prohibiting a court from entering a judgment that would serve to alter the rate paid by a

plaintiff. *See Hill v. BellSouth Telcomms., Inc*., 364 F.3d 1308, 1316 (11th Cir. 2004). "Even if such a challenge does not, in theory, attack the filed rate, an award of damages to the customer-plaintiff would, effectively, change the rate paid by the customer to one below the filed rate paid by other customers." *Id.* Therefore, no claim can be permitted to go forward that, "if successful, would require an award of damages that would have the effect of imposing different rates upon different consumers." *Bryan v. BellSouth Comm's*., 377 F.3d 424, 430 (4th Cir. 2004).

In this case, it is undisputed that Defendants are only permitted to charge the filed rate approved by the Department of Insurance, OHIO REV. CODE § 3935.04(H), such rates having been reviewed by the Department to ensure that the rates "shall not be excessive, inadequate, or unfairly discriminatory." § 3935.03(B). Examining Plaintiffs' allegations reveals that, if Plaintiffs succeed in their claims for damages, Defendants "would, in essence, be forced to refund to [Plaintiffs] the amount allegedly overcharged." *Taffet v. Southern Co*., 967 F.2d 1483, 1491 (11th Cir. 1992) (*Taffet II*). While this Court recognizes that "concerns for discrimination are substantially alleviated in [a] putative class action," *Wegoland*, 27 F.3d at 22, those concerns, albeit diminished, still exist. *See Marcus* and *In re NOS Communs., supra*. Therefore, Plaintiffs' complaint also implicates the nondiscrimination principle, and the filed rate doctrine applies to preclude their claim for damages on this independent ground as well.

*Plaintiffs' Contentions that the Filed Rate Doctrine is Inapplicable Because the Ohio Department of Insurance Conducts "No Meaningful Review" of Filed Rates and the Ohio Title Insurance Scheme is not a "Pervasive Regulatory Regime" are Without Merit*

Plaintiffs next argue that the filed rate doctrine should not be applied to the Ohio title insurance industry because the Ohio "regulatory regime [is] not sufficiently pervasive to ensure adequate regulatory oversight of those rates" and "there is no attempt by the [Ohio Department of Insurance] to meaningfully regulate title insurance filings." (Doc. No. 77 at p. 19.) The Court disagrees.

        c)      The Filed Rate Doctrine Applies Regardless of the Level of Agency Review

The Supreme Court has rejected the argument that the filed rate doctrine can only be predicated on a minimum level of agency review. In *Square D*, the Supreme Court rejected the petitioner's contention that the filed rate doctrine was inapplicable due to the fact that, unlike *Keogh*, no ICC hearing reviewing the rate had been held. The Court held that the Second Circuit decision "properly concluded that *Keogh* was not susceptible to such a narrow reading," *Square D*, 476 U.S. at 417 n.19, and approvingly cited Judge Friendly's decision: "Rather than limiting its holding to cases where, as in *Keogh*, rates had been investigated and approved by the ICC, the Court said broadly that shippers could not recover treble-damages for overcharges *whenever tariffs have been filed*." *Id*. (quoting *Square D Co. v. Niagara Frontier Tariff Bureau, Inc*., 760 F.2d 1347, 1351 (2d Cir. 1985)) (emphasis added). Thus, it is the *filing* of the rates with the regulating agency that triggers the filed rate doctrine, not any minimum level of review undertaken by the agency.

        *Square D's* decision to apply the filed rate doctrine irrespective of the level

18

of agency review has been widely followed by other federal courts. In *Goldwasser*, the Seventh Circuit rejected the notion that the filed rate doctrine does not apply because a reviewing agency "rarely exercise[s] [its] muscle and thus give[s] no meaningful review to the rate structure." *Goldwasser*, 222 F.3d at 402. Going even further, the First Circuit explained that "it is the *filing* of the tariffs, and not any affirmative approval or scrutiny by the agency, [. . .] that triggers the filed rate doctrine." *Town of Norwood v. New England Power Co.*, 202 F.3d 408, 420 (1st Cir. 2000) (emphasis in original). A district court in this circuit, under the assumption that "rates were never subjected to meaningful agency review," drew on *Square D* and held that "[e]ven so, the filed rate doctrine retains a sound basis. It applies to all duly submitted, lawful rates *regardless of the extent of the regulatory agency's inquiry* into the appropriateness of those rates." *Daleure v. Kentucky*, 119 F. Supp. 2d 683, 689 (W.D. Ky. 2000) (emphasis added). *See also In re Pa. Title Ins. Antitrust Litig.*, 648 F. Supp. 2d 663, 675 (E.D. Pa. 2009) (holding that where the statutory scheme provides for agency review of title insurance rates, "the filed rate doctrine applies irrespective of the degree of agency inquiry, scrutiny, or exercise of regulatory muscle").

Plaintiffs contend that two Ninth Circuit decisions, *Wileman Bros. & Elliott, Inc. v. Giannini*, 909 F.2d 332 (9th Cir. 1990), and *Brown v. Ticor Title Ins. Co.*, 982 F.2d 386 (9th Cir. 1992) (which relies primarily on *Wileman Bros.*), dictate a different conclusion. In *Wileman Bros.*, nectarine and plum producers served as members or employees of administrative committees appointed by the Secretary of Agriculture to issue and enforce standards for marketing nectarines and plums. "The committee members promulgated the regulations themselves rather than making recommendations

19

to the Secretary." *Brown*, 982 F.2d at 393 (citing *Wileman Bros.*, 909 F.2d at 337). The Ninth Circuit rejected defendants' contention that, under the statutory scheme, "the Secretary tacitly approved the [filed rate] by failing to disapprove them as provided for in the regulations governing the committees." *Wileman Bros.*, 909 F.2d at 337. The statute in question, 9 C.F.R. § 917.62, provided "[e]ach and every regulation, decision, determination, or other act of the committee shall be subject to the continuing right of the Secretary to disapprove of the same at any time."

The Ninth Circuit held that *Square D* and *Keogh* mandated that "governmental approval was required before there could be any effect from the collective activity and it was such approval that legitimized the allotments and the rates." *Wileman Bros.* 909 F.2d at 337-38. The court continued to hold that "the mere fact of failure to disapprove, however, does not legitimize otherwise anticompetitive conduct [. . .]. [Nondisapproval] does not guarantee any level of review whatsoever."[9] *Id.*

The Ohio title insurance scheme is readily distinguishable from the Agricultural Marketing Agreement and Act of 1937 at issue in *Wileman Bros*. The Ohio title insurance does mandate that proposed rates become final thirty days after being filed "unless disapproved by the superintendent within the waiting period." Ohio Rev. Code. § 3935.04(H). But unlike the statute in *Wileman Bros.*, the Ohio statutory scheme demands an *affirmative duty* of the superintendent. The superintendent "*shall review* filings as soon as reasonably possible." § 3935.04(C) (emphasis added). While the agricultural

---

[9] The court in *Wileman Bros.* also suggested that, although it could not consider it on a motion to dismiss, "evidence of participation [in the non-disapproval process] by representatives of the Secretary" might suffice to apply the Filed rate doctrine.

marketing statute in *Wileman Bros.* gives the Secretary of Agriculture the *right* to review the committee's filings, review of rates submitted by the rating bureaus in Ohio to the Department of Insurance is mandated. While rates become effective "unless disapproved by the superintendent within the waiting period," the superintendent's affirmative duty to review rate filings warrants the conclusion that rates that become effective as a result of *approval* by the Department of Insurance, and not as the result of the "mere fact of failure to disapprove."[10]

 *Brown v. Ticor Title Insurance* involved Arizona and Wisconsin title insurance regulations which permitted the filing of rates by rating bureaus. Relying on *Wileman Bros.* (and failing to even mention *Square D*), the Ninth Circuit held:

> if those rates were the product of unlawful activity prior to their being filed and were not subjected to meaningful review by the state, then the fact that they were filed does not render them immune from challenge. The absence of meaningful state review allows the insurers to file any rates they want. Therefore, the act of filing does not legitimize a rate arrived at by improper action.
>
> The regulations of Arizona and Wisconsin require only "non-disapproval" of the rates and do not require compliance with strict guidelines such as those set forth under the ICC regulations. This case falls within the holding of *Wileman,* and we therefore hold the filed tariff doctrine is not applicable under either the Arizona or Wisconsin regulatory schemes.

*Brown*, 982 F.2d at 394. In the first instance, other than stating the regulations require only "non-disapproval and do not require compliance with strict guidelines" *Brown* offers no meaningful discussion of either the Arizona or Wisconsin regulatory schemes and is nearly devoid of analysis. Given *Brown's* exclusive reliance on *Wileman Bros.* and its

---

[10] Indeed, approval by the superintendent is clearly what the statute comprehends: "[. . .] the superintendent may authorize a filing which he has reviewed to become effective before the expiration of the waiting period." § 3935.04(D).

conclusion that "this case falls within the holding of *Wileman*," however, one reasonable conclusion is that the Arizona and Wisconsin regulatory schemes at issue do not require any affirmative review by an agency whatsoever. As discussed above, however, the Ohio statutory scheme clearly contemplates more than mere non-disapproval by the Department of Insurance. Moreover, the Ohio statutory scheme requires compliance with strict guidelines. *See* OHIO REV. CODE. § 3935.03 (detailing regulations as to how "rates shall be made") and § 3935.04(C) (requiring the superintendent to "review filings as soon as reasonably possible after they have been made in order to determine whether they meet the requirements of sections 3935.01 to 3935.17"). While *Brown* characterized the Arizona and Wisconsin regulatory schemes as lacking meaningful state review, which it interpreted to mean allowing "insurers [to] file any rate they want," the Ohio regulatory scheme would clearly disallow such filings. § 3935.03(B) ("Rates shall not be excessive, inadequate, or unfairly discriminatory."). Finally, to the extent *Brown* even warrants any consideration from this Court, it is clearly an outlier case. *McCray v. Fid. Nat'l Title Ins. Co.*, 636 F. Supp. 2d 322, 329 (D. Del. 2009) ("Other than the Ninth Circuit in *Brown*, no other court has taken such a narrow view of the applicability of the filed rate doctrine.").

Plaintiffs also rely on *Blaylock v. First Am. Title Ins. Co.*, 504 F. Supp. 2d 1091 (W.D. Wash. 2007). In *Blaylock*, the court declined to apply the filed rate doctrine to a challenge to practices by the Washington title insurance industry under state antitrust law. Again, *Blaylock* is easily distinguishable from this case. In Washington, "title insurance is specifically exempted" from the comprehensive scheme for setting insurance premiums generally, and, "[c]omparatively, title insurance rates are subjected to a relatively superficial system of regulation." *Blaylock*, 504 F. Supp. 2d at 1095-96. "The

22

most salient difference is that the Code does not require the [Office of the Insurance Commissioner] to review title insurance rates. Although the rates are submitted, and the Commissioner has 15 days in which review could occur before the rates go into effect, *the Code does not actually mandate review*." *Id.* (emphasis added). As discussed above, however, the Ohio title insurance scheme mandates affirmative review by the superintendent.

At most, *Wileman Bros.*, *Brown*, and *Blaylock* stand for the proposition that where no review is mandated by a statutory scheme, the filed rate doctrine may be inapplicable. Even if true, the Ohio title insurance regulatory scheme's mandate of affirmative review of filed rates by the superintendent distinguishes it from the schemes in those cases. The Sixth Circuit has not ruled on whether "meaningful review" is a predicate for applying the filed rate doctrine to a regulatory scheme. This Court believes that the reasoning of cases that opine that it is unnecessary for a rate to undergo a certain "meaningful" level of scrutiny to fall within the gambit of the filed rate doctrine very persuasive, believes the Sixth Circuit would so hold, and hereby adopts that view. This view is consistent with the overarching nonjusticiability policy underlying the filed rate doctrine. Just as courts do not have the "same level of institutional competence to ascertain reasonable rates," *see Wegoland, supra,* nor are courts well-suited to make *ex post* inquiries as to whether or not an agency's review of a particular rate was "meaningful." Defining the contours of an agency's review of a filed rate is a task best left to the legislative branch. Therefore, *even assuming* as true Plaintiffs' contention that the Ohio Department of Insurance's level of review, which clearly and unlike *Wileman Bros.* contemplates more than mere non-disapproval, does not "meaningfully regulate

23

title insurance filings," the filed rate doctrine still applies.

> d)     The Ohio Statutory Scheme Provides the Department of Insurance With the Authority to Review Rates

Defining the contours of an agency's review of a filed rate is an inappropriate area for a court's inquiry. But for a court to consider a rate to be a "filed rate," the statutory scheme must provide the regulatory agency with the authority to deem a rate "filed," that is, to assess the rates' compliance with statutory requirements for filed rates. *See Tex. Commer. Energy v. TXU Energy, Inc*., 413 F.3d 503, 510 (5th Cir. 2005) (applying filed rate doctrine to statutory scheme because the scheme provided agency "oversight over the market [] sufficient to conclude that [the rates in question] are 'filed' within the meaning of the filed rate doctrine"); *Town of Norwood*, 202 F.3d at 419 (holding market-based rates are still "filed rates" for purposes of the filed rate doctrine because agency "is still responsible for ensuring 'just and reasonable' rates and, to that end, wholesale power rates continue to be filed and subject to agency review"). *Compare Williams v. Duke Energy Int'l, Inc*., 606 F. Supp. 2d 783, 790-791 (S.D. Ohio 2009) (hypothesizing that if an agency did not have "the authority to determine whether the rates are discriminatory or involve unlawful discounting of charges [. . .] the filed rate doctrine would be inapplicable").

Plaintiffs do not dispute the mechanics of the Ohio title insurance scheme as discussed by the Court, *supra*, but contend that courts refuse to apply the filed rate doctrine to situations where there is "no pervasive regulatory regime." While Plaintiffs never inform the Court what exactly a "pervasive regulatory regime" might entail, Plaintiffs suggest that *Hanson v. Acceleration Life Ins. Co.*, No. A3-97-152, 1999 WL

24

33283345 (D.N.D. March 16, 1999) (unpublished) is informative. In *Hanson*, the court declined to apply the filed rate doctrine to the North Dakota long-term care insurance scheme. The court in *Hanson* noted the uncontroversial principle that the underlying conduct of the defendant "does not control whether the filed rate doctrine applies. Rather the focus for determining whether the filed rate doctrine applies is the impact the court's decision will have on agency procedures and rate determinations." *H.J.*, *Inc. v. Northwestern Bell Tel. Co.*, 954 F.2d 485, 489 (8th Cir. 1992). The court then determined that, under the North Dakota code, "there is a lack of statutory language requiring approval of rate increases" and "[s]imply put, the North Dakota Insurance Commissioner does not have the authority to establish long term care insurance policy rates." *Hanson*, 1999 WL 33283345 at *4. Against this backdrop, the court in *Hanson's* conclusion that the filed rate doctrine was inapplicable is hardly surprising and is consistent with *Tex. Commer. Energy* and *Town of Norwood*, *supra*.

Under the North Dakota statutory scheme, neither of the underlying principles of the filed rate doctrine is implicated. First, long-term care insurance providers were not required to adhere to any rate, but instead could increase rates without the approval of the insurance commissioner. This obviates any concerns surrounding the applicability of the nondiscrimination principle of the filed rate doctrine, which "insure[s] that the regulated entities charge only those rates that the agency has approved or been made aware of as the law may require." *H.J.*, 954 F.2d at 488. Second, where an agency has no authority to establish rates, there are no nonjusticiability concerns – a court need not worry about "second-guessing" a regulating agency's reasonableness determination when that agency is not permitted to make the "first guess" at all.

Plaintiffs' attempt to analogize a statute where the "regulating" agency in question need not approve, and does not have the authority to establish, insurance rates to the Ohio title insurance scheme fails, and fails miserably. The Ohio title insurance scheme clearly gives the Department of Insurance the authority to assess rates' compliance with statutory requirements. The superintendent is specifically tasked with determining whether the rates are excessive, inadequate, or unfairly discriminatory. It is this authority that allows this Court to consider an Ohio title insurance rate a "filed rate." *See Tex. Commer. Energy*, 413 F.3d at 510. Therefore, this Court rejects Plaintiffs' unsupported contention that application of the filed rate doctrine is inappropriate because the Ohio title insurance scheme is "not sufficiently pervasive."

> *No "Fraud or Wrongful Act" or "Improperly Filed" Exception Exists to Preclude the Application of the Filed Rate Doctrine to Plaintiffs' Action for Damages*

Plaintiffs next argue that the filed rate doctrine should not be applied to the Ohio title insurance regulatory scheme because (1) the rates submitted by the title insurance companies are fraudulent and (2) the rates submitted by the title insurance companies do not comply with Ohio requirements. Neither argument holds merit.

> e)      No Fraud or Wrongful Act Exception Applies to the Filed Rate Doctrine

Plaintiffs allege that "[d]efendants' design in all of this has been to effectively 'hide' the cost basis for their artificially high and collective title insurance premiums from the regulatory scrutiny that *Ticor* demands." (Am. Compl., Doc. No. 36 at ¶ 50.) Even assuming as true that the rates submitted by the Defendant were fraudulent or the product of unlawful conduct, the filed rate doctrine still applies to bar Plaintiffs'

26

claim for damages.

The Supreme Court has not specifically addressed whether or not a fraudulent conduct or wrongful act exception applies to the filed rate doctrine. *See Ark. La. Gas Co.*, 453 U.S. at 571 ("We save for another day the question whether the filed rate doctrine applies in the face of fraudulent conduct."). *See also Maislin* 497 U.S. at 129 (noting in *dicta* that although "we need not resolve this issue today" the Supreme Court has "never held that a carrier's unreasonable practice justifies departure from the filed tariff schedule"). While no Sixth Circuit case addresses this issue, courts have uniformly rejected the notion that such an exception exists.

In *Wegoland*, the complaint alleged that two companies "gave regulatory agencies and consumers misleading financial information to submit the inflated rates they requested." 27 F.3d at 18. The court first noted that "every court that has considered the plaintiffs' argument has rejected the notion that there is a fraud exception to the filed rate doctrine." *Id.* The court held "any attempt to determine what part of the rate previously deemed reasonable was a result of the fraudulent acts would require determining what rate would have been deemed reasonable absent the fraudulent acts, and then finding the difference between the two." Such an approach would squarely implicate the nonjusticiability concern underlying the filed rate doctrine and would enmesh courts in the rate-making process. The court also noted that, as a practical matter, "regulators who are intimately familiar with the industry are best situated to discover when regulated entities engage in fraud on the agency and to remedy the wrongdoing when the specter of fraud arises." *Id.* at 21.

In *H.J.*, the Eighth Circuit went so far as to "reject the H.J. class's

27

argument that the filed rate doctrine does not apply in the face of fraudulent conduct" even where the wrongful conduct alleged was the bribery of the very regulatory officials responsible for approving the submitted rates. *H.J.,* 954 at 492. *See also Taffet II*, 967 F.2d at 1494 ("Given that the [regulatory agency is] equipped to take the defendants' fraud into account in setting future rates, a court's award of damages against a utility for 'fraudulent rate-making' would be unnecessarily disruptive to the state's scheme of utility regulation."); *Lifschultz Fast Freight, Inc. v. Consol. Freightways Corp*., 805 F. Supp. 1277, 1295 (D.S.C. 1992) (although plaintiff characterized his injuries as resulting from "acts of fraudulent manipulation" of the regulating agency, "it is clear to the court that Lifschultz is attempting to collaterally attack the lawfulness or reasonableness of the rates. This is exactly what the *Keogh* doctrine was created to prevent. The fact that the rates were allegedly set based on fraudulent information is immaterial.").

This Court holds, in accord with every other court that has confronted this issue, that there is no exception to the filed rate doctrine for fraudulent or wrongful conduct. Therefore, Plaintiffs' contention that the title insurance rates submitted by Defendants to the Ohio Department of Insurance were part of a design to "effectively hide the cost basis" of the premiums and resulted in an artificially high rate is irrelevant. The filed rate doctrine still applies.

f)      No "Improperly Filed" Exception Applies

Plaintiffs next contend that the filed rate doctrine should not apply to this case because Defendants' "filings are defective and improperly filed." (Doc. No. 104 at 6 n. 3.) Plaintiffs argue that "a filed rate which is 'incomplete' or lacks an 'essential element' does not comply with the rate filing regulatory regime, and therefore does not invoke the

28

filed rate doctrine." (Doc. No. 77 at 26 (citing *Sec. Servs v. Kmart Corp.*., 511 U.S. 431, 440, 442 (1994)). In the first instance, Plaintiffs have flyspecked language from *Security Services.* The holding of that case was that "rates filed with the Interstate Commerce Commissions *which became 'void as a matter of law'* under that commission's regulations could not be enforced." *See Dolan*, 2010 U.S. App. LEXIS 2814 at *4 (citing *Sec. Servs.,* 511 U.S. at 437).

In *Security Services*, the defendant motor carrier filed a rate with the ICC, which received and accepted it. The application made reference to, and relied on, a specific mileage guide, filed by a rating agency to which the defendant belonged. *Sec. Servs.,* 511 U.S. at 433. Under ICC regulations, such mileage guides only applied to those carriers who were participants in the rating agencies that issued them. After defendant had filed its rate with the ICC, the rating agency cancelled the defendant's participation in the rating agency for failure to pay fees. *By statute*, once the tariff "is filed or amended to note cancellation of the carrier's participation, the carrier's tariff is *void as a matter of law*." *Id.* at 440 (citing 49 C.F.R. § 1312.4(d)) (emphasis added). Therefore, once cancellation occurs, the tariff becomes "incomplete" and "ceases to satisfy the fundamental purpose of tariffs; to disclose the freight charges due to the carrier." *Id.* Under these circumstances, the filed rate doctrine did not apply, because the shipper "could not determine the carrier's rates, since *under the regulations*, distance tariffs are incomplete once the carrier's participation in the Mileage Guide has been cancelled by the agent's filing." *Id.* at 443. *See also Atlantis Express, Inc. v. Associated Wholesale Grocers, Inc*., 989 F.2d 281, 284 (8th Cir. 1993) (holding filed rate doctrine inapplicable where ICC regulation voids tariffs).

29

Plaintiffs also rely on *TON Servs. v. Qwest Corp.*, 493 F.3d 1225 (10th Cir. 2007). In TON, the court held the filed rate doctrine inapplicable to a situation where plaintiffs sued to enforce a specific "command of the very regulatory statute giving rise to the tariff-filing requirement." 493 F.3d at 1236. *TON* involved a complex regulatory structure involving payphones. Relevant (and simplified) here, as it existed in 1996, entities known as local exchange carriers (including defendant in *TON*) owned payphone lines. These payphone lines were used, however, by both the local exchange carriers' own payphone services and by independent payphone service providers (including plaintiffs in *TON*). *Id.* at 1229. The local carriers "routinely subsidized and discriminated in favor of their own payphone services." *Id.* In 1996, in an effort to increase competition, Congress directed the FCC to put a stop to this practice. The FCC did so by implementing the so-called "New Services Test," which mandated that tariff rates should be based solely on a carrier's overhead costs. *Id.* (citing 47 C.F.R. § 61.49(g)(2)). The FCC also established the method by which the local carriers would demonstrate their compliance, namely by accompanying tariff filings with "supporting cost data" as provided for by statute. *Id.* at 1231. Further, the local exchange carriers had to certify that its tariff rates were compliant with the New Services Test in order to receive "per-call compensation," which compensated payphone line owners for allowing calls from its payphones to be connected to long distance carriers. *Id.* The effective date for New Services Test compliance was April 15, 1997.

On April 10, 1997, five days before the FCC's orders went into effect, a group of local exchange carriers petitioned the FCC to delay the effective date because they were not prepared to file cost-based rates and other necessary data. *Id*. at 1231. The

FCC acquiesced, but with a caveat. If, after the local exchange carriers became fully compliant with the FCC's new orders, the newly calculated compliant rate was lower than the non-compliant rate, the local exchange carriers were ordered to reimburse or credit any independent payphone service providers for the difference (calculated between the April 15, 1997 compliance deadline and the date the local carrier became fully compliant). The defendant in *TON* did not file any new rate or cost-data until 2002. The 2002 rate was substantially lower than the rates that had been charged by defendant since April 1997, and plaintiff sued to recover the difference in rates. As a defense, defendant argued the filed rate doctrine precluded a monetary recovery, because the defendant had filed its previous rates with the appropriate regulatory body. The Tenth Circuit rejected this defense, holding the filed rate doctrine did not apply because plaintiff sought to enforce existing regulatory orders that made damages available to those in the plaintiff's position.

Turning to this case, Plaintiffs broadly allege that Defendants' rate filings do not comply with Ohio's rate filing requirements. Plaintiffs assert that "Ohio law requires that title insurers support their rates with information about past and prospective expenses to aid the ODI [Ohio Department of Insurance] in determining whether or not those rates comply with Ohio law" and claim that Defendants' rate filings lack that data. (Doc. No. 77 at 26-27.) Further, Plaintiffs cite OHIO REV. CODE § 3953.26, which prohibits payments to induce title insurance, and claim that Defendants' rate filings "include hidden costs which are largely comprised of kickbacks and other inducements forbidden by Ohio law." (*Id*.) First, *even if* Plaintiffs could prove that Defendants' rate filings incorporated illegal commissions paid to title insurance agents in violation of §

31

3953.26, the Court is directed to no statute or regulation that would *void* those filed rates. *See Dolan*, 2010 U.S. App. LEXIS 2814, at *5.

Next, and even more problematic for Plaintiffs, is Plaintiffs' contention that Ohio law "requires that title insurers support their rates with information about past and prospective expenses." (Doc. No. 77 at 26-27.) The section to which Plaintiffs refer, § 3935.03(C)(5), states that "[c]onsideration shall be given to [. . .] (5) Past and prospective expenses both countrywide and those specially applicable to this state." *Id.* Plaintiffs' contention that the failure of Defendants' filings to include essential cost data somehow renders those filings invalid or "improper" is flawed – the statute only states that "consideration" shall be given to such information. Moreover, § 3935.04 is illuminative, and expressly contemplates insurers filing rates in the absence of accompanying data:

> When a filing is not accompanied by the information upon which the insurer supports the filing, *and* the superintendent does not have sufficient information to determine whether the filing meets the requirements of sections 3935.01 to 3935.17 of the Revised Code, he shall require the insurer to furnish the information which supports the filing [. . .].

§ 3935.04(A). This statute (which is phrased in the conjunctive), therefore, allows for the superintendent to determine that a filing meets the requirements of the code in the absence of the accompanying information. Thus, while Ohio law requires the "consideration" of past and prospective expenses, it does not require any affirmative filing of supporting documentation about those expenses for a filing to be valid, but rather gives the superintendent the right to call for supporting documentation if he or she determines necessary. Therefore, *even if* Defendants' rate filings are not accompanied by supporting documentation regarding past and prospective expenses, that absence does not

32

render the filing deficient, and, again, certainly does not warrant considering the rates "void" so as not to apply the filed rate doctrine.

Moreover, the Ohio statutory scheme expressly provides for the manner in which Defendants submit their rates to the Department of Insurance. It is uncontested that certain Defendants are members of the OTIRB, which files title insurance rates on behalf of its members. Section 3935.04(B) allows an insurer to "satisfy its obligation to make such filings" by becoming a member of a rating bureau and authorizing the superintendent to accept filings from the rating bureau on the insurer's behalf. *Id.* Therefore, *even if* an insurer had an obligation to submit supporting expense documentation to the Ohio Department of Insurance alongside rate filings (which it does not, *see supra*), an insurer can "satisfy its obligation" by joining a rating bureau. This is exactly what Defendant insurers have done in this case.

Plaintiffs direct the Court's attention to Ohio Department of Insurance Bulletin 91-1 (hereinafter "Bulletin 91-1").[11] Bulletin 91-1 "specifies the framework under which rating bureaus and participating insurers in rating bureaus will operate in a loss cost system in the State of Ohio." *Id.* Under the "loss cost system," "each insurer must individually determine and file the rates it will use as a result of its own independent company decision-making process." *Id.* Defendants contend that Bulletin 91-1 applies to only those rating bureaus that submit only "loss cost" information on behalf of their members, and not those rating bureaus such as the OTIRB that files rates on behalf of

---

[11] *Available at* http://www.insurance.ohio.gov/Legal/Bulletins/Documents/91-1.pdf.

their members.[12] Plaintiffs, alternatively, insist that Bulletin 91-1 demonstrates that Defendants' rates "have not been properly filed," and that the filed rate doctrine should therefore not apply. (Doc. No. 77 at p. 26.)

This Court holds, however, no matter the scope of its intended application, Bulletin 91-1 cannot be read to render Defendants' rate filings improper so as not to apply the filed rate doctrine. A bulletin issued by the Ohio Department of Insurance can "provide guidance to the reader about the topic covered." *See* Ohio Dep't of Insurance Policy and Legislation, Bulletins, *available at:*

http://www.insurance.ohio.gov/Legal/Bulletins/Pages/BulletinIndex.aspx.

A bulletin cannot, however, displace the unambiguous text of the Ohio Revised Code. The Code expressly permits rating bureaus to file *rates* on behalf of their members. Bulletin 91-1 cannot ban what the code specifically allows. Moreover, and again, *even if* Bulletin 91-1 does stand to show that Defendants' rates are noncompliant with Ohio law (which it does not), no statute *voids* those filed and approved rates so as to preclude application of the filed rate doctrine under *Security Servs, supra.*

*The Filed Rate Doctrine Also Applies to Preclude Plaintiffs' State
Law Claims for Damages*

In their objection, Plaintiffs argue that even if the filed rate doctrine applies to preclude their claims for damages under the federal Sherman Act, Ohio does not recognize the filed rate doctrine and therefore the filed rate doctrine does not preclude

---

[12] This Court granted Plaintiffs' request to conduct limited discovery on October 15, 2008. (Doc. No. 52.) Pursuant to this order, Plaintiffs deposed Maureen Motter, a representative of the Ohio Department of Insurance. (Transcript at Doc. No. 77-2.) While Defendants support this contention with the deposition testimony of Ms. Motter, this Court has not relied in any manner on Ms. Motter's testimony in reaching its consideration of the effect of Bulletin 91-1 on Plaintiffs' claims.

Plaintiffs' state Valentine Act claim for damages. The Court disagrees.

First, it is important to reiterate that, as to the federal claims, it is irrelevant that the regulating agency in this case is a state, and not a federal agency. The filed rate doctrine acts to preclude actions for damages under the Sherman Act regardless of whether the regulating agency is state or federal. *See, e.g., Dolan,* 2010 U.S. App. LEXIS 2814 at *11 (holding "the [filed rate] doctrine applies to any 'filed rate,' including rates filed with state agencies") (internal citations and quotations omitted); *Crumley v. Time Warner Cable, Inc*., 556 F.3d 879, 881 (8th Cir. 2009) ("The filed rate doctrine also applies to rates filed with state agencies."); *H.J.,* 954 F.2d at 494 (holding there is "no reason to distinguish between rates promulgated by state and federal agencies. We are persuaded that the rationale underlying the filed rate doctrine applies whether the rate in question is approved by a federal or state agency."); *Taffet II*, 967 F.2d at 1494 (holding the filed rate doctrine "applies with equal force to preclude recovery [. . .] whether the rate at issue has been set by a state rate-making authority or a federal one.").

Plaintiffs are correct, however, that the question of whether the filed rate doctrine acts to preclude their state law antitrust claims for damages as to rates filed with a state regulatory agency is a matter of Ohio law. No Ohio Supreme Court case addresses the issue of whether the filed rate doctrine acts to bar claims for damages to rates filed with the Ohio Department of Insurance. "Where the state supreme court has not spoken, our task is to discern, from all available sources, how that court would respond if confronted with the issue." *Rector v. Gen. Motors Corp.*, 963 F.2d 144, 146 (6th Cir. 1992); *see also McClain v. Northwest Cmty. Corr. Ctr. Judicial Corr. Bd.*, 440 F.3d 320, 328 (6th Cir. 2006) (same). For the following reasons, this Court holds the Ohio Supreme

35

Court would apply the filed rate doctrine to preclude an award of damages under the Valentine Act where premised on payments made under rates approved by a state regulatory agency.

As extensively discussed in the preceding pages, the filed rate doctrine bars damage awards premised on payments made under rates approved by a regulatory agency. Under the doctrine, a private plaintiff may not challenge the reasonableness, or validity, of the filed rate. Simply put, the filed rate is "unassailable in judicial proceedings brought by ratepayers." *See Wegoland*, 27 F.3d at 20. But in addition to acting as an insurmountable bar to damage recoveries by private plaintiffs, the filed rate doctrine mandates, "as a corollary, no one may bring a judicial proceeding to enforce any rate other than the rate established by the filed tariff." *Brown v. MCI Worldcom Network Servs., Inc*., 277 F.3d 1166, 1170 (9th Cir. 2002). *See also Ark. La.*, 453 U.S. at 577 (holding the filed rate doctrine "forbids a regulated entity to charge rates for its services other than those properly filed").

While Ohio has not applied the filed rate doctrine to preclude a suit for damages by a private plaintiff, the Ohio Supreme Court has explicitly recognized the corollary principle that regulated entities cannot charge rates other than those properly filed. In *In re Investigation of Nat'l Union Fire Ins. Co.*, 66 Ohio St. 3d 81 (1993), an insurer (National Union) was a member of a rating organization (Insurance Services of Ohio) that, pursuant to OHIO REV. CODE § 3937.03(B), made rate filings on National

Union's behalf.[13] Effective January 15, 1980, Insurance Services of Ohio "filed a new general liability classification structure and rating procedure applicable to governmental subdivisions with Ohio's superintendent." *Id.* at 83. On December 31, 1984, National Union issued a policy to the city of Brook Park, Ohio, and charged the city the rates set forth in the 1980 rating organization filing. *Id.* One year later, "without submitting any additional documentation to the superintendent" of insurance, National Union increased Brook Park's premiums. *Id.* National Union argued, for various reasons not relevant here, that "filed rates may be modified simply on the basis of underwriting judgment" and were exempt from the filing requirements of § 3937.03.

The Ohio Supreme Court rejected this argument and held that the Ohio statutory scheme plainly required that any rate charged must set forth in a rating plan filed by or on behalf of the insurer, and deviations are not permitted without the approval of the Superintendent of Insurance. *Id.* at 87. As Plaintiffs themselves characterize the holding, "[i]n *Nat'l Union Fire,* however, the Ohio Supreme Court merely held that charging a premium other than the filed rate was impermissible." (Doc. No. 104 at p. 24.) Far from Plaintiffs' "merely held" characterization, *Nat'l Union Fire* recognizes, and applies, the corollary to the filed rate doctrine, and is consistent with the Court's ultimate conclusion that the Ohio Supreme Court would recognize and apply the filed rate doctrine to this case. *See also Office of Consumers' Counsel v. Public Utils. Com*, 61

---

[13] Chapter 3937 of the Ohio Code addresses Casualty and Motor Vehicle Insurance. Section 3937.03(B) provides that an insurer "may satisfy its obligation to make such filings [to the Department of Insurance] by becoming a member of, or subscriber to, a licensed rating organization [. . .]." OHIO REV. CODE §3937.03(B). Other than the substitution of the entity name, i.e, "licensed rating *organization*" for "licensed rating *bureau*," § 3937.03(B) is identical to § 3935.04(B).

Ohio St. 3d 396, 406-07 (1991) (Brown, J., dissenting) (recognizing "the well-established filed rate doctrine" and "one of the primary purposes of the regulation of public utilities is to prevent price discrimination"). *See also Gary Phillips & Assocs. v. Ameritech Corp.,* 144 Ohio App. 3d 149, 153 (Ohio Ct. App. 2001) (discussing public utility regulatory scheme, which requires Commission rate approval and mandates utilities charge only rates approved by Commission as "giv[ing] birth to what is known as the 'filed rate doctrine'").

Plaintiffs rely on two unpublished Northern District of Ohio decisions, *Chesner v. Stewart Title Guaranty Co.*, No. 06-cv-476, 2006 U.S. Dist. LEXIS 57356 (N.D. Ohio Aug. 4, 2006) and *Barnes v. First Am. Title Ins. Co*., No. 06-cv-574, 2006 U.S. Dist. LEXIS 54984 (N.D. Ohio Aug. 4, 2006). In relevant part, in both *Barnes* and *Chesner*, decided on the same day by the same judge using identical language, plaintiffs (purchasers of title insurance) alleged defendants (title insurance companies) committed fraud by "fail[ing] to disclose the potential for a discounted rate." *Barnes*, 2006 U.S. Dist LEXIS 54984 at *19; *Chesner*, 2006 U.S. Dist. LEXIS 57356 at *19. Defendants asserted the filed rate doctrine "fulfill[ed] Defendant's duty to disclose as it requires Defendant file its rates with the Ohio Department of Insurance and that such filing creates a presumption of knowledge of the rate and discount rate by the consumer." *Barnes*, 2006 U.S. Dist LEXIS 54984 at *20; *Chesner*, 2006 U.S. Dist. LEXIS 57356 at *19-20. The court refused to apply the doctrine, and also noted that defendants had not "provided [Ohio] case law demonstrating the 'filed rate doctrine' applies outside the public utilities or common carrier arenas." *Barnes*, 2006 U.S. Dist LEXIS 54984 at *20; *Chesner*, 2006 U.S. Dist. LEXIS 57356 at *20.

The failure of defendants in *Barnes* and *Chesner* to provide Ohio case law applying the filed rate doctrine to the insurance context is understandable – indeed, as discussed above, no such case law exists. Plaintiffs, in their objection and based on *Barnes* and *Chesner*, argue that because no Ohio case has applied the filed rate doctrine to the title insurance industry, the Filed Rate doctrine does not apply to the title insurance industry under Ohio law. This reasoning suffers from the fallacy of *argumentum ad ignorantiam*, which is "the mistake that is committed whenever it is argued that a proposition is true simply on the basis that it has not been proved false, or that it is false because it has not been proved true." *See Alabama-Tombigbee Rivers Coalition v. Kempthorne*, 477 F.3d 1250, 1257 (11th Cir. 2007) (citing Irving M. Copi & Carl Cohen, INTRODUCTION TO LOGIC 93 (8th ed. 1990)).

Moreover, a brief examination of the claims presented in *Barnes* and *Chesner* quickly distinguish them from Plaintiffs' claims in this case. In *Barnes* and *Chesner*, the plaintiffs were title insurance purchasers who refinanced existing mortgages. The plaintiffs claimed that they paid a higher "premium" rate for title insurance, when, due to the fact they were refinancing and already owned an existing title insurance policy, they were entitled to pay a different, discounted rate "as provided by law." *See Chesner*, 2006 U.S. Dist. LEXIS 57356 at *14 ("The Complaint clearly alleges the Plaintiffs purchased title insurance from Defendant and that under applicable Ohio law Plaintiffs were entitled to the discounted rate."). Plaintiffs alleged damages based on the difference between the title insurance rate actually paid, and the separate, discounted rate for which they were eligible based on their status as reissue purchasers, but of which they were unaware. Of significance, both of the rates were "filed rates." The

39

plaintiffs claimed the title insurance companies had a duty to disclose the availability of the second, lower rate, and defendants' failure to disclose amounted to fraud.[14] The plaintiffs *did not* challenge the reasonableness of the rate they paid, but rather alleged there was a separate rate (that was lower) that they would have purchased had they been made aware of its existence.

The claims asserted in *Barnes* and *Chesner* did not implicate the principles underlying the filed rate doctrine. Plaintiffs did not challenge the reasonableness of the rate paid (as determined by the regulating agency), so the court was not required to make the inquiry forbidden by the doctrine (nonjusticiability). Nor did plaintiffs' requested relief seek to alter the rate paid by plaintiffs in a manner that would result in different rates being paid by different customers (nondiscrimination).[15] Compare the claims asserted by Plaintiffs in this case, which directly attack the reasonableness of the rate and would require the alteration of the rate paid that would potentially result in different rates being paid by different customers. *Barnes* and *Chester* are completely inapposite and of no help to Plaintiffs in this case.

Finally, this Court looks to the Sixth Circuit's decision in *Pinney Dock*. There, plaintiffs brought federal and Ohio state antitrust claims against a group of railroad defendants. Relevant here, defendants asserted the filed rate doctrine as a defense

---

[14] The Court notes that in both *Barnes* and *Chesner*, the fraud claims were dismissed because plaintiffs failed to allege fraud with the requisite particularity as required by Rule 9(b).

[15] This is an important, and nonobvious, distinction. Success by the *Barnes* and *Chesner* plaintiffs would not have resulted in the alteration of the rate paid by plaintiffs – the  rate would have remained fully intact. Damages would have been calculated by determining the difference between the two *approved* filed rates, but recovery would have been premised on the fraudulent failure to disclose the availability of the separate, lower rate at the time of purchase, and not on some flaw in the establishment of the rate paid.

against plaintiffs federal and state antitrust claims. After exhaustively considering whether or not the filed rate doctrine applied to the specific factual scenario presented,[16] the Court concluded that the doctrine did apply and that "all rate-related claims made by the plaintiffs, *whether state or federal*, must be dismissed." *Pinney Dock*, 838 F.2d at 1482 (emphasis added). The court in *Pinney Dock* specifically applied the filed rate doctrine to the plaintiffs' Valentine Act claims, albeit without elucidation of its reasons in so doing.

For the foregoing reasons, this Court holds, based on all available sources, that the Ohio Supreme Court would respond to the question of whether the filed rate doctrine precludes a private plaintiff's claim for damages under the Valentine Act where premised on payments made under rates approved by a state regulatory agency in the affirmative.

### The Filed Rate Doctrine Does Not Necessarily Preclude Injunctive Relief Under Either the Sherman Act or the Valentine Act

Defendants object to the Magistrate Judge's recommendation that the filed rate doctrine does not necessarily preclude Plaintiffs' claim for injunctive relief. (Doc. No. 102 at 41-42, 56 (recommending dismissal without prejudice to permit Plaintiffs to amend their complaint to present a claim for injunctive relief, despite finding "[t]he undersigned can divine no way of providing the injunctive relief [requested, due to the filed rate doctrine]").) This Court finds that the filed rate doctrine bars some, but not all,

---

[16] *Pinney Dock* required the Sixth Circuit to determine whether the Filed rate doctrine applies when the plaintiff is defendant's competitor, rather than customer, an issue over which the Courts of Appeal are not in accord but not implicated by this case. *Cf. Arsberry v. Illinois*, 244 F.3d 558 (7th Cir. 2001) (doctrine may bar claims by non-purchasing competitors) with *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144 (3d Cir. 1993) (applying non-purchasing competitor exception).

of the injunctive relief sought by Plaintiffs in this case. While the filed rate doctrine would not preclude all injunctive relief sought, however, allowing Plaintiff leave to amend their complaint would be futile, because Plaintiffs' federal claims are exempted from antitrust scrutiny by the McCarran Ferguson Act, *see infra,* and Plaintiffs' state claims complain of conduct specifically allowed and contemplated by the Ohio insurance code, *see infra*. Put more simply, as to Plaintiffs' claims under the Valentine Act, this Court cannot enjoin an alleged "illegal practice" that is, in fact, legal.

As to injunctive relief, Plaintiffs seek broadly that Defendants "be perpetually enjoined and restrained from, in any manner, directly or indirectly, continuing maintaining or renewing the aforesaid combination, conspiracy, agreement, understanding or concert of action, adopting or following any practice, plan, program or design having a similar purpose or effect in restraining competition." (Doc. No. 36 at 21.) Viewed in a light most favorable to Plaintiffs, their complaint seeks to enjoin the following activities: (1) collaboration to collectively set title insurance rates at supra-competitive prices, evidenced by the identical rate charged by Defendants, and (2) the inclusion of illegal kickbacks and inducements in the rate submitted to the ODI, which acts to "hide" the true cost basis from regulatory scrutiny.

As discussed above, the Supreme Court has recognized that the filed rate doctrine does not necessarily apply to claims for injunctive relief. *Square D*, 476 U.S. at 419, 422 & n.28 (explaining that the *Keogh* rule bars damage actions but that rate-related claims remain "subject to governmental and injunctive antitrust actions"); *Georgia v. Pa. R.R. Co.*, 324 U.S. 439, 462 (1945), *superseded by statute,* Reed-Bulwinkle Act, 49 U.S.C. § 10706(b)(2), *as recognized in Square D*, 476 U.S. at 422-23 (plaintiff could

bring antitrust action to enjoin alleged "coercive and collusive influences" in rate-making). Courts have also recognized, however, that some forms of injunctive relief violate the nonjusticiability principle of the doctrine, and have precluded injunctive relief where the effect on the relief would result in altering a filed rate. *See Town of Norwood*, 202 F.3d at 420 (applying filed rate doctrine to deny injunctive relief because it "would require the *alteration* of tariffs" already filed and thus encroach on agency's authority (emphasis in original)). Thus, this Court can properly enjoin activity to prevent future conduct where doing so would not affect rates already filed and would not encroach on the agency's authority to determine the reasonableness of a given rate.

As to the first potential ground, prohibiting the collaboration of defendants prospectively would not alter any already-filed rate, but would result only in *future* rates being affected. The filed rate doctrine cannot preclude this relief. *See In re Pa. Title Ins. Antitrust Litig.*, 648 F. Supp. 2d at 686; *Green v. Peoples Energy Corp.*, 02-C-4117, 2003 U.S. Dist. LEXIS 4958 at *4 (N.D. Ill. Mar. 28, 2003) ("the critical inquiry is whether granting the injunctive relief will require dismantling the filed tariffs. If horizontal agreement is alleged and therefore the injunctive relief can be enforced without tampering with the filed rates, then [. . .] the filed rate doctrine should not be an absolute bar."). Put simply, this Court could grant injunctive relief that barred any illegal collaboration of insurers, or insurers and rating bureaus, because that relief would not affect either the already-filed rates or encroach on the Department of Insurance' authority in any way.

The second ground presents a different scenario. The essence of Plaintiffs' theory is that Defendants' rate submissions conceal the inclusion of illegal kickbacks by

"calculating a single rate that comprises both the premium for the title insurance and the kickbacks" and thereby evade Department of Insurance scrutiny. To be certain, kickbacks, or more formally "payments to induce title insurance business" are illegal under Ohio law. OHIO REV. CODE § 3953.26. But Plaintiffs do not seek to enjoin the kickbacks themselves,[17] but rather the inclusion of the kickbacks in the "single rate" submitted to the Department of Insurance. Were this Court to grant the relief Plaintiffs seek, the regulatory authority of the Ohio Department of Insurance would be seriously undermined. As discussed in the preceding paragraphs, the Ohio statutory scheme mandates that the superintendent "shall review" every rate submission to ensure its compliance with Ohio law and gives the superintendent the right to call for additional documentation if he determines necessary. Were this Court to enjoin Defendants from submitting a "single rate" and require a detailed accounting of how a particular rate was calculated, this Court would, in effect, be substituting its own judgment as to how rate filings should be reviewed for that of the regulating agency's, and by implication, necessarily conclude that the scheme as it exists results in unreasonable rates. This squarely implicates the nonjusticiability principle of the filed rate doctrine. Just as the filed rate doctrine precludes injunctive relief that results in the alteration of a filed rate due to nonjusticiability concerns, *see Town of Norwood, supra,* so too must the filed rate doctrine preclude injunctive relief where such relief would displace the statutory scheme and authority of the regulating agency to determine the reasonableness of rates.

---

[17] "Such 'obey the law' injunctions cannot be sustained." *EEOC v. Wooster Brush Co. Employees Relief Ass'n*, 727 F.2d 566, 576 (6th Cir. 1984) (citing *Payne v. Travenol Laboratories, Inc*., 565 F.2d 895, 897-98 (5th Cir.)).

Conclusion

For the foregoing reasons, the Court holds that the filed rate doctrine applies to the Ohio title insurance industry and Plaintiffs' claims for damages under both the Sherman Act and the Valentine Act are therefore precluded. The Court therefore **OVERRULES** Plaintiffs' objections in this regard. Moreover, the Court holds that Plaintiffs' claim for injunctive relief as to the allegedly "illegal collaboration" of title insurance companies and rating bureaus is not precluded by the filed rate doctrine and **OVERRULES** Defendants' objections to that extent. Defendants' objection to Plaintiffs' claim for injunctive relief based on the inclusion of kickbacks into the "single rate" submitted to the Ohio Department of Insurance is well-taken and is **SUSTAINED**.

## II.        MCCARRAN-FERGUSON ACT

*The Antitrust Exception*

The Magistrate Judge also found that Plaintiffs' Sherman Act claim was barred by the McCarran-Ferguson Act. With respect to this finding, Plaintiffs raise two objections. First, Plaintiffs complain that the Magistrate Judge failed to evaluate whether application of Plaintiffs' federal antitrust claim would "invalidate, impair, or supersede" the relevant Ohio insurance laws. (Plaintiffs' Objections at 21, quoting *Humana v. Forsyth*, 525 U.S. 299, 307 (1999) (internal citation omitted)). Defendants insist that such a consideration was not necessary, suggesting that the Magistrate Judge properly limited her analysis to the question of whether the disputed conduct was the business of insurance, regulated by state law, and not a boycott. According to Defendants, because the Sherman Act was specifically identified in the McCarran-Ferguson Act, Congress had already determined that application of the Sherman Act would "invalidate, impair, or

45

supersede" a state's regulation of the business of insurance. The "impairment" clause, Defendants maintain, is reserved for McCarran-Ferguson defenses raised as to laws other than antitrust laws. (Doc. No. 111, Defendants' Responses to Plaintiffs' Objections at 27-29.) To resolve this dispute, the Court turns to the language of the statute. *See Group Life & Health Ins. Co. v. Royal Drug C*o., 440 U.S. 205, 210 (1979) ("The starting point in a case involving construction of the McCarran-Ferguson Act, like the starting point in any case involving the meaning of a statute, is the language of the statute itself.")

The McCarran-Ferguson Act provides that "the business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or the taxation of such business." 15 U.S.C. § 1012(a). The Act further declares that "no Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purposes of regulating the business of insurance […]." 15 U.S.C. § 1012(b). "Federal law thus provides for 'reverse preemption' in the realm of regulating the insurance business." *Genord v. Blue Cross & Blue Shield*, 440 F.3d 802, 805 (6th Cir. 2006). As such, a federal law that does not directly relate to the business of insurance cannot be construed to "invalidate, impair, or supersede" a state law enacted to regulate the business of insurance. *Id*.; 15 U.S.C. § 1012(b).

The McCarran-Ferguson Act, however, contains an "antitrust exception" to the reverse preemption rule. After setting forth the rule, the Act specifically identifies the Sherman Act, the Clayton Act, and the Federal Trade Commission Act, and states that these laws "shall be applicable to the business of insurance to the extent that such business is not regulated by State law." § 1012(b).

To determine whether the McCarran-Ferguson Act applies, a court generally begins with the threshold question of whether the federal statute at issue "specifically relates to the business of insurance." If it does, the Act does not allow for reverse preemption. *Genord*, 440 F.3d at 805. If not, then the two remaining questions that must be answered in the affirmative if the federal law is reverse preempted by the state statute are: (1) "whether the state statute at issue was 'enacted […] for the purpose of regulating the business of insurance;'" and (2) "[w]hether the application of the federal law would 'invalidate, impair, or supersede' the state statute." *Id.* (quoting § 1012(b)). *See Kenty v. Bank One, N.A.*, 92 F.3d 384, 392 (6th Cir. 1996).

Defendants argue that the antitrust exception expressly exempts from Sherman Act liability activity that constitutes the "business of insurance" to the extent it is regulated by state law. According to Defendants, a defendant in an antitrust case need not show that the Sherman Act would "invalidate, impair, or supersede" a state's regulation. Instead, the Court need only find that the activity of which a plaintiff complains constitutes the business of insurance, regulated by state law, and not a boycott.

The Court agrees. "[T]he language of the [McCarran-Ferguson A]ct distinguishes preclusion analysis where antitrust laws are at issue." *Sabo v. Metro. Life Ins. Co.*, 137 F.3d 185, 189 n.1 (3d Cir. 1998) ("Because the plaintiff's complaint is not grounded in federal antitrust laws, we focus our analysis on the first clause of section 1012(b).") In *Royal Drug*, the Supreme Court restricted its inquiry into whether the McCarran-Ferguson Act barred a Sherman Act antitrust claim challenging state pharmacy agreements to the question of whether the pharmacy agreements were the business of insurance. 440 U.S. at 210 The same limited inquiry was applied to the antitrust claim

47

raised in *Union Labor Life Ins. Co. v. Pierno*, 458 U.S. 119, 129 (1982). *See Highmark, Inc. v. UPMC Health Plan, Inc*., 276 F.3d 160, 167, n.1 (3d Cir. 2001) (internal citation omitted) ("In [*United States v.*] *Fabe*, [508 U.S. 491 (1993)], the Court noted that *Pierno* dealt with the McCarran Act's effect on antitrust laws, which the Court found readily distinguishable from other laws. This is because there are two separate clauses in the McCarran Act. According to the Supreme Court, the second clause, which proscribes application of antitrust laws, is more 'narrowly circumscribed' than the first clause, which deals with federal laws in general.").

Because Plaintiffs have raised a claim under the Sherman Act, the antitrust exception controls and the Magistrate Judge properly limited her inquiry to the question of whether Defendants' activities constitute the "business of insurance." The Court, therefore, **OVERRULES** Plaintiffs' objection that the Magistrate Judge erred in not considering whether the Sherman Act would invalidate, impair, or supersede" the state law.[18]

*The Business of Insurance*

The Court turns to the questions posed by the second clause of § 2(b) of the McCarran-Ferguson Act: namely, "(1) whether the practice of the defendants

---

[18] Of course, application of the "impairment clause" to the state statutes at issue would not change the result. A federal law does not impair, invalidate, or supersede a state regulation where the "federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a state's administrative regime […]." *Humana*, 525 U.S. at 310. *See Brown v. Cassens Transport Co*., 546 F.3d 347, 362 (6th Cir. 2008). To demonstrate impairment, it must be shown that substantive sections of the State regulations will be invalidated, *Kenty*, 92 F.3d at 392, or that it will render the State law ineffective, *Brown*, 546 F.3d at 362. Here, there can be no question that application of the Sherman Act will substantially impair Ohio's regulatory framework governing title insurance by invalidating those portions of the regulations—including Ohio Rev. Code § 3935.04 and § 3935.06--that permit the submission of filed rates through rating bureaus. Such an application would surely frustrate the declared state policy of permitting such cooperation.

challenged here falls within the term 'business of insurance' and (2) whether it is 'regulated by state law.'" *McIlhenny v. American Title and Abstract Co. of Pa.*, 418 F. Supp. 364, 367 (E.D. Pa. 1976). Plaintiffs' second objection under the McCarran-Ferguson Act is directly linked to this phase of the analysis. Specifically, Plaintiffs complain that the Magistrate Judge erred in finding that Defendants' conduct constituted the "business of insurance."

In *Pierno*, the Supreme Court announced the test for determining whether a particular practice is part of the "business of insurance" exempted from the antitrust laws by § 2(b): "*first*, whether the practice had the effect of transferring or spreading a policyholder's risk; *second*, whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third*, whether the practice is limited to entities within the insurance industry." *Pierno,* 458 U.S. at 129 (emphasis in the original). No one factor is outcome determinative and must be considered along with the whole body of evidence. *Id.* The Magistrate Judge found all three elements present, and this Court concurs.

There is little doubt that the setting of rates for insurance policies constitutes the "business of insurance." *Royal Drug*, 440 U.S. at 224*; see also Gilchrist v. State Farm Mut. Auto. Ins. Co.*, 390 F.3d 1327, 1331 (11th Cir. 2004) ("Rate-making, of course, is the paradigmatic example of the conduct that Congress intended to protect by the McCarran-Ferguson Act.") Plaintiffs do not suggest otherwise. Instead, Plaintiffs argue that, by its very nature, title insurance is fundamentally different than other forms of insurance, and that it is not, in fact, insurance at all. Suggesting that title insurance is more akin to a warranty or a guarantee, Plaintiffs observe that it merely "warrants that the

49

title insurance company made no mistakes in the title search conducted prior to the closing, and it warrants that there has been no fraud on the part of the title agents." (Plaintiffs' Objections at 29.)

As to the question of whether title insurance constitutes "insurance" for the purpose of the McCarran-Ferguson Act, this Court does not write on a clean slate. Courts that have considered the issue have consistently found, as a matter of law, that title insurance is "insurance." *Commander Leasing Co. v. Transamerica Title Insurance Co.*, 477 F.2d 77, 83 (10th Cir. 1973); *Crawford v. American Title Ins. Co.*, 518 F.2d 217, 219 (5th Cir. 1975) (plaintiffs "conceding as they must, that title insurance is 'insurance' within the meaning of the McCarran Act.").

For example, in *Mitgang v. Western Title Ins. Co.*, 1974 U.S. Dist. LEXIS 6258, at *3 (N.D. Cal. Oct. 16, 1974), the court, in arriving at the conclusion that title insurance was insurance, explained that "[a]lthough a person receiving title insurance gets a different sort of policy than one receiving life insurance, the same basic relationship—that of policy holder and insurer—would seem to pertain." Similarly, while noting that "[t]itle insurance may be distinct from other insurance agency activities in some respects," the court in *American Land Title Ass'n v. Board of Governors of Federal Reserve Sys.*, 892 F.2d 1059, 1064 (D.C. C. 1989), concluded that it constituted insurance for purposes of the McCarran-Ferguson Act.

The authority relied upon by Plaintiffs to support a contrary conclusion is not persuasive. In *Ticor Title Ins. Co. v. FTC*, 998 F.2d 1129, 1138 (3d Cir. 1993), the court was not evaluating the practice of issuing title insurance, but was, instead, concerned with the practice of conducting title searches and examinations. The court

found that these distinct and limited tasks did not involve the business of insurance. In so ruling, the court removed title insurance from its analysis, noting that "the title search and examination has nothing to do with the actual performance of the title insurance contract." *Id.* at 1136. Likewise, the court in *United States v. Title Ins. Rating Bureau of Ariz.*, 700 F.2d 1247 (9th Cir. 1983), did not deal with the issuance of title insurance, but, instead, with the practice of title insurance companies providing escrow services to their customers. The Court reasoned that the performance of escrow services, which the court clearly noted was separate and apart from the issuance of title insurance, did not constitute the business of insurance because it did not have the effect of spreading risk among policy holders.[19] *Id.* at 1251.

Plaintiffs argue that the entire business of selling title insurance is largely devoid of the pooling or spreading of risk. Because they view title insurance as nothing more than a limited warranty, Plaintiffs believe that its purpose is merely to protect against "'past activities that have caused defects in title discovered after the purchase;' in stark contrast to traditional insurance which spreads 'risk against future loss for events yet to occur.'" (Plaintiffs' Objections at 26, citing Am. Compl. at ¶ 39.)

Though Plaintiffs contend that the risk is only 3.4% of losses incurred on claims to premiums written, even they must admit that the issuance of title insurance has the effect of spreading some risk. (TR at 56.) Indeed, Plaintiffs concede that title insurance protects against mechanic's liens filed before the commitment letter is signed,

---

[19] The court gave weight to the government's contention that buying escrow services is separate from buying title insurance because some people who buy escrow services do not buy title insurance, those who buy both have two separate agreements, and searches are performed by agents who keep the entire fee. *Id.* at 1252.

and further covers any potential cloud on the title that should have been uncovered at the time the search was performed. (*Id*. at 8, 56.) *See FTC v. Ticor Title,* 504 U.S. 621, 625-26 (1992) (title insurance protects against the risk of loss for title problems that were not discovered in the title search, including those defects that could not be discovered);[20] *Schwartz*, 374 F. Supp. at 574 ("title insurance companies are liable only for what they do not find, or if they become victims of false affidavits tendered to remove title objections.")

While Plaintiffs dismiss this risk as insignificant, the test in *Pierno* for the "business of insurance" does not quantify any particular amount of risk; it merely calls for a finding of some risk. *See Pierno*, 458 U.S. at 129; *see also SEC v. Variable Annuity Life Ins. Co. of America*, 359 U.S. 65, 71 (1959)[21] ("the concept of 'insurance' involves *some* investment risk-taking on the part of the company.") (emphasis added). That the title search has the effect of minimizing or obviating some or even most of the risk in advance of the issuance of the title insurance policy does not change the fact that some risk is spread among the policy holders.[22] *See Schwartz*, 374 F. Supp. at 574 ("The

---

[20] Specifically, the Court found that "[a] title insurance policy insures against certain losses or damages sustained by reason of a defect in title not shown on the policy or title report to which it refers [...]. The insured is protected from some losses resulting from title defects not discoverable from a search of the public records, such as forgery, missing heirs, previous marriages, impersonation, or confusion in names [...]. Title insurance also includes the obligation to defend in the event that an insured is sued by reason of some defect within the scope of the policy's guarantee." *Id*. at 625-26.

[21] Plaintiffs erroneously claim that this decision stands for the contrary position that more than minimal risk spreading is required. In *SEC*, the Court found that the issuance of variable annuities did not constitute the business of insurance because it did not involve the spreading of *any* risk. *Id*. at 71.

[22] The process of minimizing or limiting risk by a pre-issuance investigation is not unique to title insurance. Life insurance policies are issued only after the insurer knows, generally by means of a pre-issue physical examination, the risk associated with insuring the prospective insured. If the physical examination reveals that the risk is too great, the policy will not issue. Similarly, if the title search reveals a significant potential cloud on the title, the title insurance policy may not issue.

investigation of the risk of loss prior to deciding if to insure that risk is clearly part of the business of insurance.")

It is clear that only some risk spreading is required under the Supreme Court's test. *See SEC*, 359 U.S. at 71. By Plaintiffs' own admissions, the issuance of title insurance satisfies that requirement. In the absence of clear and binding authority, the Court is not prepared to read additional requirements into the Supreme Court's test. The Court, therefore, finds that the issuance of title insurance satisfies the first prong under *Pierno*.

The Court is convinced that the setting of rates for title insurance premiums satisfies the Supreme Court's definition of the "business of insurance."[23] *See Royal Drug*, 440 U.S. at 224, n. 32 ("It is clear from the legislative history that the fixing of rates is the 'business of insurance.'") Indeed, it would seem that this type of activity is precisely the kind that the McCarran-Ferguson Act meant to leave to the state legislatures to regulate. Moreover, it is clear that the State of Ohio has undertaken the task of regulating title insurance. The State has set forth a comprehensive regulatory plan governing title insurance, and has sought to subject the issuance of title insurance policies to the same scrutiny to which it subjects other forms of insurance. Though not determinative, it is significant that the regulations governing title insurance appear in the section of the Ohio Revised Code that deals with insurance, as opposed to the section

---

[23] At oral argument, Plaintiffs attempted to draw the distinction between "rate-setting" and "rate-making." Plaintiffs argued that "rate-making" is the process by which insurers are supposed to share information with the rating bureau (TR at 52-53), whereas "rate-setting" is the process of actually fixing insurance rates. While Plaintiffs admit that pooling statistical information is exempt under the Sherman Act, they claim that when courts speak of the "business of insurance" as an exemption, they are really speaking of what Plaintiffs refer to as rate-making. The Court rejects this distinction because the case law clearly exempts the fixing of insurance rates from the Sherman Act. *See Royal Drug*, 440 U.S. at 224 n. 32.

dealing with property. *See Mitgang*, 1974 U.S. Dist. LEXIS 6258, at *3 (the fact that the regulations covering title insurance were found in the Insurance Code of California was evidence that the State of California intended to treat title insurance as any other type of insurance); *contra Brown*, 546 F.3d at 360 (the fact that regulations governing worker's compensation appeared in the chapter of the Michigan Complied Laws dealing with labor matters, instead of the Michigan Insurance Code, was further evidence that worker's compensation benefits did not involve insurance).

Plaintiffs do not take issue with the Magistrate Judge's findings as to the second and third elements of the *Pierno* test. The issuance of title insurance by the insurer to the insured is clearly an "integral part of the policy relationship between the insurer and the insured." *Pierno*, 458 at 129. Further, the activity in question is certainly limited to entities within the insurance industry; namely, the insurer and the insured. *Contra Royal Drug Co*., 440 U.S. at 215-16 (insurers' contracts with pharmacies whereby participating pharmacies would supply prescriptions at a set cost were not between insurers and insureds, but involved pharmacies and druggists who were wholly outside the insurance industry.) The Court, therefore, finds that Defendants' conduct constitutes the "business of insurance," and **OVERRULES** Plaintiffs' second objection relating to the McCarran-Ferguson Act.

Though not specifically objected to by Plaintiffs, the Court finds that the Magistrate Judge also properly concluded that Defendants' conduct was regulated by state law. 15 U.S.C. § 1012(b). While Plaintiffs take issue with the level of review, there can be no doubt that the State of Ohio has subjected title insurance to substantial regulation.

54

As a result, the Court concludes that the McCarran-Ferguson Act bars Plaintiffs from challenging the alleged conduct as a violation of the federal antitrust laws.[24]

The Court is sympathetic to Plaintiffs' position that title insurance is different from other types of insurance, and understands that Plaintiffs believe that Ohio's statutory scheme for regulating title insurance may leave open the possibility for abuse. Nonetheless, Congress has determined that federal antitrust laws shall not serve to frustrate a state's regulation of the business of insurance. This Court must honor congressional intent and clear legal precedent that cautions against federal intervention into these state matters.

## III. DEFENDANTS' ALLEGED CONDUCT IS PERMITTED BY THE OHIO INSURANCE CODE

Defendants argue that Plaintiffs' claims under the Valentine Act, a general antitrust statute, must be dismissed because the Ohio insurance code expressly and specifically permits the collaboration of which Plaintiffs complain. The Court agrees.

At oral argument, it became clear that the parties disputed the meaning of § 3935.06, which, in relevant part, states:

> Co-operation among rating bureaus, or among rating bureaus and insurers, in rate making or in other matters covered by sections 3935.01 to 3935.17, inclusive, of the Revised Code, is authorized, provided the filings resulting from such co-operation are subject to all such sections which are applicable to filings generally. The superintendent may review such co-operative activities and practices and if, after a hearing, he finds that any such activity or practice is unfair, unreasonable, or otherwise inconsistent with such sections, he may issue a written order specifying in what respects such activity or practice is unfair, unreasonable, or otherwise inconsistent, and requiring the discontinuance of such activity or practice.

---

[24] Section 3(b) of the McCarran-Ferguson Act also makes clear that the Act should not be read to immunize from federal antitrust liability "any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation." 15 U.S.C. § 1013(b). This provision is inapplicable because Plaintiffs do not allege a cognizable antitrust boycott.

OHIO REV. CODE § 3935.06. Defendants assert that even if collaboration to set uniform prices of title insurance would otherwise be illegal under the Valentine Act, such collaboration is specifically permitted by the Ohio insurance code section cited above. Plaintiffs insist that this section does not permit "conduct prohibited by the Valentine Act." (TR at 95.)

In *List v. Burley Tobacco Growers' Co-op. Ass'n*, 114 Ohio St. 361 (1926), the Ohio Supreme Court held, "[t]hose acts being declared to be legal by the Ohio Legislature must necessarily constitute a valid exception to the Valentine Act." *Id.* at 387. In *List*, the court determined that a 1920 Ohio law "makes provision for co-operative associations in the marketing of agricultural products" and, after determining the placement of agricultural interests in "a special class" as to exempt them from antitrust scrutiny was not unreasonable so as to violate the equal protection clause of the fourteenth amendment, held that the specific law permitting cooperative conduct excepted the conduct from the scrutiny of the Valentine Act. *Id.* at 394 (Jones, J., concurring) ("I concur in the judgment solely because the state co-operative statutes permit such agreement, and to that extent render the Ohio Valentine Act ineffective as to persons coming within the provisions of the co-operative laws.").

Relevant here, under the Valentine Act, a "trust" is defined as a "combination of capital, skill, or acts by two or more persons for any of the following purposes: [. . .] (4) To fix at a standard or figure, whereby its price to the public or consumer is in any manner controlled or established, an article or commodity of merchandise, produce, or commerce intended for sale, barter, use, or consumption in this

56

state; [. . .]." OHIO REV. CODE § 1331.01(B). Plaintiffs allege that "[d]efendants collectively entered into a trust for the purpose of fixing prices in violation of the Ohio Valentine Act." (Doc. No. 36 at ¶ 66.) Assuming Plaintiffs' allegations as true, the Court must answer the following question: is Title 39 of the Ohio insurance code intended to except the cooperative action complained of by Plaintiffs from state antitrust scrutiny under the Valentine Act? The Court answers this question in the affirmative.

Answering this question requires this Court to construe the meaning of the section of the statute which states, "[c]o-operation among rating bureaus, or among rating bureaus and insurers, in rate making or in other matters or in other matters covered by sections 3935.01 to 3935.17, inclusive, of the Revised Code, is authorized [. . .]." § 3935.06. "As with any other instance in which we must interpret a state law, 'When there is no state [case] law construing a state statute, [we] must predict how the state's highest court would interpret the statute.'" *United States v. Simpson*, 520 F.3d 531, 535 (6th Cir. 2000) (citing *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir. 1999)). In Ohio, "[t]he essential goal of statutory construction is to give effect to the intent of the General Assembly." *Stevens v. Ackman*, 91 Ohio St. 3d 182, 193 (2001). "The intent may be inferred from the particular wording the General Assembly has chosen to set forth the substantive terms of a statute." *Id.* "Intent may also be revealed in the procedural passage of the legislative act under consideration, when that body passes legislation that enacts, amends, or repeals a statute." *Id.* "Where the lawmaking body declares its own intention in the enactment of a particular law, or defines the sense of the words employed, it is within the exercise of its legislative power, and its own construction of its language should be followed." *State ex rel. Moore Oil Co. v. Dauben*, 99 Ohio St. 406, 412-413

(1919).

Title 39 of the Ohio revised code was enacted on October 1, 1953, when the Ohio general code was replaced by the Ohio revised code. Prior to the 1953 recodification, Ohio's insurance scheme fell under section 9592 of the Ohio general code. Section 9592 contained, within the statute itself, a declaration of the General Assembly's "own intention in the enactment of [the] particular law [. . .]." Specifically, the General Assembly stated: "The purpose of this act [G.C. §§ 9592-1 to 9592-18] is to promote the public welfare by regulating insurance rates to the end they shall not be excessive, inadequate or discriminatory, and *to authorize and regulate cooperative action among insurers in rate making and other matters within the scope of this act.*" OHIO GEN. CODE § 9592-1. (Eff. Dec. 31, 1947) (emphasis added). This statement of purpose was not in the recodified statutes. In adopting the Ohio revised code, however, the General Assembly specifically stated in this section that it did "not" intend "to change the law as heretofore expressed by the section or sections of the General Code." *State v. Kotapish*, 171 Ohio St. 349, 351 (1960) (decided under former analogous section); *see also Ohio Bank & Sav. Co. v. Tri-County Nat'l Bank*, 411 F.2d 801, 804 (6th Cir. 1969) (section 1.24 (former analogous section) "makes it clear that a substantive change was not intended").

Thus, the very conduct complained of by the Plaintiffs--cooperative action among insurers to set the rates of title insurance--was specifically contemplated and authorized by the Ohio General Assembly when it enacted the original statute, which was later recodified as it is now constituted. Additionally, *List v. Burley* teaches that a later-in-time law specifically permitting cooperative conduct excepts that conduct from the

scrutiny of the general provisions of the Valentine Act.

The Ohio Revised Code's rules of construction also compel this conclusion. Price fixing is a violation of the Valentine Act, which was enacted in 1898. *See Rayess v. Lane Drug Co*., 138 Ohio St. 401, 405 (1941); OHIO REV. CODE ANN. § 1331.01(B)(4). The Valentine Act is a statute of general application, and its price fixing provision broadly encompasses any "article or commodity of merchandise, produce, or commerce intended for sale, barter, use or consumption in this state." *Id.* As discussed in the preceding paragraphs, however, the Ohio insurance statutory scheme, enacted in 1947, specifically permits collaboration between insurers to fix rates of insurance. The two statutes are plainly in conflict. Section 1.51 of the Revised Code informs this exact situation.[25] "OHIO REV. CODE ANN. § 1.51 provides that if general and special provisions conflict, the specific provision takes precedent as an exception to the general provision unless the legislature provides otherwise." *Bucheit Int'l v. Ameritrust Co. Nat'l Ass'n*, No. 95-4267, 1997 U.S. App. LEXIS 1026 at *11 (6th Cir. Jan. 17, 1997). Here, the "specific provision" of the insurance code "takes precedent as an exception to the general provision" on price fixing as contained in the Valentine Act.

This conclusion is also supported by recalling the context under which the insurance code was enacted. At the time of the 1953 recodification, section 9592 had existed in its current form since December 31, 1947. *See Home Ins. Co. v. Albers Super*

---

[25] In its entirety, § 1.51 reads:

If a general provision conflicts with a special or local provision, they shall be construed, if possible, so that effect is given to both. If the conflict between the provisions is irreconcilable, the special or local provision prevails as an exception to the general provision, unless the general provision is the later adoption and the manifest intent is that the general provision prevail.

OHIO REV. CODE ANN. § 1.51.

*Markets, Inc*., 103 N.E.2d 17 (Ohio Ct. App. 1950) (discussing the prior provisions of section 9592 and noting that those sections were repealed effective Dec. 31, 1947). Prior to 1944, the United States Supreme Court had consistently held that the business of insurance was not commerce. *See, e.g., Paul v. Virginia*, 75 U.S. (8 Wall.) 168, 183 (1869) ("Issuing a policy of insurance is not a transaction of commerce."). Until 1944, in fact, the business of insurance, in consequence, was largely immune from federal regulation. *See St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 539 (1978) ("The States enjoyed a virtually exclusive domain over the insurance industry."). Indeed, commentators have noted that state regulatory policy viewed monopolistic insurance rate-fixing prior to 1944 with indifference. Joel B. Dirlam and Irwin M. Stelzer, *A Case Study in the Workability of Regulated Competition*, 107 U. Pa. L. Rev. 199, 213 (1958-1959). Specific to Ohio, there is evidence that courts did not consider the collaborative actions of insurers to come within the prohibitions of the Valentine Act:

> There may be good reasons why combinations by insurance agents for the purpose of increasing rates of insurance should be prohibited, but that will not justify a court in holding that such combinations are prohibited by a law which prohibits combinations with reference to articles which may be produced, transported and used and which are the subject of barter and sale.
>
> If it is thought wise to extend the provisions of the antitrust law of Ohio so as to include the business of insurance, labor unions and everything about which a person may be engaged, the legislature can very easily use language which will clearly express that intention, but it is sufficient for the determination of this case to say that such intention does not clearly appear from a consideration of the present law.

*State v. Bovee*, 17 Ohio Dec. 663, 671 (Ohio C.P. 1907) (holding business of fire insurance not within the terms "trade," "commerce," or "commodity" as used in the Valentine Act).

In *United States v. South-Eastern Underwriters Assn*., 322 U.S. 533 (1944), however, the Supreme Court held for the first time that an insurance company doing business across state lines engages in interstate commerce, and that the Sherman Act therefore applied to "business of insurance." *Id.* at 553, 553-562. ("No commercial enterprise of any kind which conducts its activities across state lines has been held to be wholly beyond the regulatory power of Congress under the Commerce Clause. We cannot make an exception of the business of insurance."). *South-Eastern* "was vigorously protested in the insurance field. The insurance companies, relying upon the court's previous rulings, had engaged in practices which were prohibited under the federal anti-trust laws but which were permitted under the laws and regulations of the various states." *National Casualty Co. v. Federal Trade Com*., 245 F.2d 883, 885 (6th Cir. 1957), *aff'd FTC v. National Casualty Co.*, 357 U.S. 560 (1958).

Both Houses of Congress characterized *South-Eastern* as "precedent-smashing" and quickly worked to enact a legislative reversal of the effects of the decision. *Perry v. Fidelity Union Life Ins. Co*., 606 F.2d 468, 473 (5th Cir. Ala. 1979) (citing H.R. Rep. No. 143, 79th Cong., 2d Sess. (1945), Reprinted in 1945 U.S. Code Cong. Serv. 670, 671; S.Rep. No. 20, 79th Cong., 1st Sess. 2 (1945)). Out of this concern "that [*South-Eastern Underwriters*] might undermine state efforts to regulate insurance, Congress in 1945 enacted the McCarran-Ferguson Act." *Humana Inc. v. Forsyth*, 525 U.S. 299, 306 (1999). As discussed in *Royal Drug,* the legislative history of the McCarran Ferguson Act reflects "[t]he consistent theme of [. . .] a primary concern that cooperative ratemaking would be protected from the antitrust laws." *Royal Drug*, 440 U.S. at 223 (citing Senator Ferguson's floor debate remarks: "What we saw as wrong was

61

the fixing of rates without statutory authority in the States; but we believe that State rights should permit a State to say that it believes in a rating bureau."). As discussed above, the McCarran-Ferguson Act exempted the "business of insurance" from federal antitrust scrutiny under the Sherman Act, except to the extent that such business was not regulated by state law. But McCarran-Ferguson also provided for a moratorium, until January 1, 1948,[26] on *any* enforcement of the Sherman Act to "the business of insurance or acts in the conduct thereof." 15 U.S.C § 1013.

"The purpose of the moratorium was to allow the States three years to take steps to regulate the business of insurance." *Royal Drug*, 440 U.S. at 220 n.22. During the moratorium, the majority of state legislatures, including Ohio's, enacted insurance regulatory legislation, modeled along the lines of a model bill drafted by the National Association of Insurance Commissioners. *See* George K. Gardner, *Insurance and the Anti-Trust Laws*, 61 Harv. L. Rev. 246, 247 (1948). These laws "were intended to provide that degree of regulation of the insurance business which would avoid the Scylla of prosecution under the Sherman Act and the Charbydis of oppressive state regulation." *See* Dirlam & Stelzer, 96 U. Pa. L. Rev. at 224-25. The Ohio statutory scheme was enacted to provide that degree of required regulation to alleviate federal concern about the fixing of rates without statutory authority.

Relevant to Plaintiffs' state law claims here, the Ohio Supreme Court has repeatedly noted that the Valentine Act was patterned after the Sherman Act, and has "consistently interpreted the Valentine Act in accordance with federal judicial construction of the federal antitrust laws—without regard to when the federal court

---

[26] Later amended to June 30, 1948.

announced the case law." *Johnson v. Microsoft Corp.*, 106 Ohio St. 3d 278, 284 (2005) (collecting cases).

As discussed above, the Ohio statutory scheme was specifically intended to authorize cooperative conduct among insurers to set rates and to regulate such behavior as to place it beyond the reach of the Sherman Act. In light of the construction and interpretation given to the Valentine Act by the Ohio Supreme Court, which tracks the federal statute, then, like the federal scheme, the Ohio statutory scheme places this cooperative conduct beyond the reach of the Valentine Act. To hold that the Ohio General Assembly intended to make collaboration by insurers to set rates illegal for purposes of the Valentine Act when enacting a statutory scheme specifically permitting such conduct would be an anomalous result.

Moreover, and contrary to Plaintiffs' insinuations, the Ohio statutory scheme does not merely "condone price fixing." (Doc. No. 77 at pp. 8-9.) *See Allstate Ins. Co. v. Lanier*, 242 F. Supp. 73, 88 (E.D.N.C. 1965) (asking "[i]s the State merely lending the color of authority to what would otherwise be unlawful conduct under the Sherman Act? This the State cannot do," and then examining state law that *required* insurer membership in a rating bureau, and concluding that sufficient safeguards, including the right to file for deviations and the public protest, existed to allow for competition). While the Ohio statutory scheme does not provide for unfettered collaboration between insurers, it does incorporate several procedural safeguards designed to promote competition.[27] First, in the sentences immediately following §

---

[27] Indeed, Plaintiffs themselves cite to an example of an insurance company "not a party to Defendants' price-fixing agreement," Entitle Direct Insurance, that allegedly offers lower prices than Defendants.

3935.06's authorization of "[c]o-operation among rating bureaus, and among rating bureaus and insurers," the superintendent is given the power to "review such co-operative activities and practices and if, after a hearing, he finds that any such activity or practice is unfair, unreasonable, or otherwise inconsistent with such sections, he may issue a written order [. . .] requiring the discontinuance of such activity or practice." *Id.* Moreover, the public has the right to complain to the superintendent: "[a]ny person or organization aggrieved with respect to any filing that is in effect may make written application to the superintendent for a hearing thereon [. . .]." § 3935.05(D).

Next, insurers are not required to become a member of, or a subscriber to, any rating bureau. § 3935.04(B). Beyond merely not requiring membership, however, the statute allows for competition by allowing non-members to subscribe to the rating services provided by the rating bureaus, which "shall furnish its rating services without discrimination to its members *and* subscribers." § 3935.06 (emphasis added). Finally, the statutory scheme provides that any insurer who has filed a rate through a rating bureau "may make written application to file a deviation from the class rates, schedules, rating plans, or rules respecting any kind of insurance [. . .]." § 3935.07. Indeed, the superintendent "shall issue an order permitting the deviation if he finds it is justified [under the code]" and shall only deny such application for a deviation if "he finds that the resulting premiums would be excessive, inadequate, or unfairly discriminatory." § 3935.07.

Note that the Ohio insurance code is not necessarily intended to *encourage* competition. Indeed, the introductory statute states that the code does "not prohibit or encourage reasonable competition, or prohibit or encourage uniformity in insurance rates

64

[. . .]." OHIO REV. CODE § 3935.01; *see also* OHIO GEN. CODE § 9592-1 (substantially same). But, as discussed in the preceding paragraph, the scheme *allows* competition sufficient to exempt Defendants' alleged behavior from scrutiny under the Sherman Act, and therefore by analogy, to the Valentine Act. Plaintiffs insist that that more competition by title insurance companies "is not only possible, but [would] produce the substantial and predictable benefits to consumers one would expect." (Doc. No. 115-1 at 3-4 (citing lower title insurance prices in Iowa).) But "the question before [this Court] is not whether the Ohio method of regulation compares favorably with the regulations of other states, or whether it is an ideal manner in which to regulate the business of insurance." *Ohio AFL-CIO,* 451 F.2d at 1183. Plaintiffs may well be correct that a different statutory scheme would ultimately benefit Ohioans. But this is a determination for the Ohio General Assembly, not this Court.

Because the Court arrives at the same conclusion as the Magistrate Judge as to the viability of Plaintiffs' state antitrust claim, but via different analysis, the Court **ADOPTS** the Magistrate Judge's conclusion but **REJECTS** her analysis. Defendants' motion to dismiss Plaintiffs' claims under the Valentine Act is **GRANTED.**

## IV.        THE NATURE OF THE DISMISSAL

Defendants also object to the Magistrate Judge's Report to the extent that it recommends that the Consolidated Complaint be dismissed without prejudice. After determining that Plaintiffs' claims were barred by the filed rate doctrine and/or the McCarran-Ferguson Act, the Magistrate Judge suggested that the dismissal be without prejudice to afford Plaintiffs the opportunity to "amend the Complaint to meet the *Twombly/Iqbal* standard, if possible." (Report at 56.) Defendants insist that this result is

inconsistent with the Magistrate Judge's determination that Defendants' conduct is exempt from antitrust scrutiny.

"The dismissal of a complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6) is a 'judgment on the merits,' and is therefore done with prejudice." *Pratt v. Ventas, Inc*., 365 F.3d 514, 522 (6th Cir. 2004) (citing *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 399 n.3 (1981)). While Plaintiffs acknowledge that the Magistrate Judge found that, as a matter of law, the Sherman Act claim was barred by the filed rate doctrine, they underscore the fact that she left open the possibility that a federal claim for injunctive relief may still exist. Plaintiffs forget, however, that the Magistrate Judge also found, and this Court agrees, that the McCarran-Ferguson Act is a complete bar to Plaintiffs' federal antitrust claim. *See, Ohio AFL-CIO*, 451 F.2d at 1185 (in affirming the dismissal of a federal antitrust action seeking damages and injunctive relief, the Sixth Circuit observed that: "Concluding, as we do, that the complaint failed to state a claim on which relief could be granted, it would not be proper to remand the action to the district court [...].") *See, e.g., Commander Leasing Co*., 477 F.2d at 86 (dismissal of federal antitrust action seeking damages and injunctive relief as barred by the McCarran-Ferguson Act).  It would, therefore, be an exercise in futility to permit Plaintiffs to further amend. *See Sinay v. The Lamson & Sessions Co*., 948 F.3d 1037, 1041 (6th Cir. 1991). Defendants' objection is, therefore, **SUSTAINED**, the Court **REJECTS** the portion of the Report that recommends a dismissal of the federal antitrust claim without prejudice,

and the Sherman Act claim is **DISMISSED** with prejudice.[28]

The same logic holds true for Plaintiffs' Valentine Act claim. The focal point of Plaintiffs' Consolidated Complaint is the challenge to the manner in which proposed title insurance rates are brought before the Ohio Department of Insurance. Yet, as this Court has determined, Defendants' activities in arriving at these proposed rates are not unlawful and are permitted under the governing statutes. In fact, this collaborative rate-making was contemplated when the Ohio General Assembly put this regulatory framework into place. Because the conduct which forms the basis of Plaintiffs' case is not unlawful, Plaintiffs could not re-plead in such a way that would state a cause of action under Ohio law. Any such attempt would be futile, and will, for that reason, not be permitted. Plaintiffs' Valentine Act claim will also be **DISMISSED** with prejudice, and the portion of the Report that recommends dismissal of this claim without prejudice is **REJECTED**.

**CONCLUSION**

For all of the reasons set forth in this Memorandum Opinion, the Magistrate Judge's Report and Recommendation (Doc. No. 102) is **ADOPTED**, in part, and **REJECTED**, in part. Both of the claims in the Consolidated Complaint shall be **DISMISSED**, with prejudice, against all Defendants. Defendants' Joint Motion to

---

[28] The Court finds that the dismissal of the corporate parent Defendants should also be with prejudice. The Magistrate Judge correctly determined that a corporate parent Defendant could not be liable under the Sherman Act merely for approving or assenting to the actions of its affiliate or subsidiary. *See Cupp v. Alberto-Culver USA, Inc.*, 310 F. Supp. 2d 963, 973-74 (W.D. Tenn. 2004). She recommended that these defendants be dismissed, without prejudice, for this additional reason. Because Plaintiffs have not alleged any facts that would suggest that the corporate parent Defendants played a role in any alleged conspiracy, the Court finds that it would be futile to permit Plaintiffs leave to attempt to re-plead a cause of action against them.

Dismiss for failure to state a cause of action (Doc. No. 43) is **GRANTED**, and Defendant Old Republic's Motion to Dismiss (Doc. No. 41) is also **GRANTED**. Defendant Stewart's Motion to Dismiss (Doc. No. 42) is **DENIED** as moot. The Clerk is directed to close the following cases: Case No.1:08CV677, 1:08CV678, 1:08CV741, 4:08CV750, 1:08CV803, 1:08CV1021, 5:08CV1289, and 1:08CV1836.

        **IT IS SO ORDERED**.

Dated:    March 31, 2010

                        **HONORABLE SARA LIOI**
                        **UNITED STATES DISTRICT JUDGE**